IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,    )
       Plaintiff,          )
                      )
vs.                        )     Case No. 16-10141-02-EFM
                      )
PATRICK STEIN,          )
          Defendant      )
_____)

**SENTENCING MEMORANDUM**

On April 18, 2018, a jury convicted Patrick Stein of Conspiracy to Use a Weapon of Mass Destruction and Conspiracy to Violate Civil Rights. These convictions were based largely upon voluminous recordings of Patrick discussing his desire to kill Muslim residents of Garden City, Kansas, and upon the government's surreptitious encouragement of those desires through the use of confidential informants and undercover agents. Patrick Stein now stands convicted and facing sentencing.

## I. INTRODUCTION

For one who only listened to the trial evidence, one might think Patrick Stein's story begins and ends with hate. But Patrick's story does not begin with his sentencing, his conviction, his trial, or even with his involvement in a militia.

When Patrick was born, his mother was in the throes of alcoholism—a battle she would not overcome until Patrick was over 11 years old. For the first few years of his life, Patrick was—per other members of his family—the kid tasked with "keeping a beer

in mom's hand." Perhaps unsurprisingly, when he was 10, Patrick had his own first experience with alcohol.

Alcohol got a grip on Patrick. When he was only 14, Patrick was placed in inpatient drug and alcohol treatment for the first time. Over the next 30 years, this pattern emerged. Substance abuse. Family strife. Business or personal failure. Medical detoxification. Treatment. Repeat.

Patrick would ultimately require multiple medical detoxifications. He would receive substance abuse treatment—both in- and outpatient—several times in his life. He would ultimately receive mental health treatment, including prescriptions for ADHD, depression, anxiety, insomnia, and alcohol dependency.

Patrick's struggle with dependency and mental health issues contributed to the failure of two marriages, the estrangement of his sons, and an inability to find connection or success in work, and even placed him in a situation that caused Patrick to become the victim of a violent crime while working as a truck driver.[1] The destruction wrought in Patrick's life was consistent, continuous, and contributory to the story of this case.

The patterns of failure and strife in Patrick's life consistently led him to seek acceptance and to belong to organizations with purpose. In the mid-2000s, Patrick sought to establish a biofuels plant that he could run and operate with, and on behalf of, his family and outside investors. When that failed along with the economy in 2008, Patrick

---

[1] See Paragraph 102 of the presentencing report.

was unmoored and struggling. He became consumed by fear and anger, seeking to fill the holes in his life with substances and by pursuing duty and "brotherhood" in an organization with purpose—the militia.

And then in 2016, he met Dan Day.

Rather than try to use Dan Day to talk Patrick Stein out of his fearful beliefs, or encourage him to use nonviolent means to address his fears about Muslims, rather than tell him it was ok not to pursue action, rather than have agents knock on Patrick's door and interview him to scare him and disrupt his thinking, the FBI chose to use Dan Day to reinforce every one of Patrick Stein's beliefs, his rhetoric, and his hate, for their own ends.

And in Patrick Stein, they found the perfect, vulnerable target. Patrick had relapsed into alcohol use following his most recent inpatient treatment in Prescott, Arizona in late 2013/early 2014. His relapse continued until at least the beginning of his engagement with the Kansas Security Force, and he used methamphetamine regularly for at least 5 months after meeting Dan Day (and likely further along into the conspiracy for which he was convicted). In fact, the FBI suspected Patrick was using methamphetamine regularly well into his interactions with Dan Day. In an instant message, Agent Amy Kuhn wrote regarding Patrick that "[h]e is kind of all over the place right now, I'm guessing he is using more meth causing him to be all over." (FBI Instant Message from Agent Amy Kuhn to Agent Mark Engholm, May 13, 2016, at 3:01 p.m.). Patrick's

vulnerability made him subject to influence, and the government's uncritical acceptance and endorsement of all of Patrick's views, through the "yes men" of Dan Day and UCE Brian, wielded such influence to motivate Patrick.

Dan Day and UCE Brian pushed, prodded, and encouraged Patrick to engage in and continue a conspiracy to use a weapon of mass destruction, as well as to violate the civil rights of Muslim residents of Garden City. And while his decision to engage in that conspiracy was wrong, and although he has been convicted of that conspiracy, his sentence should reflect the reality of that conspiracy, not the rhetoric of the government. The reality of the conspiracy is that, at the time of Patrick's arrest, it had no bomb. It had in its possession a total of 1 gram of actual explosive material. It had not acquired the means to make a bomb, the ingredients to complete a bomb, or the ingredients or materials to make even a sizable part of a bomb.

At its best—or worst—the conspiracy was at least 1 week away from obtaining some type of device supplied by the government. It was about 1 month away from any operational plan. And at the moment of Patrick's arrest, the conspiracy had not settled on the means, the personnel, the time, the tactics, or the reality of an actual attack. The conspiracy remained primarily in the realm of the rhetorical.

These arguments are not made to "relitigate" the trial. Patrick has been convicted of conspiracy. And he will be sentenced for conspiracy. But Patrick should be sentenced for the "reality" of his offenses—largely rhetorical—and not as if the object of the

offense had happened in reality. Talking about a bomb is different than planning to acquire a bomb. Planning to acquire a bomb is different than possessing a bomb. Possessing a bomb is different than placing a bomb. Placing a bomb is different than detonating a bomb.

Pursuant to 18 USC § 3553(a), Patrick is to be sentenced for what he did, not what he might have done.

## II. FEDERAL SENTENCING UNDER 18 USC § 3553(a)

The primary directive of federal sentencing is that any sentence imposed must be "sufficient, but *not greater than necessary*," to accomplish the purposes of punishment. 18 USC § 3553(a). Rather than being hamstrung by a mandatory Guidelines calculation, a court may impose a non-Guidelines sentence (1) "on the basis of traditional departure grounds," (2) "because the Guidelines sentence itself fails to properly reflect § 3553(a) considerations," or (3) "because a case warrants a different sentence regardless." *United States v. Rita*, 127 S. Ct. 2456, 2465 (2007). "[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Id.*

In *United States v. Angel-Guzman*, 506 F.3d 1007 (10th Cir. 2007), Judge McConnell cautioned that when the district court is considering what sentence to impose, "[t]he Sentencing Guidelines range does not apply, even presumptively, until the court has considered all relevant circumstances in light of § 3553(a)." *Id.* at 1015.

18 U.S.C. § 3553(a) requires the Court to "impose a sentence sufficient, but not greater than necessary" to achieve the goals laid out in Subsection (a)(2), which states a sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and provide the appropriate correctional treatment to the defendant. In the determination of a "sufficient" sentence, the statute further requires the Court to consider a number of factors, including: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed [to accomplish the (a)(2) goals set out above]; (3) the kinds of sentences available; (4) []the sentencing range established . . . in the guidelines; (5) any pertinent policy statement . . . issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(1)-(7).

Sentencing requires "nuance and careful discrimination between and among cases and defendants based on the factors enumerated in 18 U.S.C. § 3553. That nuance is impossible under a Guideline that is structured as bluntly as [the terrorism enhancement]." *United States v. Jumaev*, 12-CR-00033-JLK, USDC Colorado, "Memorandum Opinion and Order on Sentencing," (Doc. 1920), at 21, July 18, 2018 (internal quotations omitted and brackets added).

Conspiracy to Use a Weapon of Mass Destruction carries a statutory maximum sentence of life imprisonment. 18 U.S.C. § 2332a (a)(4). The statutory sentence of the civil rights violation is not more than ten (10) years. 18 U.S.C. § 241. Patrick Stein respectfully submits that the 3553(a) factors support a sentence substantially less than life. A sentence of no more than 15 years, with a lengthy postrelease supervision period, is "sufficient" to accomplish the goals of the statute, and a term of longer imprisonment is "greater than necessary" to achieve the same goals.

### III. SENTENCING FACTORS

#### A. Nature and Circumstances of the Offense

##### 1. General Circumstances

Despite nearly four (4) weeks of testimony, including that of FBI Special Agent Amy Kuhn, and paid FBI Confidential Human Source Dan Day, the majority of evidence consisted of audio recordings of the defendants discussing the use of explosive devices at the Mary Street apartments in Garden City, Kansas. Dan Day made these recordings as part of his "undercover" persona for the FBI while pretending to be a member of the conspiracy.

Patrick Stein was afraid of the Muslim refugees that had come to live in the western Kansas towns of Liberal, Dodge City, and particularly Garden City, Kansas. As trial testimony showed, Patrick conducted surveillance, from a distance, on the African Mall in Dodge City. During cross-examination, CHS Dan Day testified that Mr. Stein

told him that the surveillance was conducted during the day and using binoculars (Dan Day, Trial Tr. 4/3/18 (real-time) at p. 256-57) . Patrick Stein also participated in surveillance with Jason Crick's militia group at the Somali mall in Garden City in February 2016. *Id*. at 258.

Patrick was afraid of Muslims because of what he read about them on the internet and the videos he watched on YouTube. Dan Day testified "I heard all kinds of YouTube videos that he watched, not just Muslims, and that's the reason that he didn't like Muslims." *Id.* at 287. Patrick's knowledge of the Quran, the Muslim holy book, came directly from the internet and conservative talk-show hosts such as Sean Hannity and Michael Savage. Patrick himself had never read the Quran, nor had he participated in a comparative study of any religion.

All of Patrick's exposure to the Muslim religion has been negative—by choice, through the media to which he exposed himself, and by government design through Dan Day and the UCE. Dan Day provided false information to Patrick and the others about Somali men wearing expensive suits, (Dan Day, Trial Tr. 4/3/18 (real-time) at p. 105, 242), driving new vehicles, (9-4-16 Phone call between Dan Day and Patrick Stein), and overtaking apartment buildings (Lula Harris, Trial Tr. 3/26/18 (real-time) at p. 329). Dan Day also implied that the residents of the Mary Street apartments were involved in some form of illegal trafficking—whether of guns, (Dan Day, Trial Tr. 4/3/18 (real-time) at p. 104), drugs (*Id.* at 105), or humans (*Id.*). All this information was untrue, and it was all

calculated to stoke Patrick's fear and thus hatred of Muslims in general and the residents of Mary Street in particular.

## 2. Speculative vs. Actual Danger

When Patrick Stein was arrested, the total amount of actual explosive material possessed among all three co-defendants was approximately 1 gram (Dr. Jack Barrow, Trial Tr. 4/9/18 (real-time) at p. 14, 32, 45, 69, 71-72; Dr. Jason Miller, Trial Tr. 4/5/18 (real-time) at p. 270). This quantity had been produced after months of talk and planning.

At worst, when Patrick was arrested, he was about one week away from having some kind of "explosive device" created from his inert, non-explosive urea, despite there being no evidence he could have created it himself, had even tried, or even knew how to do it. Further, even upon the delivery of the fictional "bomb" to be provided by the UCE in this case, Patrick would have been, at best, over 3 weeks away from any theoretical attack.

The "attack" upon which the government builds its sentencing case is entirely speculative. To punish someone for the characteristics of what a theoretical attack over a month away could have been requires so many assumptions as to render it as counterfactual as assuming the attack would never have actually happened. In other words, if the government gets to fill in the gaps between the arrest and the attack with speculation as to the actual follow-through, it is equally fair for the court to consider

speculation of things that would have disrupted actual follow-through or changed the minds of the defendants.

So, for instance, there are questions and details that were never discussed among the co-defendants about carrying out an actual attack on an actual place against actual people at an actual date and time. To answer operational questions about an actual attack, the government must speculate.

Further, there are questions about external factors that could have intervened to prevent an actual attack, even assuming operational questions were answered. To answer these questions about external forces regarding an actual attack, the government must speculate.

Why does this matter? Because a sentence, in this case, should reflect the actuality, likelihood, and imminence of danger—not the dangerousness or vileness of the defendants' words. In a "terrorism" prosecution, determining the actual intent of defendants is an "inevitably speculative endeavor." Amy Waldman, The Atlantic, "Prophetic Justice," October 2006, at

https://www.theatlantic.com/magazine/archive/2006/10/prophetic-justice/305234/

(accessed October 23, 2018). While the danger of such a speculative endeavor can be mitigated in prosecutions of stings for drug crimes, as drug crimes are typically "common and oft-repeated behaviors," in "terrorism" cases, the actual risk and behavior is

"exceedingly rare." Jesse Norris, "Why the FBI and the Courts Are Wrong About

Entrapment and Terrorism," 84:5 MISSISSIPPI L.J. 1257, 1322 (2015). Thus:

> Drug . . . stings are meant to ensnare people who have already habitually
> engaged in these crimes but have eluded detection. Terrorism stings, in
> contrast, are meant to stop people who would have engaged in terrorism in
> the future. This makes all the difference. In the drug context, for example, a
> defendant's immediate willingness to sell drugs to an undercover informant
> is a strong indicator that he was in the habit of selling drugs. . . In the case of
> terrorism, however, . . . the chance that a particular person, even one who
> holds robustly pro-terrorist views, will commit a terrorist attack is
> extraordinarily low.

*Id.* at 1322-23. Thus, a mitigated sentence can be used to minimize the risks associated

with the speculative nature of the objects of the crimes.

To be clear, the questions above are not guilt questions—the defendants' words

and expressions of agreement, along with the limited actions they took, led a jury to

convict them of conspiracy. The questions are, however, circumstance, seriousness, and

danger questions. This case is largely a rhetorical case—about words. The government,

from the beginning of their opening, started not with actions, but with words. (*See*

Government Opening, Trial Tr. 3/22/18 (real-time) at p. 52 ("Number one, the

cockroaches got to go, period. That was a comment that defendant Patrick Stein made . . .

."). The words spoken by the Patrick Stein were plentiful, violent, hateful, and

consistently shared among the group. As the Court noted in an earlier hearing, Mr. Stein

was "extraordinarily loquacious."

The actions taken by Patrick Stein, however, were small, isolated, hidden, not

communicated to the group, sometimes contradictory, sometimes slowly undertaken,

sometimes not undertaken at all, disorganized, ad hoc, unplanned, insignificant, left a lot to do, and largely reflected his inability to actually accomplish anything of meaning, particularly without the help of the FBI. The sentence should reflect that fact.

Further, the actions not taken by the FBI reveal their true belief about the dangerousness of Patrick Stein. At the outset, the FBI never intervened to tell Patrick to "knock it off," even before he had begun "organization mode." The government mocked that notion in court, but in reality, it is a strategy used both in other cases and districts and in this district. The FBI never put Patrick under full-time surveillance. They never monitored, in real-time, a GPS tracker on Patrick. They never surveilled the mosque, or warned the mosque, or warned local law enforcement or local Muslim leaders or the apartment owners. This despite the fact that Patrick Stein had supposedly wanted to just go "kick in doors" and start shooting and could have done so anytime he wanted.

Even when they thought the group "had everything they needed" (Dan Day, Trial Tr. 4/2/18 (real-time) at p. 32, 126, 154); (Dan Day, Trial Tr. 4/3/18 (real-time) at p. 217-18) (Amy Kuhn, Trial Tr. 4/10/18 (real-time) at p. 198, 204, 241) to make a bomb "within hours," (Dr. Jack Barrow, Trial Tr. 4/9/18 (real-time) at p. 112-13), the FBI chose not to arrest Patrick Stein. Rather, they decided to leave him out, un-surveilled and un-monitored, and the community un-warned. They continued to send in Dan Day, an untrained paid informant, to do nothing other than continue to wear a wire and completely agree with the defendants, to "maintain his persona." Even later, they chose

not to arrest any of the defendants, but rather to introduce a UCE to create more evidence and more chargeable offenses.

All of these observations are made not to criticize the FBI's choices, but rather to note that the FBI's choices were based on a real-time assessment of the real danger of the defendants. Either the FBI concluded that the defendants posed no real, imminent danger to the public and thus were safe to leave un-arrested, or they decided to dangle the public as bait so they could get more and sexier charges. If the defendants were truly, to the FBI's knowledge, hours away from being able to make their own bomb, the defendants must not have really wanted to make their own bomb because they never did.

In reality, the timeline for the defendants obtaining their own explosives was long. After months of talking and weeks of work, the defendants had managed to have in their possession at the time of arrest a total of 1 gram of explosive material. After the introduction of the UCE, the FBI accelerated that timeline to 1 week for a completed bomb, even though Patrick Stein provided inert urea instead of the much more volatile ammonium nitrate—apparently not even understanding the difference. The FBI filled in all the gaps in Patrick's knowledge, wherewithal, and ability with a deus ex machina, in the form of Brian, that solved all of the problems with the "real danger" narrative the government was trying to sell. The acceleration of the timeline, and the resulting perception of danger was artificial and speculative and should be considered as such.

*3. 2016*

18 USC § 3553(a) requires the court to consider the circumstances of the offense when crafting an appropriate sentence. Those circumstances must include the backdrop to this case. 2016 was "lit." The court cannot ignore the circumstances of one of the most rhetorically mold-breaking, violent, awful, hateful and contentious presidential elections in modern history, driven in large measure by the rhetorical China shop bull who is now our president.

Much has been written about Trump's election, but two things are relevant to the time period surrounding this case. First, almost no one thought Trump was going to win . Second, Trump's appeal as the voice of a lost and ignored white, working-class set of voters (Patrick Stein) is the connection most often cited for his ultimately surprising victory.

This matters for two reasons. First, Trump's brand of rough-and-tumble verbal pummeling heightened the rhetorical stakes for people of all political persuasions. A personal normally at a 3 on a scale of political talk might have found themselves at a 7 during the election. A person, like Patrick, who would often be at a 7 during a normal day, might "go to 11." *See* Spinal Tap. That climate should be taken into account when evaluating the rhetoric that formed the basis of the government's case.

Second, Patrick Stein was an early and avid supporter for Donald Trump. His connection to Donald Trump was so complete and long-standing that the surprising win cannot be ignored when evaluating the actual danger or likelihood of an actual attack.

Trump's win changed everything, and it is reasonable to speculate that it would have changed things among the defendants as well. The urgency for action would be gone. The feeling of a losing battle would be gone. The conspiracies, in part, would be disproven as the transition from Obama to Trump took place. It is logical to conclude that the discussed attack would never have happened in the world that existed post-Trump.

### B. History and Characteristics of the Defendant

In their book *Why We Hate*, authors Jack Levin and Gordana Rabrenovic describe patterns that can lead individuals to hate-motivated activities and crimes:

> Frustration increases the likelihood that an individual will turn violent. People who cannot fulfill their goals and are dissatisfied with their lives may decide to strike back against those they regard as responsible for their plight. . . Moreover, there are circumstances in which the true source of the frustration is difficult if not impossible to identify. . .

> When the source of our difficulties is very powerful or difficult to identify or both, we tend to redirect or displace our anger to some innocent target, especially a target that is both visible and vulnerable. In other words, we tend to attack someone who is easily identifiable and likely incapable of striking back.

Jack Levin & Gordana Rabrenovic, <u>Why We Hate</u> 25-26 (2004) (Hereinafter "Why We Hate").

Levin and Rabrenovic also describe the language used in hate-motivated crimes committed by the defendants (and Americans in general):

> The enemy is typically dehumanized, in an effort to reduce the feelings of guilt and shame associated with murdering decent and honorable human beings. Often the "other" has been referred to as a "cancer" that needs to be removed from society. Serving as the equivalent of the N-word

for blacks, the term *gook* has, for example, been employed in a long history
of supporting wars waged against Asians by the United States.

Why We Hate at 35-36. As this Court is well aware, in this case, the terms used were

"cockroaches" and "infestation."

These opening paragraphs of Why We Hate read like a synopsis of Patrick Stein's

pre-sentencing report, which contains an accurate and detailed report of Patrick's history

and personal characteristics, thus eliminating the need to report such information here.

### C. Goals of Sentencing

*i. The need for the sentence imposed to reflect the seriousness of the offense, to
promote respect for the law, and to provide just punishment for the offense.*

Patrick Stein does not deny the seriousness of his offense but respectfully suggests

that a 15-year sentence with at least 10 years of supervised release would adequately

reflect the seriousness of the offense, promote respect for the law and provide just

punishment. If he were sentenced to 15 years, Patrick Stein will have spent about half of

his remaining life in prison upon his release, a strong signal of the seriousness of the

offense. *See United States v. Amawi*, 695 F.3d 457, 488 (6th Cir. 2012) ("[I]t was

reasonable for the district court to credit the fact that if he serves his entire sentence, he

would have spent nearly half of his remaining life in prison when released.") (brackets

added).

Additionally, Patrick Stein is now a convicted felon and will remain a convicted

felon for the remainder of his life. In the eyes of his community, the state of Kansas, the

country and the government, he is also a terrorist and no matter where he goes after he is

released he will be under some form of observation. As this Court is aware, serious collateral consequences—aside from the personal shame—adhere to a felony conviction.

*ii. The need for the sentence to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant.*

A 15-year sentence would also adequately satisfy this statutory factor. Such a sentence, in conjunction with mandatory supervision, would adequately deter Patrick Stein from re-offending and, generally would protect the public from Patrick Stein committing further crimes. Lengthy supervised release has been held to be additional deterrence and protection. *See id.*

### D. Kinds of Sentences Available

This Court has discretion in setting the terms and conditions that Mr. Stein must follow while he is on supervised release. Considering options in supervised release, as well as its availability, is an important part of the "individualized determinations" required under 18 U.S.C. § 3553(a). *United States v. Wright*, 747 F.3d 399, 417 (6th Cir. 2014).

### E. The Guidelines Range and the Policy Statements

Mr. Stein has addressed the guidelines range and policy statements in his arguments and objections to the PSR. He would apply those arguments here to the extent that they show a reduced guideline range.

**F. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

Comparison with other "terrorism" cases throughout the country reveals that sentences vary widely, but most remain far below the range of life. In fact, as of 2011, just over 10% of individuals prosecuted and sentenced in association with "terrorism" were sentenced to 15 years or longer. Francesca Laguardia, *Terrorists, Informants, and Buffoons: The Case for Downward Departure as a Response to Entrapment*, 17 Lewis & Clark L.Rev. 171, 190 (2013). This reflects the reality that:

> In the terrorism context, laughably incompetent criminals of little motivation and few philosophical opinions appear upon arrest as scheming ideological masterminds requiring immediate intervention, only to have those appearances dissipate over the months and years of prosecution that follow. As incompetent and directionless oafs, the harsh sentences aimed at true terror masterminds would seem entirely inapplicable.

*Id.* at 175. In fact, despite the rhetoric of the prosecution:

> [I]ncidents of terrorism thus far have not been accomplished by individuals who have learned to build bombs through Internet postings or *The Anarchist Cookbook*. Instead, training is required in order to turn an aspiring terrorist into an actual threat. As Peter Bergen has stated, "It's ridiculous to think that the U.S. or any other military would do its training over the Internet . . . Radicalization is one thing, having operational cells with the capacity to launch attacks is something else entirely."

*Id.* at 191.

In this case, involving more "incompetent and directionless oafs" than "scheming ideological masterminds," a sentence in excess of 15 years would be inappropriate. Analysis of a variety of cases with similar, or worse, conduct, reveals that defendants are often given lesser sentences.

In *United States v. Abu Khalid Abdul-Latif*, (11-CR-00228-01-JLR (W. D. Wash)), the defendant pleaded guilty to conspiracy to murder United States agents and to use weapons of mass destruction. **Abdul-Latif** had planned to attack a military recruit processing office, using automatic weapons and grenades. According to the government, the defendant wanted to attack when he could get the "largest possible gathering" of recruits and family members, and his "goal" was to "inspire others with a message of hate." Abdul-Latif took steps to plan the attack and purchase weapons, and despite his guilty plea, "has not disavowed the radical ideology that inspired his attack plot, nor has he expressed any meaningful remorse." He was sentenced to 18 years in prison. *See Press Release*, United States Attorney's Office Western District of Washington, "Seattle Man Sentenced to 18 Years in Prison for Plot to Attack Seattle Military Processing Center," March 25, 2013, *at* https://archives.fbi.gov/archives/seattle/press-releases/2013/seattle-man-sentenced-to-18-years-in-prison-for-plot-to-attack-seattle-military-processing-center (accessed October 3, 2018).

Abdul-Latif's co-defendant, **Walli Mujahidh**, (11-CR-00228-02-JLR (W. D. Wash)), was described as a "cold-hearted, enthusiastic partner" who "talked at length in recorded conversations about the innocent people he planned to gun down." In addition, he actually traveled from Los Angeles to Seattle, with the purpose to secure weapons and then carry out the attack. He was sentenced to 17 years in prison. See *Press Release*, United States Attorney's Office Western District of Washington, "Former Los Angeles

Man Sentenced to 17 Years in Prison for Role in Plot to Attack Seattle Military Processing Center," April 8, 2013, *at* https://archives.fbi.gov/archives/seattle/press-releases/2013/former-los-angeles-man-sentenced-to-17-years-in-prison-for-role-in-plot-to-attack-seattle-military-processing-center (accessed October 3, 2018).

**Aziz Sayyed** (18-CR-00090-AKK-HNJ (N. D. Alabama)), pleaded guilty to plotting a terror attack in Huntsville, Alabama, as well as pledging support to ISIS. He had acquired chemicals for a bomb attack similar to one that had previously been successful in Manchester, England. He was sentenced to 15 years in prison and lifetime postrelease supervision. *See* David Kumbroch, WHNT.com, "Man Sentenced to 15 Years in Prison for Planning Terror Attack in Huntsville, Pledging Support for ISIS," June 20, 2018, *at* https://whnt.com/2018/06/20/man-sentenced-to-15-years-in-prison-for-planning-terror-attack-in-huntsville-pledging-support-for-isis/ (accessed October 3, 2018).

**Rezwan Ferdaus,** (11-CR-10331-RGS (D. Mass)), was sentenced to 17 years in prison after pleading guilty to attempting to damage and destroy a federal building (the Pentagon) and attempting to provide material support to terrorists. He constructed IED detonation components, supplying 12 of them to a UCE he believed to be a member of al Qaeda, with "the intention that they be used to kill U.S. soldiers overseas." When told that his devices had killed soldiers, Ferdaus said he felt "incredible," and that was "exactly what [he] wanted." After multiple deliveries, with confirmed "kill" counts, Ferdaus made a training video for al Qaeda demonstrating how to construct detonators.

He also planned to fly an explosives-laden drone into the Pentagon and follow with a ground attack. He traveled to Washington D.C. to conduct surveillance, and he obtained explosives and automatic weapons. During this investigation, FBI UCEs told Ferdaus "more than 25 times that he did not have to go through with his plan…that there was no shame in backing out, and that he could turn back at any time." *See Press Release*, United States Attorney's Office District of Massachusetts, "Man Sentenced in Boston for Plotting Attack on Pentagon and U.S. Capitol and Attempting to Provide Detonation Devices to Terrorists," November 1, 2012, *at*

https://archives.fbi.gov/archives/boston/press-releases/2012/man-sentenced-in-boston-for-plotting-attack-on-pentagon-and-u.s.-capitol-and-attempting-to-provide-detonation-devices-to-terrorists (accessed October 3, 2018).

Where longer sentences are given, even those sentences do not reach life, and they are often reserved for more completed acts or more immediate dangers.

For example, **Mohamed Osman Mohamud**, (10-CR-00475-HZ (D. Oregon)), a Portland man, actually placed a "bomb" (provided by the FBI) near a Christmas tree lighting ceremony with the goal of getting "the most casualties." *United States v. Mohamud*, 843 F.3d 420, 429-30 (9th Cir. 2016). He connected the wires on a "detonator" and used a cell phone to attempt to "detonate the bomb." Following his arrest, FBI agents found videos of past Portland Christmas Tree Lighting Ceremonies, al Qaeda videos,

references to "jihad," and plans to "secure [him]self from the FBI." *Id.* The jury rejected his entrapment defense, and he was sentenced to 30 years imprisonment. *Id.* at 431-32.

**James Cromitie,** (09-CR-00558-Cm (S. D. N.Y.)), was convicted of conspiracy and attempt to use weapons of mass destruction for a plot to attack an Air National Guard Base in New York and to bomb two synagogues in the Bronx. *United States v. Cromitie*, 727 F.3d 194, 199 (2d Cir. 2013). In that case, the defendant drove and placed "bombs" in the trunks of pre-parked cars, after surveilling targets and establishing battle plans. *Id.* at 203. He was sentenced to a 25-year mandatory minimum sentence under 18 U.S.C. § 2332g – Conspiracy to acquire and use anti-aircraft missiles.[2] *Id.* at 204.

**Michael Finton**, (09-CR-30098-DRH-CJP (C. D. Ill.), an Illinois man, pleaded guilty to attempting to use a weapon of mass destruction to bomb a federal courthouse in Springfield, Illinois. He parked a truck with a completed "bomb," activated a timer, and then called a detonator via cell phone with the hope that he would "kill innocent civilians, committed public servants, and dedicated first responders." He also hoped that his bomb would be big enough to destroy a target across the street—a congressman's office. He received 28 years in prison. *See Press Release*, United States Attorney's Office Central District of Illinois, "Illinois Man Admits Plotting to Bomb Federal Courthouse and Is Sentenced to 28 Years in Prison," May 9, 2011, *at*

---

[2] Mr. Cromitie was convicted of: Count 1 – Conspiracy to use a weapon of mass destruction 18 U.S.C. § 2332a; Count 2-4 – Attempt to use a weapon of mass destruction 18 U.S.C. § 2332a; Count 5 Conspiracy to acquire and use anti-aircraft missiles 18 U.S.C. § 2332g; Count 6 – Attempt to acquire and use anti-aircraft missiles 18 U.S.C. § 2332g; Count 7 – Conspiracy to kill officers and employees of the United States 18 U.S.C. §§ 1114, 1117; and Count 8 – Attempt to kill officers and employees of the United States 18 U.S.C. §§ 1114, 2.

https://archives.fbi.gov/archives/springfield/press-releases/2011/si050911.htm (accessed October 3, 2018).

In cases involving support for foreign-oriented terrorism or actual battlefield training or involvement, sentences have been similarly circumscribed.

**Hamid Hayat,** (07-10457 (N. D. Cal.)), was convicted of providing material support to terrorists for actually attending a "terrorist training camp in Pakistan" and returning to the United States "to await orders to carry out a terrorist attack." *United States v. Hayat*, 710 F.3d 875, 880 (9th Cir. 2013). He was sentenced to 24 years. *Id.* at 884.

**Tarek Mehanna,** (12-1461 (D. Mass)), was convicted of conspiring to provide material support to al Qaeda, providing material support, and conspiring to kill persons in a foreign country. *United States v. Mehanna*, 735 F.3d 32, 41 (1st Cir. 2013). He traveled to Yemen in search of a terrorist training camp and then provided translation services for articles and materials on pro-al Qaeda propaganda websites. *Id.* He was sentenced to 210 months (17.5 years). *Id.* at 40.

**Rafiq Sabir,** (05-00673-02-LAP) was sentenced to 25 years in prison for providing material support to al Qaeda for pledging allegiance and offering services as a battlefield doctor and a martial arts trainer. *United States v. Farhane*, 634 F.3d 127, 132-33 (2d Cir 2011).

**Jose Padilla**, the popularly-known "dirty bomber," was convicted of conspiracy to murder persons outside the United States and to provide material support to terrorists. *United States v. Jayyousi*, 657 F.3d 1085, 1091 (11th Cir. 2011). He and his co-defendants "formed a support cell linked to radical Islamists worldwide and conspired to send money, recruits, and equipment overseas." *Id.* at 1092. At sentencing, he was listed as a career offender "because of his extensive criminal history, which included 17 arrests and a murder conviction." *Id.* at 1117. He had received "al-Qaeda training." *Id.* Padilla was initially sentenced to 208 months, a downward departure from his 360-life range. *Id.* at 1115-16. That sentence was reversed. *Id.* at 1119. Upon resentencing, he was sentenced to 21 years, with a supervised release term of 20 years. *See* Amended Judgment, 04-CR-60001-MGC, Southern District of Florida, Miami Division (CM/ECF Document 1458) (September 9, 2014).

In "one of the most significant terrorism prosecutions in recent years," **Ahmed Abu Khatallah**, (14-CR-00141 (D. D.C.) the "mastermind" of the Benghazi attacks in Libya, was convicted of conspiring to provide material support to terrorists, maliciously destroying United States property, and using and carrying a semiautomatic weapon during the attack. He was sentenced to 22 years. He was accused of "heading an extremist militia and directing the attacks." Frank Miles, FoxNews.com, "Benghazi mastermind sentenced to 22 years in prison on federal terrorism charges," June 27, 2018, *at* https://www.foxnews.com/us/benghazi-mastermind-sentenced-to-22-years-in-prison-

on-federal-terrorism-charges (accessed October 3, 2018). Prosecutors, in that case, had

sought a life sentence, while the defendant requested 15 years. Khatallah's attack—he

was described as a "key plotter"—involved the "first killing of a U.S. ambassador while

in the performance of his duties in nearly 40 years," as well as 3 other individuals. *See*

Spencer S. Hsu, <u>Washington Post</u>, "Libyan militia leader gets 22-year sentence in

Benghazi attacks that killed U.S. ambassador," June 27, 2018, *at*

https://www.washingtonpost.com/local/public-safety/libyan-militia-leader-to-be-

sentenced-in-2012-benghazi-attacks-that-killed-us-ambassador/2018/06/27/55782e5c-

789a-11e8-aeee-4d04c8ac6158_story.html?utm_term=.eef2c004e966 (accessed October

3, 2018). (quoting Assistant U.S. Attorney Michael C. DiLorenzo).

Finally, the defendants in *United States v. Amawi,* (06-CR00719 (N.D. Ohio)),

were convicted of conspiracy to kill persons outside the United States, conspiracy to

provide material support to terrorists, and distributing information regarding the

manufacture of explosives. *United States v. Amawi*, 695 F.3d 457, 465 (6th Cir. 2012).

**Mohammad Amawi**, one of the defendants, traveled to Jordan to provide computers and

videos for jihadists going to Iraq. *Id.* at 467-68. He and his co-defendants "shared an

intent to engage in activities that were aimed at killing or maiming United States military

personnel" and had "provide[d] material support to these activities." *Id.* at 477. Each

defendant had an offense level of 58, with a terrorism enhancement-caused criminal

history of VI, and a guideline sentence of life imprisonment. *Id*. at 485. The district court

departed downward to sentences of 100 to 240 months imprisonment, and those sentences were upheld as substantively reasonable. *Id.* at 486-87. In that case, the district court specifically considered that if defendant Amawi served his entire 20-year sentence, he would have "spent nearly half of his remaining life in prison." *Id.* at 488. The court further found that the lifetime supervised release term would provide additional deterrence and security. *Id.*

In cases where longer terms of imprisonment are imposed, they often involve actual attacks.

For example, **Aafia Siddiqui,** (10-3916 (S. D. N.Y.)), was convicted of attempted murder of United States nationals (among other things) for gaining control of an M-4 rifle and shooting at American officials in Afghanistan while shouting "I am going to kill all you Americans" and "death to America" and other expletive-filled threats. *United States v. Siddiqui*, 699 F.3d 690, 696-97 (2d Cir. 2012). She was sentenced to 86 years. *Id.* at 696. She had been previously connected to various attempts to assassinate Afghan officials and carry out a "mass casualty attack." *Id.*

In recent years there have been two cases in Kansas in which a defendant reached the point of no return, only to be arrested before he could actually push the button on an FBI decoy bomb.

The first was the case of Terry Loewen. Mr. Loewen worked at Wichita's Eisenhower Airport and devised a plan, with the help of FBI Confidential Human

Sources thought to be members of *al Qaeda in the Arabian Peninsula*, to blow up an aircraft while it was on the tarmac and filled with passengers. He was arrested as he tried to gain access to the airfield with an inert FBI "bomb." Mr. Loewen did not know that the FBI and airport officials had deactivated the gate at which he attempted to gain access. *See* Complaint and Affidavit, *United States v. Loewen*, 13-CR-10200, Attached as Exhibit A. According to the government, "[t]here is no doubt that, had the plan gone as [Loewen] expected, ***hundreds*** of innocent travelers would have been killed." *United States v. Loewen*, 13-CR-10200-MLB (D. Kan), "Response of the United States to Defendant's Motion to Dismiss," (Doc. 94) March 2, 2015, at 1-2 (brackets and emphasis added).

Mr. Loewen pleaded guilty to one count of attempted use of a weapon of mass destruction and entered an 11(c)(1)(C) agreement with the government to 20 years, with lifetime supervised release. The government agreed that this sentence was "consistent with the sentencing factors of 18 U.S.C. § 3553(a)" and did "not offend the advisory sentencing guidelines" despite application of the terrorism enhancement. *United States v. Loewen*, 13-CR-10200-MLB (D. Kan), "Plea Agreement Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C)," (Doc. 108) June 8, 2015, at 3, 4 (brackets and emphasis added).

The second recent Kansas case is that of John Booker. Mr. Booker is one of the elusive North American "knuckleheads" that the government has apparently never seen

in the wild. In March of 2014, after seeing his post on Facebook that being killed in a jihad would be a "rush," the FBI went to tell him to, essentially, "knock it off." Agents knocked on Mr. Booker's door and conducted an interview with him. During the interview, Mr. Booker admitted that he "enlisted in the United States Army with the intent to commit an insider attack against American soldiers. . ." He also admitted that he had "formulated several plans for committing jihad once enlisted," and that he "wanted to target someone with power." Mr. Booker was denied entry into the Army.

Seven months later, Mr. Booker, still unarrested, became involved with a Confidential Human Source (CHS1) and expressed a "desire to engage in violent jihad," and to "kill the American soldier." With the help of the FBI and CHS1, Mr. Booker made an anti-American video, discussed making a pro-ISIL propaganda video, and was introduced to a second Confidential Human Source (CHS2). Mr. Booker was so intent on jihad that he told CHS2 that being a suicide bomber was "his number one aspiration because he couldn't be captured." Mr. Booker settled on Fort Riley as the place to conduct his suicide bombing and worked with his FBI connections to obtain the components needed to build his car-bomb. Mr. Booker was arrested outside a little-used gate of Fort Riley as he was making the final connections on the FBI-supplied "bomb."

Like Mr. Loewen, Mr. Booker entered into an 11(c)(1)(C) plea agreement with the government. Unlike Mr. Loewen, however, in addition to pleading guilty to Attempted Use of a Weapon of Mass Destruction, Mr. Booker also pleaded to Attempted

Destruction of Government Property by Fire or Explosion. And unlike Mr. Loewen, Mr. Booker agreed to a sentence of 30, not 20 years. *See* Complaint and Affidavit, *United States v. Booker*, 15-MJ-05039, Attached as Exhibit B.

Both Mr. Loewen and Mr. Booker agreed to the application of USSG § 3A1.4, the so-called Terrorism Enhancement. And because of this, their offense levels were each 43 (even with acceptance of responsibility), and their criminal history categories were VI. However, neither were given life sentences. Because in each case a life sentence was greater than was necessary to comply with paragraph (a)(2) of 18 U.S.C. § 3553. *See United States v. Ranum*, 353 F. Supp. 2d 984, 986 n.1 (E.D.Wis. 2005) (the guidelines clash with § 3553(a)'s primary directive to 'impose a sentence sufficient, but not greater than necessary to comply with the purposes' of sentencing, also quoting Justice Kennedy's 2004 speech to the ABA that "prison sentences are too long...").

Obviously, these do not represent the totality of "terrorism" cases where sentences were imposed. They do, however, illustrate the variety of sentences and reflect the overall trend that life sentences are often rejected in favor of more determinative, circumscribed sentences measured in years rather than lifetimes.

### G. The Need to Provide Restitution to Any Victims of the Offense

There were no victims of this offense. Thus there is no need to provide restitution.

## IV. DEPARTURES AND VARIANCES

### A. The proposed guidelines criminal history score improperly overstates Patrick's true criminal history

According to the pre-sentence report, Patrick Stein's real criminal history score is zero (0). This should have placed him in category I of the Guidelines' Criminal History range. However, due to the Terrorism Enhancement, Patrick's Criminal History Category has been artificially inflated to category VI.

In this case, a criminal history score of VI is substantively unreasonable. "[S]ubtantive reasonableness addresses whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) (internal quotation marks omitted). "[T]he automatic assignment of a defendant to a Criminal History Category VI is not only too blunt an instrument to have genuine analytical value, it is fundamentally at odds with the design of the Guidelines. It can, as it does in this case, import a fiction into the calculus. It would impute to a defendant who has had no criminal history a fictional history of the highest level of seriousness." *United States v. Jumaev*, 12-CR-00033-JLK, USDC Colorado, "Memorandum Opinion and Order on Sentencing," (Doc. 1920), at 17, July 18, 2018 (quoting *United States v. Mehanna*, No. 1:09-CR-10017-GAO (D. Mass. April 12, 2012)).

Patrick Stein has no scoreable past criminal activity. His only adult convictions relate to incidents that occurred (1) over 30 years ago—a vehicle registration offense, and

(2) over 20 years ago—a more serious burglary charge related to an alleged drug debt from a time that Patrick Stein was involved with methamphetamine. Due to the age of these convictions, they were properly given zero (0) criminal history points, and Patrick's original criminal history category was correctly set at category I yet the terrorism enhancement adjusted the category upward to VI.

The Guidelines provide the basis for the requested downward departure as USSG § 4A1.3(b)(1) clearly states:

> If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.

*See also United States v. Robertson*, 662 F.3d 871, 879 (7th Cir. 2011) ("[A] within-Guidelines sentence may be inappropriately high when . . . the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history. . .").

This is not a case where Patrick Stein had multiple, minor criminal offenses that added up to an unfairly high score. Rather, this is a case where Patrick Stein had zero scorable criminal offenses but was given the highest criminal history score based solely on an arbitrary decision of the United States Sentencing Commission. Patrick Stein has a true criminal history score of zero and corresponding category of I. His artificially inflated category of VI substantially over-represents Patrick's criminal history, and his ultimate sentence should take that into account.

**B. A life sentence conflicts with § 3553 (a)'s primary directive to impose a sentence that is "sufficient but not greater than necessary."**

A life sentence is much greater than necessary to accomplish the goals of federal sentencing.

On October 14, 2016, Patrick met with UCE Brian at a Dodge City McDonald's and gave him 300 pounds of inert urea. Brian was under the belief that the fertilizer was ammonium nitrate, a highly volatile substance commonly used for making fertilizer bombs. He was mistaken, but Patrick was arrested shortly after handing the inert urea over to the undercover FBI agents.

At the time of Patrick's arrest, Curtis Allen had already been arrested for an alleged domestic violence incident against Lula Harris, his live-in girlfriend. Based on that arrest, Gavin Wright told both the FBI's paid informant and Patrick Stein that he was out of the conspiracy and no longer wanted anything to do with it. As Patrick told UCE Brian, the conspiracy consisted of only himself and the paid informant. It was an interesting end to a case that began with only Patrick Stein and that informant, Dan Day.

Patrick Stein first met Dan Day in February of 2016. Dan Day had already been working as a paid FBI informant for several months. In fact, based on Dan Day's reporting the FBI had opened a domestic terrorism file on Jason Crick, the first subject of Dan Day's undercover activities. Approximately two months after he met Dan Day, the FBI opened a domestic terrorism file on Patrick Stein, based almost entirely on Dan Day's uncorroborated reporting. At the time of the "Opening Electronic Communication"

(hereinafter the "Opening EC"), only one meeting involving Patrick Stein had been recorded: a meeting to discuss the possible reaction of the government to an attempt to amend the Constitution of the United States under an Article V convention of the States. And while the group had the procedure for that process completely incorrect, it was still a constitutional way to go about effecting governmental change.

While the Kansas Security Force was concerned about and planned for the reaction of the government following the presentment of the Article V documents,[3] the FBI had a different idea about what Patrick Stein and KSF were planning. From the Opening EC:

> GCRA [Garden City Resident Agency] believes sufficient predication exists which identifies Patrick Stein as being a leader of an organized group of individuals who advocate and threaten force or violence to achieve both political and social goals. Stein has espoused and promoted hatred for the government and has contributed to an apparent plan or intention to act against the government. GCRA requests to initiate a full investigation related to Patrick Stein as a Tier 5 – Radicalizer / Recruiter, Priority Level 3 subject. Possible violations include:
> 18 USC 1505 – Obstruction of justice
> 18 USC 2332f – Bombing of places of public uses, government
>                                facilities
> 18 USC 249 – Hate Crimes
> 18 USC – 241 Conspiracy against rights
> 18 USC 247 – Damage to religious property; obstruction of free
>                                exercise of religious beliefs
> 18 USC 2384 – Sedition
> 18 USC 2385 Advocating the overthrow of the government.

---

[3] This was documented in the April 19, 2016 KSF meeting that was recorded by Dan Day.

As the Opening EC makes clear, this case did not start as a case of conspiracy to use a weapon of mass destruction. It began as a case of political discourse and discontentment, in which defensive actions against an attacking government were discussed, not "first strike" options.

The defendants were ultimately convicted of conspiracy, essentially an agreement to bomb an apartment complex that housed a mosque. The closest Patrick Stein came to an actual bombing was when he delivered inert urea to UCE Brian at McDonald's on October 14, 2016.

Unable to arrest any of the defendants actually pressing the button in an attempt to detonate an FBI supplied "bomb," the government had to be satisfied with an agreement and speculation that the defendants would actually have gone through with a plan. But if we are going to allow speculation that they would have tried to activate a bomb, we must allow for speculation in the other direction: that something would have happened to stop them from pushing the button. The sentence should take that into account.

## C. The Guideline sentence 12 level enhancement is arbitrary, capricious, and unfair because it raises both guideline range and criminal history

> In the main, the Commission developed Guidelines sentences using an empirical approach based on data about past sentencing practices, including 10,000 presentence investigation reports. See USSG § 1A.1, intro. comment., pt. A, ¶ 3. The Commission modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.

*Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (internal quotes and citations omitted).

"The Terrorism Enhancement, when applied, 'takes a wrecking ball,' to the initial Guidelines range." *United States v. Jumaev*, 12-CR-00033-JLK, USDC Colorado, "Memorandum Opinion and Order on Sentencing," (Doc. 1920), at 9, July 18, 2018 (internal citations omitted). The enhancement almost automatically reaches the "maximum statutory sentence and fail[s] to differentiate between various levels of conduct." *Id.* at 20 (analyzing enhancement in context of material support of terrorism); *see also id.* at n.20 (noting the "difficulty" that "there is no distinction between less and more serious offenses, those in which actual harm occurred and those where it did not").

Put another way, "[i]s terrorism sufficiently unique (and dangerous) that it justifies a sentencing 'rule' that goes against notions of individualized sentences that reflect the inevitable differentiation among criminals?" Id. at 22. "There is no rational basis for concluding that all individuals labeled as 'terrorists' and all crimes of 'terrorism' are equal. 'Gradation of offenses' is an important value in criminal law. 'We do not treat a purse-snatcher like a rapist, [yet t]he Enhancement reflects a different view: a terrorist is a terrorist.' The requirement to view any terrorist as every terrorist goes against the basic principles of sentencing and the factors set forth in 18 U.S.C. § 3553." Id. at 22-23 (internal citations omitted and brackets in original).

In addition to artificially inflating Patrick Stein's criminal history category from a I to a VI, the terrorism enhancement also arbitrarily enhances his guideline sentence by 12 points. There appear to be no empirical studies or other justifications for either

increase. *See Kimbrough*, 552 U.S. at 84 ("Given the Commission's departure from its empirical approach in formulating the crack Guidelines and its subsequent criticism of the crack/powder disparity, it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case."). These factors all weigh heavily against a guidelines-based life sentence.

### D. The defendant showed utter lack of sophistication

Patrick Stein's crimes demonstrated an extreme level of hatred and fear, but they also demonstrated an utter lack of sophistication. *See United States v. Talk*, 13 F.3d 369, 371 (10th Cir. 1993) ("While not foreclosing the possibility that lack of sophistication could provide a valid basis for an upward or a downward departure, depending on the crime and the circumstances, we hold that forcible rape is not a crime where sophistication or lack thereof would justify any departure.").

The recordings made by the FBI's paid informant show that while Patrick Stein was the most vocal of the defendants, he was also the least knowledgeable of the defendants when it came to the actual mechanics of the plan. Patrick Stein did not know the difference between commercial and military grade C-4, and he did not know the difference between inert urea and ammonium nitrate, as he told UCE Brian. His lack of knowledge was such that Curtis Allen and Gavin Wright did not include him when they were experimenting with HMTD.

The defendants as a whole also showed a lack of sophistication as their plans changed as often as they met and ranged from dressing up as maintenance men and pumping anhydrous ammonia through the apartment vents, to dropping sticks of dynamite through holes punched in the roof, to placing trash cans around the building and packing them with explosives. In short, they had no real direction or plan other than to do something.

### E. Government manipulation of the charges, even if not in bad faith.

On September 21, 2016, AUSA Tony Mattivi wrote case agents Robin Smith and Amy Kuhn and a variety of other FBI officials the following email:

> Everyone:
> Given recent developments, I'm reassessing where we are with possible charges in this case. Until now, I had been thinking about this case in terms of violations of 18 USC 844(i) and 18 USC 371 [Conspiracy to commit arson]. ***With the events planned in the next several days, I think the defendants are crossing into the realm of us considering a charge of 18 USC 2332a*** (attempting to use weapons of mass destruction – punishable by up to life imprisonment). We should (and I know we will, for tactical reasons as well as the legal reasons) pay close attention to whether any of our targets show up to any of these UC meetings armed. If so, that also gives us a valid basis for charging violations of 18 USC 924(c) (possession of a firearm in furtherance of a crime of violence, namely the attempted use of the WMD – punishable by a mandatory term of imprisonment for five years, mandatorily consecutive to any sentence imposed for the underlying WMD charge) And each time we can document a target showing up armed for a meeting, that's a separate and additional 924(c) count – with a separate (and potentially consecutive) sentence. Of course, the 844(i) and the 371 counts remain applicable.
> Just wanted to share my thoughts as the case progresses and evolves. Please call or email if you have questions or want to discuss further (especially if you think I'm missing the mark here – please speak up!).
> Thanks,

Tony

Tony Mattivi email Attached as Exhibit C (Emphasis added)

Prior to September 21, 2016, the United States government was thinking of this case in terms of a conspiracy to violate 18 U.S.C. § 844(i)—that is, destroying real or personal property used in interstate commerce by means of fire or explosive. § 844(i) carries a minimum term of 5 years and a maximum term of 20 years as long as injury or death does not result. There was no injury or death in Patrick Stein's case.

So what changed after September 21, 2016? What "events" planned in the "next several days" could cause the government to move from a charge that would carry a maximum sentence of 20 years in prison to one that carried a potential life sentence? The only such event was the introduction of UCE Brian and the government's offer to build the explosive device for the defendants. There was no change in plans. There was no change in targets. There was no change in means. The only change? The government was now going to supply a much bigger "bomb."

Prior to September 21, 2016, the case consisted of the three defendants and Dan Day . In fact, Dan Day told the FBI—incorrectly, it turns out—nearly a month before Mr. Mattivi's email that the defendants had everything they needed to build an explosive device. However, it appears that the size and scope of that theoretical explosive device was not sufficient, in the government's eyes, to warrant an arrest.

The email quoted above clearly shows that charges were manipulated through the use of UCE Brian and his offer to make a much larger explosive than defendants would

have made on their own. *See* U.S.S.G. Pt. A.4 ("[A] sentencing court may control any inappropriate manipulation of the indictment through use of its departure power.");

*United States v. Gamez*, 1 F.Supp. 2d 176 (E.D.N.Y. 1998) (Weinstein, J.) (departure from level 20 to 15 warranted in money laundering case because nature of crime more closely resembled structuring crime which had lower guidelines); *United States v. Lieberman*, 971 F.2d 989, 995 (3d Cir. 1992) (where prosecution charged defendant with tax evasion and embezzlement, knowing not groupable, and other defendants not charged, court can depart downward to ensure equality in sentencing and that U.S. Attorney not manipulate sentencing *even absent bad faith*) (emphasis added).

The federal criminal code is a complex amalgam of interchangeable statutes in which numerous charges can be used to fit any situation. There rarely seems to be one clear-cut statute or one clear-cut set of facts. The same can be said for the United States Sentencing Guidelines, as was seen by the contortions required to arrive at a base offense level in the pre-sentencing report.

This argument is similar to that of sentencing entrapment, in which a defendant is encouraged by government agents to provide a higher quantity of drugs than he was originally intending to sell. *See United States v. Staufer* 38 F.3d 1103 (9th Cir. 1994) (district court has authority to depart downward where defendant was encouraged by agents to furnish 10,000 doses of LSD, more drugs than defendant was predisposed to deliver (5,000 doses)). *See also United States v. Searcy*, 233 F.3d 1096, 1099 (8th

Cir.2000) ("This case demonstrates that the Sentencing Guidelines have a 'terrifying capacity for escalation of a defendant's sentence' as a result of government misconduct.").

Patrick Stein is not alleging an escalation in his guideline sentence based on government misconduct, so much as he is alleging it is based on simple government conduct: the escalation from relatively simple trash can bombs envisioned by the defendants to vehicle-born-improvised-devices proposed by UCE Brian. This proposition alone raised the stakes not only on the investigation but on the potential sentences associated with that investigation as well. The ultimate sentence should take that into account.

## F. Imperfect Entrapment

At the close of evidence, the defendants requested an entrapment instruction. (Doc. 374 Proposed Defense Jury Instruction No. 24). The instruction was denied by the Court. While Patrick Stein disagrees with the Court's denial of this instruction, this is not the issue before the Court at this time. Rather, the question is whether the evidence presented was sufficient for this Court to make a finding of "imperfect entrapment" and grant a downward departure for the aggressive conduct of the government through its paid informant Dan Day.

The testimony at trial clearly demonstrated that it was Dan Day who:

1) "Found" ISIS recruiting flyers at the Garden City library and informed Jason Crick and other militia members, including the defendants.

2) Proposed the Mary Street Apartment complex as the target of the defendants' plans—first mentioning the complex at the meeting in Brody Benson's field and continuing to push this location because it was close to his house and close to the FBI office in Garden City.

3) Provided the defendants with information about the Mary Street Apartments, including telling them that the white residents had been moved out to make room for the Muslim refugees. He also told them that they were driving brand new cars and wearing expensive suits, and were more than likely involved in illegal activity, possibly funding terrorism.

4) Worked to keep the group together whenever there appeared to be friction that might jeopardize the conspiracy, spending hours on the phone with Patrick Stein convincing him that he just needed to let Curtis Allen have his own way because what they were trying to do was too important to let petty disagreements get in the way.

5) Pushed the group to have meetings when nothing was getting done.

6) Pushed the group to meet with the UCE, not only for what he could do for them now but what he could do for them in the future, often implying that UCE

Brian could provide them with supplies for the civil war the defendants believed was inevitable.

7) Always agreed with Patrick Stein, regardless of the outrageous statements or fantasies Patrick espoused.

UCE Brian also described his "legend" not only as an arms dealer who could provide the items that Patrick and the other defendants wanted for a price, but also as a like-minded individual who, like Dan Day, always agreed with Patrick.

While the Court found that these facts did not meet the requirements of entrapment, the facts do show a paid informant who took an active role in the conspiracy, playing the part of active KSF participant as well as a confessor and conciliator for Patrick Stein regarding his issues with Curtis Allen and Gavin Wright.

"Imperfect entrapment" is appropriate in situations where the government's encouragement of criminal activity was not severe enough to constitute the defense of entrapment, but was nonetheless severe enough to warrant a downward departure at sentencing. *See United States v. Garza-Juarez*, 992 F.3d 896, 912 (9th Cir. 1991). With imperfect entrapment the defendant does not need to be devoid of any predisposition to commit the crime. *United States v. McClelland*, 72 F.3d 717, 725 (9th Cir. 1995). "[I]t is precisely those defendants who are predisposed but who are then pressured unduly by the government to go forward with the offense who are eligible to assert imperfect entrapment." *Id.*

### G. Variance Based on Fact That Patrick Stein's
### Crimes Did Not Transcend National Boundaries.

Patrick Stein's offense level was increased by 12 points (and his criminal history increased from category I to category VI), based on the terrorism enhancement found at U.S.S.G. § 3A1.4. This enhancement applies if the crime for which the defendant is convicted "involved or was intended to promote a 'federal crime of terrorism.'" While Patrick has objected to the application of this enhancement, the United States Probation Office has applied it to his conviction on Count 1, conspiracy to use a weapon of mass destruction.

To define "federal crime of terrorism" § 3A1.4 looks to 18 U.S.C. 2332b(g)(5):

(A)      Is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B)     Is a violation of . . . 2332a[4]

In *United States v. Garey*, 383 F. Supp. 2d 1374 (M.D. Ga. 2005) United States District Judge Land, when faced with a similar objection from a defendant convicted under 18 U.S.C. § 2332a, among other charges, upheld the enhancement but expressed apprehension:

The Court's concern centers upon the fact that this definition of federal crime of terrorism is included in the code section that is limited to terrorism that transcends national boundaries. 18 U.S.C. § 2332b. Violation of § 2332b, in which this definition appears, requires a finding that the offenses conduct "transcends national boundaries"; therefore, Defendant could not have been convicted under § 2332b . . . The question therefore arises as to whether the interpretation of this definition should be read in

---

[4] Patrick Stein concedes that the crime for which he was convicted meets the second prong of the definition

the context of the entire code section and should thus be read to mean that federal crime of terrorism is an offense, *transcending national boundaries* . . .

383 F. Supp. 2d at 1378 (emphasis in original). Despite his concerns, Judge Land found that the guidelines did not require the offense to transcend national boundaries for the enhancement to apply and overruled the defendant's objection. *Id.*

However, Judge Land found that his concerns were enough to grant a variance to the defendant:

> In this case, the guidelines increase the Defendant's offense level by twelve levels for conduct of which he was not convicted by a jury. . . Nevertheless, under the guidelines, Defendant is arguably being held criminally responsible for conduct for which he was not indicted and for which he never could have been convicted [terrorism transcending national borders].

*Id.* at 1379. Judge Land also found it "troubling that another defendant who carried out a threat to bomb public facilities, injuring and maiming (but not killing) thousands of people, would face the same sentence as this Defendant who did not cause physical injury to a single person." *Id.*

Judge Land granted the defendant a variance by finding that the terrorism enhancement did not accomplish the purposes of 18 U.S.C. § 3553 by accurately considering the "nature and circumstances of the offense." He combined this with a finding that the increase in criminal history category did not accurately reflect and, in fact, ignores the "individual 'history and characteristics' of the Defendant, and instead places too much weigh on a questionable interpretation of what constitutes a federal

crime of terrorism under the guidelines." *Id*. In the end, Judge Land used the defendant's true criminal history category of III and an offense level of 41 to sentence the defendant to 360 months in prison.

Patrick Stein would ask this Court to adopt the same justification for a variance as that used by Judge Land and based his guidelines on his true criminal history category of I and an offense level of no more than 31 (43-12).

## V. CONCLUSION

Patrick Stein has been convicted and will be sentenced for his role in the charged conspiracies. A sentence of no more than 15 years will be sufficient, but not greater than necessary, to appropriately reflect the reality of the crime with which he was involved and the factors for sentencing under law.

s/ James R. Pratt
JAMES R. PRATT, #17716
445 N. Waco
Wichita, Kansas 67202
Ph: (316) 262-2600
Fax: (316) 262-2602
Jim@JamesRPrattLaw.com
Attorney for Defendant

s/ Michael Shultz
MICHAEL SHULTZ, #23133
Shultz Law Office, P.A.
445 N. Waco
Wichita, Kansas 67202
Ph: (316) 269-2284
Fax: (316) 269-2011
michael@shultzlaw.net
Attorney for Defendant

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 29, 2018, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to each counsel of record in this case.

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: none

<u>s/James R. Pratt</u>
JAMES R. PRATT #17716
Attorney for Defendant
445 N. Waco
Wichita, Kansas 67202
Ph: (316) 262-2600
Fax: (316) 262-2602
Jim@JamesRPrattLaw.com
