IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA,       )
                                     ) District Court
                  Plaintiff,         ) Case Nos.
v.                                   ) 16-10141-01,
                                     ) 02, 03
CURTIS WAYNE ALLEN, PATRICK          )
EUGENE STEIN, and GAVIN WAYNE        ) Circuit Court
WRIGHT,                              ) Case No.
                                     ) 19-3030
                  Defendants.        )


TRANSCRIPT OF PROCEEDINGS

     On the 25th day of January, 2019, came on to be
heard proceedings in the above-entitled and numbered
cause before the HONORABLE ERIC F. MELGREN, Judge of the
United States District Court for the District of Kansas,
sitting in Wichita, commencing at 8:59 A.M. Proceedings
recorded by machine shorthand.  Transcript produced by
computer-aided transcription.

APPEARANCES:

The plaintiff appeared by and through:
        Mr. Stephen R. McAllister
        United States Attorney
        500 State Avenue
        Suite 360
        Kansas City, Kansas  66101

        Mr. Anthony W. Mattivi
        United States Attorney's Office
        290 US Courthouse
        444 SE Quincy
        Topeka, Kansas  66683-3592

        Ms. Risa Berkower
        Ms. Mary J. Hahn
        U.S. Department of Justice
        Civil Rights Division, Criminal Section
        950 Pennsylvania Avenue, NW
        Washington, DC 20530

```
The defendant Curtis Allen appeared by and through:
          Ms. Melody J. Brannon
          Mr. Rich Federico
          Federal Public Defender's Office
          117 SW 6th Avenue
          Suite 200
          Topeka, Kansas 66603

The defendant Patrick Stein appeared by and through:
          Mr. James R. Pratt
          Pratt Law, LLC
          445 North Waco
          Wichita, Kansas  67202

          Mr. Michael J. Shultz
          Shultz Law Office, P.A.
          445 North Waco
          Wichita, Kansas  67202

The defendant Gavin Wright appeared by and through:
          Ms. Kari S. Schmidt
          Mr. Tyler J. Emerson
          Conlee Schmidt & Emerson, LLP - Wichita
          200 West Douglas
          Suite 300
          Wichita, Kansas  67202

Also present:
          Mr. Shawn Brewer, U.S. Probation Officer
```

I N D E X

PAGE

EXHIBITS
For the Defendant:

No. 976        September 4th recording                62
No. 979        September 13th recording               62


REPORTER'S CERTIFICATE                                114

| | | |
|---|---|---|
| 08:59:22 | 1 | CLERK DAVENPORT:  All rise. |
| 08:59:23 | 2 | United States District Court for the District of |
| 08:59:25 | 3 | Kansas is now in session, the Honorable Eric F. Melgren |
| 08:59:27 | 4 | presiding. |
| 08:59:27 | 5 | THE COURT:  Good morning.  You may be seated. |
| 08:59:30 | 6 | The court calls the case of the United States v. |
| 08:59:37 | 7 | Curtis Allen, Patrick Stein, and Gavin Wright, Case |
| 08:59:40 | 8 | No. 16-10141.  Let's start with appearances, please. |
| 08:59:46 | 9 | Government? |
| 08:59:46 | 10 | MR. MATTIVI:  Good morning, Your Honor.  The |
| 08:59:48 | 11 | Government appears by Steve McAllister, the U.S. |
| 08:59:51 | 12 | Attorney; Tony Mattivi; Risa Berkower; and Mary Hahn. |
| 08:59:55 | 13 | THE COURT:  Thank you. |
| 08:59:56 | 14 | MS. BRANNON:  Good morning, Your Honor.  Mr. Allen |
| 08:59:57 | 15 | appears in person and through counsel Melody Brannon and |
| 09:00:02 | 16 | Rich Federico. |
| 09:00:02 | 17 | THE COURT:  Thank you. |
| 09:00:02 | 18 | MR. PRATT:  Your Honor, Mr. Stein appears in |
| 09:00:06 | 19 | person, in custody, with counsel Jim Pratt and Michael |
| 09:00:07 | 20 | Shultz. |
| 09:00:07 | 21 | THE COURT:  Thank you. |
| 09:00:08 | 22 | MS. SCHMIDT:  Your Honor, Mr. Wright appears in |
| 09:00:10 | 23 | person, in custody, by Kari Schmidt and Tyler Emerson. |
| 09:00:13 | 24 | THE COURT:  Thank you. |
| 09:00:14 | 25 | A couple of preliminary matters let me take up. |

| | | |
|---|---|---|
| 09:00:17 | 1 | The Court has a standing rule prohibiting electronic |
| 09:00:22 | 2 | media, cell phones and laptops, in the courthouse.  I've |
| 09:00:26 | 3 | made a general exception of that today for members of the |
| 09:00:28 | 4 | media, given the public interest in this case.  I have |
| 09:00:32 | 5 | not only allowed many of you to bring devices in but am |
| 09:00:36 | 6 | also permitting you to -- well, I'm going to quickly |
| 09:00:40 | 7 | exceed my own knowledge here, but to either live tweet or |
| 09:00:43 | 8 | post from the courtroom or otherwise use your Internet |
| 09:00:48 | 9 | capabilities on the -- with respect to the media. |
| 09:00:50 | 10 | What I'm not allowing, and I thought it would be |
| 09:00:52 | 11 | important to refresh your recollection on that, obviously |
| 09:00:55 | 12 | all those items must be on silent.  And if you've not |
| 09:00:58 | 13 | double checked to do that since you got to the courtroom, |
| 09:01:00 | 14 | I announce that you do that. |
| 09:01:01 | 15 | Also, we are strictly prohibiting, as the Court |
| 09:01:04 | 16 | always does, any recording, either audio or visual |
| 09:01:09 | 17 | recording, using those devices.  And I've instructed the |
| 09:01:12 | 18 | court security officers that any violations of that may |
| 09:01:16 | 19 | result in your surrendering your item to them until the |
| 09:01:18 | 20 | conclusion of this hearing.  I thought it important to |
| 09:01:21 | 21 | mention that. |
| 09:01:21 | 22 | I also should mention -- I don't see anyone |
| 09:01:25 | 23 | standing at this point, and I suspect our court security |
| 09:01:27 | 24 | officers are prohibiting that, but just so you know, we |
| 09:01:30 | 25 | have, on a rather emergency basis here, besides filling |

09:01:32  1   our jury box, set up overflow seating on the fifth floor.

09:01:37  2   So if you have other colleagues or friends who are coming

09:01:39  3   later, by simply taking the elevators that would be

09:01:42  4   behind me up to the fifth floor, there's an assembly room

09:01:46  5   there that we've set up video connections with.

09:01:49  6        The Court previously heard objections to the

09:01:51  7   presentence investigation reports and to the calculations

09:01:55  8   of the sentencing guidelines that were issued on that.

09:01:57  9   We had a hearing last year, heard arguments on those.  At

09:02:00  10  the conclusion of those arguments, I inquired as to

09:02:02  11  whether there were any other objections and were advised

09:02:05  12  that there were not.  I have, of course, since then

09:02:07  13  issued my written ruling with respect to those

09:02:11  14  objections.  So normally in a sentencing hearing we would

09:02:13  15  start with objections to the presentence report, but

09:02:18  16  we've moved beyond that point so we will not need to do

09:02:21  17  that today.

09:02:22  18       What we're going to do today is as follows:

09:02:28  19  first, the Government has requested, and I've allowed,

09:02:30  20  the presentation of certain video victim statements,

09:02:33  21  which we will allow the Government to present.  I've

09:02:36  22  received some letters from the Government as well with

09:02:40  23  respect victim statements.

09:02:41  24       I'm unaware, Mr. Mattivi, of whether there are

09:02:44  25  going to be any live victim statements presented.  Do you

09:02:46   1  know, will there be?

09:02:48   2       MR. MATTIVI:  I know of one person, Chief Utz from

09:02:52   3  the Garden City Police Department who would like to

09:02:54   4  address the court in addition to his letter.

09:02:54   5       THE COURT:  All right.  We'll do that as well.

09:02:56   6  I've asked that all three defendants be present at the

09:02:59   7  same time so that they can all hear the presentation of

09:03:02   8  statements from the victims.  I think they're entitled to

09:03:04   9  do that, so we'll hear those.

09:03:08   10      Following the conclusion of the presentation of

09:03:10   11 the victim statements, I'm then going to sentence the

09:03:13   12 defendants one at a time.  I think that's both the

09:03:17   13 preferred procedure and because, of course, sentencing is

09:03:21   14 obviously a very personal item, I think we'll take up one

09:03:24   15 at a time.  So at the conclusion of hearing the victim

09:03:27   16 statements, the United States Marshals will take

09:03:30   17 Mr. Stein and Mr. Wright back downstairs to the holding

09:03:33   18 cell, we will sentence Mr. Allen at that point.  I

09:03:36   19 anticipate, as best I can project then, that we will

09:03:41   20 sentence Mr. Stein immediately after lunch, and

09:03:45   21 Mr. Wright then towards the middle of the afternoon.  So

09:03:49   22 that's the procedure which we'll follow.

09:03:52   23      A preliminary matter that I think we need to take

09:03:54   24 up.  The Government filed a motion with respect to

09:03:58   25 submitting transcripts to the record with respect to

09:04:03   1   recorded statements that we heard at the trial.  It's not

09:04:08   2   perfectly clear to me from that motion whether they're

09:04:11   3   suggesting only the transcripts of statements or

09:04:15   4   recordings that were actually played at the trial.  I

09:04:17   5   assume that's as far as your motion intends to go.  Is

09:04:20   6   that correct, Government?  Ms. Berkower?

09:04:22   7        MS. BERKOWER:  Good morning, Your Honor.  Yes, the

09:04:24   8   idea was to provide into the record the complete

09:04:29   9   transcripts that we used at the *James* hearing, and so the

09:04:34   10   transcripts that were provided on the hard drive to the

09:04:36   11   Court and to counsel are basically the same binders that

09:04:40   12   we provided to the Court and counsel at that hearing,

09:04:43   13   which allowed us to litigate each individual audio clip.

09:04:46   14        THE COURT:  Well, I'm a bit puzzled.  Are you

09:04:49   15   wanting -- because at the *James* hearing, of course, we

09:04:52   16   had voluminous transcripts, and then I admitted some of

09:04:55   17   those, some I did not, some were not offered.  Are you

09:04:58   18   wanting all of those in, or only the transcripts of the

09:05:00   19   audio recordings that were actually presented at the

09:05:02   20   trial?

09:05:03   21        MS. BERKOWER:  We were asking to have the

09:05:05   22   transcripts admitted because we anticipate potential

09:05:09   23   appellate litigation about whether those clips were

09:05:12   24   misleading in some way.  I know there were several

09:05:14   25   rule-of-completeness objections, that there should have

09:05:17  1  been larger portions of those clips played, and so the

09:05:19  2  idea was to have a complete record so that that could be

09:05:22  3  litigated in a more convenient way.

09:05:24  4      THE COURT:  All right.  Thank you for that

09:05:25  5  explanation, Ms. Berkower.

09:05:26  6      I've received no response from the defendants with

09:05:28  7  respect to that motion.  What is your position regarding

09:05:29  8  that?  Ms. Brannon?

09:05:31  9      MS. BRANNON:  We agree with the Government that

09:05:33  10  those should be admitted.

09:05:34  11      THE COURT:  All of them?

09:05:35  12      MS. BRANNON:  Yes.

09:05:37  13      THE COURT:  All right.  Other defendants, any

09:05:39  14  objections to that request?

09:05:40  15      MS. SCHMIDT:  No, Your Honor.  And I believe the

09:05:41  16  day that we had the second day of the *James* hearing we

09:05:45  17  had agreed at that time -- and I believe there's a record

09:05:47  18  in the transcript -- that we agreed at that time to have

09:05:51  19  all of those marked.  I mean, they're in electronic form

09:05:54  20  now.  But we did agree to that because we do know there

09:05:58  21  will be appellate litigation on that.

09:05:59  22      THE COURT:  All right.  Very well.

09:06:00  23      MR. PRATT:  Your Honor, may I have just a second?

09:06:02  24      THE COURT:  Certainly.

09:06:03  25      (Whereupon, a sotto voce discussion was had

09:06:03  1  between Mr. Pratt and Mr. Stein.)

09:06:43  2        MR. PRATT:  No objection, Your Honor.

09:06:44  3        THE COURT:  Very well.  I'm going to grant the

09:06:45  4  Government's motion as filed at document 480, as further

09:06:49  5  explained by Ms. Berkower to include all the transcripts

09:06:52  6  of matters that were presented at the *James* hearing,

09:06:54  7  without regard to whether they were actually played at

09:06:56  8  the trial or not.

09:06:57  9        Are there any other preliminary matters that we

09:06:59  10  need to address before we proceed to hear victim

09:07:01  11  statements on these consolidated matters?

09:07:04  12        MR. MATTIVI:  Nothing known to the Government,

09:07:05  13  Your Honor.

09:07:05  14        MS. BRANNON:  If I may, Your Honor.

09:07:07  15        THE COURT:  Ms. Brannon.

09:07:10  16        And I appreciate you going to the podium,

09:07:12  17  Ms. Brannon.  I am going to ask ultimately that all

09:07:14  18  people who present do that, in part because we have

09:07:17  19  people in the overflow room, so I hadn't mentioned that

09:07:21  20  before.

09:07:22  21        MS. BRANNON:  Thank you, Your Honor.

09:07:22  22        We just wanted to renew a couple of objections

09:07:25  23  before the Government starts so that we're not

09:07:27  24  interrupting necessarily.  We renew all of our objections

09:07:30  25  to the victim impact statements.  We understand the

| | | |
|---|---|---|
| 09:07:32 | 1 | Court's ruling, but there has been a couple of |
| 09:07:35 | 2 | submissions after that, I think three more submissions. |
| 09:07:38 | 3 | And we just wanted to make sure that our objections go to |
| 09:07:42 | 4 | those statements as well for the same reasons, that we |
| 09:07:45 | 5 | don't believe they fall within the statute definition of |
| 09:07:48 | 6 | victim and because we also believe it's cumulative.  And |
| 09:07:51 | 7 | for all of the statements, we also object to the video |
| 09:07:54 | 8 | clips for the reason that all of the parties, including |
| 09:08:00 | 9 | the Court, have had these and had them available and |
| 09:08:03 | 10 | reviewed them before this hearing and that there's not a |
| 09:08:05 | 11 | reason to play them in court as well. |
| 09:08:07 | 12 | Secondly, Your Honor, we would just ask for |
| 09:08:11 | 13 | assurance from the Government on the record that all |
| 09:08:14 | 14 | *Brady* material has been provided to us that relates to |
| 09:08:17 | 15 | sentencing, particularly with the victim impact evidence |
| 09:08:20 | 16 | that they're presenting, if they have *Brady* material |
| 09:08:23 | 17 | that's exculpatory, that's inconsistent with the evidence |
| 09:08:25 | 18 | that they're presenting, other people that they've |
| 09:08:28 | 19 | interviewed, that have a different take, perhaps, on |
| 09:08:32 | 20 | this.  We believe that's *Brady* and should have been |
| 09:08:35 | 21 | provided to us. |
| 09:08:35 | 22 | THE COURT:  Help me out there, Ms. Brannon -- |
| 09:08:37 | 23 | MS. BRANNON:  Sure. |
| 09:08:38 | 24 | THE COURT:  -- as to what *Brady* material would be |
| 09:08:40 | 25 | pertinent with respect to victim statements.  Obviously, |

09:08:42  1  we're past the point of exculpatory evidence.  So just to

09:08:46  2  be clear with your position, tell me what you believe

09:08:48  3  that request covers.

09:08:49  4       MS. BRANNON:  Sure.  And I would point out that

09:08:51  5  *Brady* was a sentencing case.  And so *Brady* and the idea

09:08:54  6  of exculpatory evidence does apply in sentencing as well

09:08:58  7  as at trial.  An example would be if they interviewed

09:09:03  8  numerous people who lived in this same community who said

09:09:06  9  "Yes, I'm aware of this, but no, it did not interfere

09:09:10 10  with my life, it did not cause me concern, it did not

09:09:15 11  make me want to move," those sorts of things.  People can

09:09:20 12  have different perspectives on this.  And if the

09:09:22 13  Government ran into that sort of evidence and ran into

09:09:25 14  those people and have those reports, then those should

09:09:28 15  have been disclosed to us.

09:09:29 16       THE COURT:  So your request is simply if such

09:09:32 17  reports existed, to ensure that they've been disclosed to

09:09:34 18  the defense?

09:09:38 19       MS. BRANNON:  I don't know that this should come

09:09:40 20  down to whether they actually wrote a report.  If they

09:09:42 21  interviewed people and are in possession of that sort of

09:09:44 22  knowledge that we would consider to be exculpatory in the

09:09:49 23  sense that it is helpful to us in presenting our case,

09:09:52 24  then it should be disclosed to us, whether or not it's

09:09:54 25  been reduced to writing.

1-25-19   USA v. STEIN   No. 16-10141-02          13

| | | |
|---|---|---|
| 09:09:55 | 1 | THE COURT:  All right. |
| 09:09:56 | 2 | MS. BRANNON:  And I anticipate that Mr. Mattivi |
| 09:09:59 | 3 | would have revealed that.  We just wanted to bring up the |
| 09:10:01 | 4 | matter and make sure that it's clear on the record. |
| 09:10:03 | 5 | THE COURT:  Well, with respect to your first |
| 09:10:05 | 6 | request, certainly the objections the defense made to the |
| 09:10:08 | 7 | presentation of victim statements I deemed to cover |
| 09:10:13 | 8 | victim statements that were disclosed after that motion |
| 09:10:15 | 9 | was made, including recent letters that I received as |
| 09:10:17 | 10 | well, and I -- although I don't know that it's necessary, |
| 09:10:21 | 11 | certainly you're entitled to renew that objection if |
| 09:10:23 | 12 | you'd like to. |
| 09:10:24 | 13 | With respect to the *Brady* issue, Mr. Mattivi, I |
| 09:10:26 | 14 | see you've risen.  Would you like to address that? |
| 09:10:28 | 15 | MR. MATTIVI:  I have, Judge.  Maybe I can |
| 09:10:30 | 16 | circumvent.  We don't need to split hairs.  Our approach |
| 09:10:33 | 17 | to discovery in this case has been if there's anything |
| 09:10:35 | 18 | that's even remotely helpful to the defense, we've turned |
| 09:10:38 | 19 | it over.  That remains true to this day. |
| 09:10:40 | 20 | THE COURT:  So it's the Government's position that |
| 09:10:41 | 21 | anything that might arguably be covered by Ms. Brannon's |
| 09:10:44 | 22 | request has previously been produced to the defense? |
| 09:10:46 | 23 | MR. MATTIVI:  That's correct, Your Honor. |
| 09:10:47 | 24 | THE COURT:  Thank you, Mr. Mattivi. |
| 09:10:47 | 25 | Anything further, Ms. Brannon? |

09:10:50  1       MS. BRANNON:  Not on behalf of Mr. Allen.

09:10:51  2       THE COURT:  Any other preliminary matters we need

09:10:54  3   to address?  Mr. Pratt?

09:10:55  4       MR. PRATT:  Just briefly, Your Honor.  In

09:10:57  5   addition to what Ms. Brannon said, we raised this

09:10:59  6   objection originally in our filing, but under Rule 32,

09:11:04  7   the Court -- it says that "Before imposing sentence the

09:11:07  8   Court must address any victim of the crime who is present

09:11:09  9   at sentencing and must permit the victim to be reasonably

09:11:12  10  heard."  We'd raise that in our objection to the victim

09:11:15  11  videos.  I believe the Court's already ruled on that, but

09:11:18  12  we would like to renew that objection at this time.

09:11:21  13      THE COURT:  Again, there were a plethora of

09:11:24  14  objections raised with respect to this sentencing issues,

09:11:28  15  whether the guideline calculations or otherwise.  The

09:11:30  16  Court's ruled on those.  I don't -- I don't consider it

09:11:33  17  necessary to renew those objections.  I think the record

09:11:36  18  reflects the objections that defense counsel made.  And

09:11:39  19  certainly, Mr. Pratt, if you want to renew that

09:11:41  20  objection, you're entitled to.  And, of course, the

09:11:43  21  Court's ruling with respect to victim statements was, at

09:11:48  22  the end of the day, although I found these statements

09:11:53  23  were entitled to be heard, that it was the Court's

09:11:55  24  position that whether the law required me to hear them or

09:11:58  25  not, the Court was exercising its discretion to hear them

09:12:01   1   in any event, even if they perhaps would not be strictly

09:12:04   2   covered by the law mandating I hear them.

09:12:06   3       And so, again, that objection's been overruled,

09:12:09   4   and is overruled again.  But as I noted, all objections

09:12:12   5   previously raised by defense counsel are in the record

09:12:16   6   and are preserved for purposes of appeal.

09:12:19   7       MR. PRATT:  Thank you, Your Honor.

09:12:20   8       THE COURT:  Any other preliminary matters?

09:12:23   9       MS. SCHMIDT:  Nothing from Mr. Wright, Your Honor.

09:12:24   10      THE COURT:  All right.

09:12:25   11      The Government may proceed with respect to

09:12:27   12  presenting victim statements, either in video or those

09:12:33   13  that wish to be done in person.  I'll note that I do not

09:12:36   14  know the extent to which those in the overflow room can

09:12:40   15  see the video presentations.  I do know that those of you

09:12:43   16  sitting in the jury box are not going to be able to see.

09:12:46   17  You're just going to have to hear.  I apologize for that.

09:12:49   18  But given the unexpected interest in this hearing today,

09:12:51   19  that's the best we can do.

09:12:52   20      MR. MATTIVI:  With your permission, Your Honor,

09:12:54   21  we'll go ahead and play the videos first, then we'll ask

09:12:57   22  Chief Utz to go ahead and make his statement, and then

09:12:59   23  we'd ask the Court to just inquire of anyone in the

09:13:01   24  gallery who might also be interested.

09:13:03   25      THE COURT:  Very well.  You may proceed.

| | | |
|---|---|---|
| 09:13:05 | 1 | MR. MATTIVI:  Thank you. |
| 09:13:11 | 2 | (Viewing victim impact videos of Ifrah Ahmed, |
| 09:13:11 | 3 | Ifrah Farah, Marsal Naleye, Abdukadir Yusuf, and Hassan |
| 09:33:03 | 4 | Abdi.) |
| 09:33:03 | 5 | MR. MATTIVI:  Your Honor, would you be ready to |
| 09:33:05 | 6 | hear from the Chief? |
| 09:33:06 | 7 | THE COURT:  All right. |
| 09:33:08 | 8 | MR. MATTIVI:  Where would you like him, Your |
| 09:33:09 | 9 | Honor? |
| 09:33:10 | 10 | THE COURT:  Sir, if you would come forward and |
| 09:33:11 | 11 | speak in the microphone at the podium, that way we're |
| 09:33:13 | 12 | certain we have a good record.  If you would start by |
| 09:33:16 | 13 | introducing yourself and then I'll be happy to hear any |
| 09:33:18 | 14 | comments you have to say. |
| 09:33:19 | 15 | CHIEF UTZ:  Thank you, Your Honor.  My name's |
| 09:33:22 | 16 | Michael Utz.  I'm the Chief of Police for Garden City, |
| 09:33:24 | 17 | Kansas. |
| 09:33:25 | 18 | On behalf of the dedicated men and women of the |
| 09:33:29 | 19 | police department, thank you for letting me address the |
| 09:33:30 | 20 | Court.  I've submitted a victim impact statement to the |
| 09:33:34 | 21 | U.S. Attorney's Office to be asked to be submitted to the |
| 09:33:36 | 22 | court for consideration -- |
| 09:33:38 | 23 | THE COURT:  I've read it. |
| 09:33:40 | 24 | CHIEF UTZ:  -- at sentencing. |
| 09:33:43 | 25 | This is a statement regarding the act of mass |

09:33:45  1  violence planned by Curtis Allen, Patrick Stein, and

09:33:49  2  Gavin Wright.  I've been with the police department since

09:33:53  3  1984.  With that being said, I take pride in our

09:33:57  4  community and the people who reside in it.  I traveled

09:34:00  5  200 miles to come to court today to address the Court, to

09:34:03  6  let you know how important Garden City and our community

09:34:06  7  is to me and to my department.

09:34:08  8      Garden City is a very diverse community, and as a

09:34:12  9  result, we thrive as a community.  Since my move to

09:34:17  10  Garden City in 1984, I had the privilege of witnessing

09:34:21  11  the overwhelming acceptance of refugees in our community.

09:34:25  12  I, along with other members within the department, have

09:34:28  13  developed a trusting and valued relationship with the

09:34:31  14  refugees.  Through community engagement and personal

09:34:34  15  contacts, we took time to educate ourselves about their

09:34:37  16  cultural backgrounds.  We understand their fears from

09:34:41  17  their home countries and can help them become acclimated

09:34:46  18  into our community a little easier.

09:34:48  19      Most of our refugees come to Garden City, a

09:34:52  20  secondary resettlement community, because it has a

09:34:55  21  reputation of being a safe and secure environment from

09:34:58  22  the evil that lays in the shadows, a place that provides

09:35:02  23  a quality education for children, and work opportunities.

09:35:07  24      In my 35 years in law enforcement, I have never

09:35:10  25  witnessed -- I thought I witnessed about every crime

09:35:14   1   possible until October 13th when I was made aware from

09:35:18   2   the FBI of the investigation involving Curtis Allen,

09:35:21   3   Patrick Stein, and Gavin Wright on the conspiracy to use

09:35:24   4   a weapon of mass destruction in our community.

09:35:29   5       Your Honor, the location that they were planning

09:35:32   6   this attack, 312 West Mary, there's a four-lane highway

09:35:36   7   that passes through there.  This roadway is heavily

09:35:40   8   traveled with school buses, folks traveling to and from

09:35:44   9   work, and others going about their day-to-day business.

09:35:50   10   If this conspiracy would not have been stopped and the

09:35:54   11   explosive devices would have been implanted and exploded,

09:35:58   12   it would have further impacted the traffic on this

09:36:00   13   roadway and several nearby schools, causing a catastrophe

09:36:04   14   in our community.

09:36:05   15       None of these three individuals live in Garden

09:36:08   16   City, Kansas.  They do not understand the core values

09:36:11   17   that we have accepted in our diverse community.  They

09:36:15   18   wanted to bring their evil thoughts and beliefs into our

09:36:17   19   community to murder and spread their hatred.

09:36:20   20       After release from the news from the FBI, my

09:36:25   21   department went to work and we met with many of the

09:36:27   22   elders of the East African Community Center.  There was

09:36:30   23   fear in their eyes and sadness in their hearts during the

09:36:33   24   discussions with them, and we tried to comfort them.

09:36:37   25   They could not understand why, in America, one would want

1-25-19   USA v. STEIN   No. 16-10141-02

19

| | | |
|---|---|---|
| 09:36:41 | 1 | to do such harm. |
| 09:36:42 | 2 | Refugees came to Garden City to escape the fear |
| 09:36:46 | 3 | and lack of trust in the government they experienced in |
| 09:36:48 | 4 | their own countries.  They have witnessed the killings of |
| 09:36:50 | 5 | families and loved ones and came to the United States to |
| 09:36:52 | 6 | escape that life.  Curtis Allen, Patrick Stein, and Gavin |
| 09:36:59 | 7 | Wright have taken that peace from them and left them with |
| 09:37:02 | 8 | the fear that they so desperately tried to escape. |
| 09:37:06 | 9 | However, with the meetings with the elders, we tried to |
| 09:37:09 | 10 | bring back the trust. |
| 09:37:12 | 11 | The healing in our community is a process and will |
| 09:37:16 | 12 | take time.  The evil destiny of all three of these |
| 09:37:20 | 13 | individuals planned for this Somalian residence in our |
| 09:37:23 | 14 | community will always weigh heavily in our hearts because |
| 09:37:25 | 15 | in our community hatred is not welcome. |
| 09:37:28 | 16 | If it was not for the swift actions of the FBI and |
| 09:37:32 | 17 | the Department of Justice in stopping these three |
| 09:37:34 | 18 | individuals from their conspiracy acts of injustice in |
| 09:37:37 | 19 | our community, it would have had a devastating impact. |
| 09:37:42 | 20 | Hundreds, if not thousands, of members of our community |
| 09:37:45 | 21 | would have been killed or seriously injured.  Millions of |
| 09:37:48 | 22 | dollars' worth of potential property would have been |
| 09:37:51 | 23 | destroyed.  The emotional scars would have been -- would |
| 09:37:56 | 24 | have been and are unmeasurable. |
| 09:37:58 | 25 | Your Honor, today is a decision for you to have -- |

| | | |
|---|---|---|
| 09:38:02 | 1 | make them a sentencing for Curtis Allen, Patrick Stein, |
| 09:38:04 | 2 | and Gavin Wright.  These three men have threatened our |
| 09:38:07 | 3 | friends, family, and loved ones in our community.  I've |
| 09:38:10 | 4 | explained here today what impact these three men had on |
| 09:38:13 | 5 | our community and would have had on our community.  If |
| 09:38:17 | 6 | these men are not held accountable, what unforeseen |
| 09:38:20 | 7 | damage will they have caused as they continue to teach |
| 09:38:23 | 8 | their hatred to younger generations? |
| 09:38:25 | 9 | There is no room in any community or country in |
| 09:38:29 | 10 | this type of -- for this type of behavior.  I would ask |
| 09:38:32 | 11 | you to send a strong message to these three men and |
| 09:38:36 | 12 | communicate to them and others who have the same |
| 09:38:41 | 13 | ideological hatred toward humanity that this type of |
| 09:38:44 | 14 | behavior will not be condoned by sentencing them to the |
| 09:38:47 | 15 | maximum sentence available. |
| 09:38:47 | 16 | I ask you, Your Honor, to help us repair what has |
| 09:38:50 | 17 | been lost in our community.  Thank you. |
| 09:38:52 | 18 | THE COURT:  Thank you, Chief. |
| 09:38:55 | 19 | I will note for the record -- |
| 09:38:58 | 20 | MR. MATTIVI:  Your Honor, I'm sorry.  I'm not |
| 09:38:59 | 21 | aware of anything else but I certainly would ask you to |
| 09:39:01 | 22 | inquire. |
| 09:39:01 | 23 | THE COURT:  I will note for the record that the |
| 09:39:04 | 24 | Government submitted numerous video statements of |
| 09:39:07 | 25 | potential victims, and following my ruling with respect |

1-25-19  USA v. STEIN  No. 16-10141-02                      21

```
09:39:09   1  to those objections, I did view all of those, in addition
09:39:12   2  to the ones that were presented today.
09:39:13   3       I've also had a handful of letters presented to me
09:39:19   4  from potential victims, which I've read as well.  Neither
09:39:23   5  I nor the Government are aware of any other victims who
09:39:25   6  wish to be heard with respect to today's sentencing.  But
09:39:29   7  are there any present in the courtroom who would like to
09:39:31   8  be heard at this time?
09:39:35   9       All right, seeing no indication, I believe that
09:39:38  10  will conclude our victim presentation section of today's
09:39:43  11  proceedings.
09:39:43  12       Is there anything else that we need to address in
09:39:46  13  a consolidated manner before we move to individual
09:39:47  14  sentencing?
09:39:48  15       MR. MATTIVI:  Nothing known to the Government,
09:39:49  16  Your Honor.
09:39:50  17       MS. BRANNON:  I don't believe so, Your Honor.
09:39:52  18       MR. PRATT:  No, Your Honor.
09:39:53  19       MS. SCHMIDT:  No, Your Honor.
09:39:54  20       THE COURT:  All right.  At this point I'm going to
09:39:57  21  request the marshals to take Mr. Stein and Mr. Wright
09:40:00  22  back downstairs, we'll proceed with sentencing just with
09:40:05  23  respect to Mr. Allen.  As they prepare to do that let me
09:40:09  24  ask a couple of questions.  Do we -- we've been here --
09:40:11  25  well, I've been here 40 minutes.  I assume some of you
```

| | | |
|---|---|---|
| 09:40:14 | 1 | have been in the courtroom longer.  Do we need a recess |
| 09:40:16 | 2 | in general before we proceed?  What's your preference? |
| 09:40:19 | 3 | MS. BRANNON:  We'd ask for one, Your Honor. |
| 09:40:20 | 4 | THE COURT:  All right.  Here's what I'm going to |
| 09:40:22 | 5 | ask then.  I'm going to ask the marshals if you would |
| 09:40:24 | 6 | take all three defendants down.  Let's come back at |
| 09:40:27 | 7 | 10:00 o'clock with just Mr. Allen, and we'll reconvene at |
| 09:40:31 | 8 | that point for his sentencing. |
| 09:40:31 | 9 | I'm going to request those of you present in the |
| 09:40:35 | 10 | courtroom to wait a minute just for security purposes. |
| 09:40:38 | 11 | It'll be easier for the marshals to move the three |
| 09:40:41 | 12 | defendants if the hallway's not otherwise crowded with |
| 09:40:47 | 13 | spectators.  So if the marshals want to take the |
| 09:40:50 | 14 | defendants down and return Mr. Allen at 10:00 o'clock, |
| 09:40:52 | 15 | we'll proceed with his sentencing directly at that point. |
| 09:40:55 | 16 | For those of unfamiliar with the courthouse, I'll |
| 09:40:57 | 17 | inform you that there are men's rooms behind me at the |
| 09:41:01 | 18 | end of the hall, both on this floor and the floor below, |
| 09:41:04 | 19 | women's rooms on the other side.  We will take a |
| 09:41:09 | 20 | 20-minute recess, come back at 10:00 o'clock, and proceed |
| 09:41:12 | 21 | at that point to hear sentencing for Mr. Allen. |
| 09:41:16 | 22 | Defense counsel, I know that even though your |
| 09:41:20 | 23 | clients are not here, referring to Mr. Stein and |
| 09:41:23 | 24 | Mr. Wright's counsel, are not present for Mr. Allen's |
| 09:41:27 | 25 | sentencing, obviously you'll want to, I assume, sit in on |

| | | |
|---|---|---|
| 09:41:30 | 1 | that.  I'd assumed that you would be free to sit in the |
| 09:41:34 | 2 | gallery.  I can see I was wrong about that.  So feel free |
| 09:41:37 | 3 | to return to counsel table if you want to be present for |
| 09:41:40 | 4 | that sentencing, even though it will just be of |
| 09:41:42 | 5 | Mr. Allen. |
| 09:41:42 | 6 | MR. PRATT:  Thank you, Your Honor. |
| 09:41:43 | 7 | THE COURT:  Court's in recess until 10:00 o'clock. |
| 09:41:46 | 8 | CLERK DAVENPORT:  All rise. |
| 09:41:47 | 9 | (A recess was taken from 9:41 to 10:00 A.M. |
| 09:41:47 | 10 | Defendant Curtis Allen returned to the courtroom and the |
| 09:58:37 | 11 | hearing proceeded as follows:) |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

| | | |
|---|---|---|
| 13:15:06 | 1 | (A recess was taken from 9:31 A.M. to 1:15 P.M. |
| 13:15:06 | 2 | Defendant Curtis Stein returned to the courtroom and the |
| 09:58:37 | 3 | hearing proceeded as follows:) |
| 13:15:10 | 4 | CLERK DAVENPORT: All rise. |
| 13:15:11 | 5 | THE COURT: Good afternoon. You may be seated. |
| 13:15:16 | 6 | The court resumes our hearing with respect to the |
| 13:15:23 | 7 | sentencing to Patrick Stein. Again, the objections to |
| 13:15:32 | 8 | the presentence investigation report have previously been |
| 13:15:34 | 9 | addressed. Although I did sustain one objection, because |
| 13:15:39 | 10 | of the nature of the way the guidelines work, it |
| 13:15:42 | 11 | ultimately does not change the final calculation of the |
| 13:15:44 | 12 | guideline. Mr. Stein still presents at this court |
| 13:15:47 | 13 | following his conviction by the jury of Count 1 of |
| 13:15:53 | 14 | conspiracy to use a weapon of mass destruction and |
| 13:15:55 | 15 | Count 2, conspiracy against civil rights. He still |
| 13:15:59 | 16 | presents to this court at an offense level 43, criminal |
| 13:16:04 | 17 | history category VI, for which the recommended guideline |
| 13:16:06 | 18 | sentence is life as to Count 1, statutory maximum of ten |
| 13:16:10 | 19 | years as to Count 2, to run concurrent with Count 1, and |
| 13:16:15 | 20 | supervised release of life for Count 1 and one to three |
| 13:16:18 | 21 | years for Count 2. |
| 13:16:23 | 22 | Let me hear from the Government -- pardon me. |
| 13:16:31 | 23 | Ms. Berkower, you may approach and proceed. |
| 13:16:33 | 24 | MS. BERKOWER: Thank you, Your Honor. |
| 13:16:41 | 25 | Good afternoon, Your Honor. Your Honor, at the |

| | | |
|---|---|---|
| 13:16:48 | 1 | last hearing for Mr. Allen you foreshadowed your thinking |
| 13:16:54 | 2 | about the sentences for these defendants, and so I intend |
| 13:16:59 | 3 | to approach the argument today with some of that in mind. |
| 13:17:01 | 4 | And I know counsel for Mr. Stein was present at that |
| 13:17:04 | 5 | hearing and so also had the benefit of hearing your |
| 13:17:07 | 6 | thoughts on that.  But despite what we went through with |
| 13:17:12 | 7 | Mr. Allen and some of the considerations that the Court |
| 13:17:14 | 8 | did not give him a guideline sentence, we would submit |
| 13:17:16 | 9 | that a guideline sentence of life imprisonment is still |
| 13:17:19 | 10 | appropriate under the 3553 factors for this defendant, |
| 13:17:23 | 11 | especially for this defendant. |
| 13:17:25 | 12 | The Court's familiar with the facts, having sat |
| 13:17:28 | 13 | through the trial and extensive post-trial filings, but a |
| 13:17:31 | 14 | few facts are worth highlighting that show that for this |
| 13:17:34 | 15 | defendant, Mr. Stein, a life sentence is wholly justified |
| 13:17:38 | 16 | here. |
| 13:17:39 | 17 | First, with regard to the nature and circumstances |
| 13:17:42 | 18 | of this offense.  As the Court alluded to earlier, the |
| 13:17:46 | 19 | bombing in this case that was planned was an atrocious |
| 13:17:51 | 20 | crime.  Mr. Stein and his codefendants planned to |
| 13:17:54 | 21 | indiscriminately murder innocent civilians, men, women, |
| 13:17:57 | 22 | and children, as they were in the act of prayer because |
| 13:18:01 | 23 | they hated Muslims and didn't want them in the |
| 13:18:03 | 24 | United States.  They wanted to send the message that |
| 13:18:08 | 25 | Muslims are not welcome in America.  And this crime is |

```
13:18:10    1  repugnant to the founding principles of our nation,
13:18:13    2  because in America people of all faiths are welcome and
13:18:17    3  it is known around the world that here anyone can
13:18:20    4  practice his or her faith freely.
13:18:25    5        In America, we're also a nation of laws.  We
13:18:27    6  settle our lives at the ballot box, not through vigilante
13:18:31    7  violence.  And if law enforcement in this case had not
13:18:34    8  stopped these defendants, this crime would have been
13:18:36    9  devastating to the victims, to their families, and to the
13:18:40   10  entire Garden City community.  It would have tarnished
13:18:43   11  the image of the state of Kansas and the United States as
13:18:47   12  a whole as a place that welcomes people of all faiths,
13:18:51   13  where racial and religious based violence is simply not
13:18:54   14  tolerated.
13:18:55   15        And as the Court saw this morning, and through the
13:18:57   16  victim impact statements that were provided to the Court,
13:19:00   17  both before this hearing and earlier today, even just the
13:19:03   18  plot itself, without carrying it to fruition, carried --
13:19:08   19  caused such great harm to its intended victims, it was
13:19:12   20  apparent in the eloquent statements the Court heard from
13:19:15   21  those victims as well as from members in leadership
13:19:17   22  positions in the community.
13:19:18   23        And I would also note that the Tenth Circuit has
13:19:22   24  recognized that the seriousness of a conspiracy to use a
13:19:27   25  weapon of mass destruction is treated differently than
```

| | | |
|---|---|---|
| 13:19:30 | 1 | other kinds of conspiracies in the criminal code. |
| 13:19:33 | 2 | Congress expressly acknowledged in 2332a that there |
| 13:19:39 | 3 | should -- that there's no difference in punishment |
| 13:19:41 | 4 | between conspiracy, attempts, and actual use of a weapon |
| 13:19:45 | 5 | of mass destruction, because the crime itself, even just |
| 13:19:48 | 6 | plotting to do it, is of the utmost seriousness. |
| 13:19:51 | 7 | And the Tenth Circuit recognized that in *United* |
| 13:19:53 | 8 | *States v. Nichols*, a case that's instructive here in part |
| 13:19:57 | 9 | because the defendant was convicted of conspiring to use |
| 13:19:59 | 10 | a weapon of mass destruction but ultimately acquitted of |
| 13:20:03 | 11 | the underlying use of the weapon of mass destruction in |
| 13:20:06 | 12 | the Oklahoma City bombing. |
| 13:20:07 | 13 | And the Tenth Circuit in that case said, "Congress |
| 13:20:11 | 14 | did not create different punishments for the conspiracy |
| 13:20:13 | 15 | or underlying substantive offenses, leading to the |
| 13:20:16 | 16 | inference it viewed the two as equivalent in consequence |
| 13:20:19 | 17 | and severity.  This is especially so because Congress |
| 13:20:23 | 18 | normally treats conspiracy as a crime punished by no more |
| 13:20:26 | 19 | than five years imprisonment."  And that, of course, is |
| 13:20:30 | 20 | a statute we're all familiar with, 18 U.S.C. § 371.  The |
| 13:20:35 | 21 | legislature's special treatment strongly suggests we |
| 13:20:37 | 22 | should not distinguish between using an explosive weapon |
| 13:20:41 | 23 | of mass destruction or conspiring to do so in determining |
| 13:20:43 | 24 | the proper punishment in this case, and the citation |
| 13:20:46 | 25 | there is 169 F.3d 1255, Tenth Circuit, 1999. |

13:20:52  1        Your Honor, we have the FBI and state and local

13:20:59  2   law enforcement to thank for foiling this plot and saving

13:21:03  3   many, many lives.  But it bears repeating that the

13:21:07  4   horrific nature of this crime can't be overstated.  It is

13:21:09  5   a mass hate crime murder that the defendants planned to

13:21:12  6   carry out with a weapon of mass destruction, and it

13:21:16  7   warrants an extremely serious punishment.

13:21:20  8        Second with regard to the history and

13:21:22  9   characteristics of this particular defendant, nothing in

13:21:27  10  this particular defendant's personal history really

13:21:29  11  counsels for any leniency here.  His papers and the PSR

13:21:35  12  acknowledge some substance use in his past.  But by his

13:21:39  13  own account, in his interview with the probation

13:21:41  14  department, he was not using those substances during the

13:21:44  15  duration of this conspiracy.  He also acknowledged in his

13:21:46  16  sentencing papers and in the PSR some mental health

13:21:49  17  issues that he had had in the past, but he also told

13:21:52  18  probation he had not been in any kind of treatment for

13:21:55  19  those issues since several years -- since 2014, several

13:21:57  20  years prior to the conspiracy.  And so the Government

13:21:59  21  would submit that neither of those two characteristics of

13:22:02  22  this particular defendant counsel for leniency in the way

13:22:05  23  they might in a different case where there was a much

13:22:08  24  more severe history of either of those two types of

13:22:11  25  issues.

13:22:12  1          But at the same time it bears repeating that this

13:22:15  2  defendant started this conspiracy, as the Court found

13:22:18  3  during trial, on June 14th, 2016, in Brody Benson's shoot

13:22:23  4  shack.  He and defendant Allen talked about using

13:22:26  5  explosives to attack Muslims in southwest Kansas.  That

13:22:29  6  was when this conspiracy began.  And we know why he was

13:22:33  7  inspired to do that that day, because he said so on a

13:22:37  8  recording that we heard at trial.  He was angry about the

13:22:39  9  Pulse Nightclub shooting and it inspired him to start

13:22:43  10  organizing this attack.  He said it himself on the

13:22:45  11  recording.  After that shooting, a switch flipped, and he

13:22:48  12  went into organization mode.  He then tried to recruit

13:22:53  13  others to join him.  For weeks and for months he took an

13:22:56  14  active roll in planning this attack.  He met for hours

13:22:59  15  and hours with his codefendants to pick a target.  They

13:23:01  16  devised a plan for the attack.  They worked out

13:23:04  17  logistics.  His codefendants manufactured homemade

13:23:07  18  explosives, and then he also pursued an additional avenue

13:23:10  19  to obtain explosives and potentially automatic weapons

13:23:15  20  from someone he believed was a black-market operator.

13:23:17  21          When he was arrested, he had just delivered 300

13:23:20  22  pounds of fertilizer to someone that he thought was going

13:23:25  23  to build a bomb to blow up that entire apartment complex.

13:23:30  24  And at the prior sentencing hearing I know the Court

13:23:33  25  referred to Mr. Stein as someone who may be "all hat and

13:23:36  1  no cattle," but I submit to the court you can buy cattle

13:23:39  2  and that's exactly what Mr. Stein did that day when he

13:23:42  3  delivered that fertilizer with the expectation, the full

13:23:45  4  expectation, it would be delivered back to him in the

13:23:47  5  form of a bomb that could be used to explode an entire

13:23:50  6  apartment complex.

13:23:51  7       And, of course, the delivery of that fertilizer

13:23:55  8  was after Mr. Allen was arrested.  He was so determined

13:23:58  9  to carry out this attack that he still went forward with

13:24:01  10  it even after Mr. Allen, who had been making the homemade

13:24:04  11  explosives with Mr. Wright, was detained.

13:24:06  12       From the start and through the time of his arrest,

13:24:09  13  he was a vocal and active participant in this conspiracy.

13:24:12  14  We heard that repeatedly on the tapes.  And his hatred of

13:24:16  15  Muslims, his motivation for getting back at Muslims and

13:24:22  16  the government that allowed them to be here was a

13:24:24  17  constant on every single one of those recordings.

13:24:27  18       And significantly, this defendant is wholly

13:24:29  19  unrepentant.  To this day he has yet to acknowledge any

13:24:32  20  responsibility for what he did.  His sentencing papers

13:24:35  21  seek to blame Dan Day and the undercover, Brian, for his

13:24:38  22  crimes.  And the trial evidence established that just

13:24:41  23  isn't true.  When that conspiracy started in Brody

13:24:44  24  Benson's shoot shack, Dan Day had been carted away in an

13:24:47  25  ambulance and was in the hospital.  He was nowhere part

| | | |
|---|---|---|
| 13:24:50 | 1 | of that conversation.  He wasn't even on the property. |
| 13:24:53 | 2 | Dan Day had nothing to do with the Pulse Nightclub |
| 13:24:56 | 3 | shooting that caused Mr. Stein's switch to flip.  And |
| 13:24:59 | 4 | it's worth recalling that in that recording Mr. Stein |
| 13:25:01 | 5 | wasn't even talking to Dan Day.  Dan Day happened to pick |
| 13:25:05 | 6 | up one side of a telephone conversation that Mr. Stein |
| 13:25:07 | 7 | was having with some unidentified person that he was |
| 13:25:09 | 8 | trying to get to come to Brody Benson's field, as he |
| 13:25:12 | 9 | explained what he wanted to do. |
| 13:25:13 | 10 | Blaming Dan Day is contrary to the facts, and it |
| 13:25:17 | 11 | shows he is still unrepentant.  He wants to blame |
| 13:25:21 | 12 | somebody else for his own crimes.  And with regard to |
| 13:25:23 | 13 | Brian, the Court heard and saw on recordings and in text |
| 13:25:27 | 14 | messages throughout the trial how careful Brian was to |
| 13:25:30 | 15 | give Mr. Stein repeated opportunities to take a step |
| 13:25:33 | 16 | back, to decide not to do what he was going to do.  And |
| 13:25:38 | 17 | each time, instead of showing any hesitation or doubt, |
| 13:25:41 | 18 | Mr. Stein doubled down on his commitment to the crime. |
| 13:25:44 | 19 | As the Court will recall in Government's trial |
| 13:25:47 | 20 | Exhibit 111b and 111c, Mr. Stein described him and his |
| 13:25:52 | 21 | codefendants as having "the will, determination, and |
| 13:25:55 | 22 | dedication second to none." |
| 13:25:58 | 23 | He also, without any prompting told Brian that he |
| 13:26:02 | 24 | would just tell him the plan and went to lay it all out |
| 13:26:05 | 25 | in text messages.  Each time, instead of showing |

13:26:08  1  hesitation or doubt, he always wanted to go forward.

13:26:11  2  Even after Mr. Stein gave Brian 300 pounds of fertilizer,

13:26:15  3  Brian gave him one last chance to back out in that

13:26:17  4  McDonald's, and we heard that recording at trial, too.

13:26:20  5  Inside the McDonald's, before his arrest, Brian said to

13:26:23  6  him, "Are you sure you want to go through with this?

13:26:25  7  There might be children in that building."  And

13:26:27  8  Mr. Stein didn't waver for a second.  In Government's

13:26:32  9  trial Exhibit 19o, Brian said, "I'll be honest with you.

13:26:35  10  Are there a bunch of kids in there?"  Stein: "I'm sure

13:26:39  11  there are."  Instead, Mr. Stein seemed pleased with what

13:26:42  12  he was going to do, and the scale of death and

13:26:44  13  destruction that he would cause.

13:26:45  14       From Government's Exhibit 19l, Mr. Stein told

13:26:49  15  Brian, "It's a no-fail operation.  And if I'm going to do

13:26:53  16  it, I want it F'ing done right."  Brian said, "Well,

13:26:57  17  we're gonna make sure -- we're going to make you -- what

13:26:59  18  we're going to make you will do it."  Stein:  "Good."

13:27:02  19  Brian:  "You got my word on that."  Stein:  "Good."

13:27:05  20  Brian:  "It's gonna make a big mess, it's gonna -- both

13:27:08  21  of those areas are gone."  Stein:  "Good."  Brian:  "I

13:27:10  22  know that's what you wanted."  Stein:  "Absolutely.  I

13:27:13  23  mean, it's nothing but F'ing cockroaches, man."

13:27:16  24       He even spoke of working again with Brian on

13:27:19  25  future occasions in future attacks, calling it "a

```
13:27:21    1   fruitful F'ing relationship."  "This is only the

13:27:24    2   beginning, man.  Them MF'ers are everywhere."

13:27:29    3        I'd also point out and remind the court that the

13:27:32    4   children Brian referenced to him that might be in that

13:27:34    5   apartment complex were not just hypothetical, abstract

13:27:37    6   ideas to Mr. Stein.  The Court will recall that Dan Day

13:27:40    7   testified about an incident where he and Mr. Stein were

13:27:42    8   driving, they saw a Somali woman with her child, and

13:27:46    9   Mr. Stein's immediate reaction was how much he wanted to

13:27:48   10   kill them both.

13:27:50   11        Again and again the evidence showed Mr. Stein

13:27:53   12   viewed the Muslim residents of Garden City to be subhuman

13:27:57   13   cockroaches.  This defendant is not someone who is

13:27:59   14   manipulated or pressured or coerced in any way.  Again

13:28:03   15   and again he showed himself ready, willing, and more than

13:28:06   16   able to carry out this attack and kill innocent people,

13:28:09   17   and he has yet to show any contrition.

13:28:12   18        The defendant's postarrest interview is also

13:28:15   19   significant.  And while that didn't come into evidence at

13:28:18   20   trial, we provided the Court with certain excerpts of

13:28:20   21   that in our sentencing papers.  And I would draw the

13:28:22   22   Court's attention back to that now, because it provides a

13:28:24   23   telling window into this defendant's character and the

13:28:28   24   type of punishment that is really truly necessary here.

13:28:30   25        Even after his arrest, sitting in a room with FBI
```

13:28:34  1  agents, he proclaimed himself ready to die for his

13:28:37  2  beliefs.  He mocked the agents for arresting him because

13:28:40  3  he was a true patriot.  He told the agents that Muslims

13:28:43  4  were a domestic enemy, and he was willing to take all

13:28:46  5  means necessary to eliminate the threat that they posed.

13:28:50  6  To him, these agents had arrested the wrong person.  They

13:28:54  7  should have been thanking him for his service, not

13:28:57  8  arresting him.

13:28:58  9       And this is disturbing because it shows that

13:29:00  10  Mr. Stein views vigilante violence as patriotism.  It

13:29:04  11  sets him apart from other categories of criminals.  He's

13:29:08  12  not motivated by money or by addiction; he's motivated by

13:29:11  13  ideology.  And even after his arrest, he didn't waver in

13:29:15  14  his commitment to that ideology.  There's nothing in the

13:29:18  15  record to show that he has changed his views since that

13:29:22  16  time, and he certainly hasn't renounced his twisted view

13:29:24  17  of patriotism by any means.  The Government would submit

13:29:29  18  that all of this shows Mr. Stein is truly a danger to the

13:29:32  19  public and at a high risk of recidivating.

13:29:36  20       And several circuits have recognized, and

13:29:38  21  Mr. Mattivi pointed this out earlier in Mr. Allen's

13:29:41  22  hearing, that several circuits have recognized that

13:29:43  23  ideologically motivated criminals such as terrorists pose

13:29:48  24  a unique risk to society.  And that's the *Meskini* case in

13:29:53  25  the Second Circuit, the *Ressam* case in the Ninth Circuit,

| 13:29:55 | 1 | and the *Jayyousi* case in the Eleventh Circuit.  And we |
| 13:30:00 | 2 | would submit that, taken together, this all shows that a |
| 13:30:02 | 3 | life sentence truly is necessary here to stop Mr. Stein |
| 13:30:05 | 4 | from committing further crimes. |
| 13:30:06 | 5 | With regard to promoting respect for the law and |
| 13:30:08 | 6 | deterring others, we would note that the trial evidence |
| 13:30:11 | 7 | made clear that a lot of people knew what Mr. Stein |
| 13:30:14 | 8 | wanted to do.  There were at least three meetings where |
| 13:30:18 | 9 | he talked with other people in his militia group about |
| 13:30:21 | 10 | what he wanted to do and asked them to join the attack. |
| 13:30:24 | 11 | And no one, except Dan Day, ever reported any of this to |
| 13:30:28 | 12 | the authorities.  If Dan Day hadn't done so, the FBI |
| 13:30:32 | 13 | would have learned about this plot when it heard a bomb |
| 13:30:35 | 14 | go off in Garden City, and that was something that |
| 13:30:38 | 15 | Special Agent Amy Kuhn, who was called as a defense |
| 13:30:40 | 16 | witness in this case, testified to. |
| 13:30:46 | 17 | And additionally, as the Court heard on recordings |
| 13:30:48 | 18 | played at trial, the defendants talked extensively about |
| 13:30:50 | 19 | how they knew what they were doing was wrong, they knew |
| 13:30:53 | 20 | it would get them sent to jail, and they knew even it |
| 13:30:57 | 21 | would get them labeled domestic terrorists.  Mr. Stein |
| 13:30:59 | 22 | himself used that term more than once, yet they talked |
| 13:31:02 | 23 | extensively about how to thwart law enforcement by |
| 13:31:05 | 24 | claiming that they were just militia members, exercising |
| 13:31:07 | 25 | their rights. |

13:31:08   1        Based on that, a substantial sentence is necessary

13:31:10   2   to promote respect for the law that was clearly lacking

13:31:15   3   among the defendants and their peers at the time of this

13:31:17   4   offense, and to deter others from committing similar

13:31:21   5   crimes.

13:31:21   6        Now with regard to avoiding unwanted sentencing

13:31:25   7   disparity among similarly situated defendants, I know

13:31:28   8   that the Court already addressed this in the last hearing

13:31:30   9   but I do want to touch on some of that again here.  The

13:31:33   10   Government would respectfully submit that a life sentence

13:31:36   11   actually would not create such a disparity, because

13:31:38   12   although while it is difficult to distinguish among

13:31:41   13   cases, especially terrorism cases, the Fourth Circuit

13:31:44   14   in -- I'm sorry, the Fourth Circuit in *Abu Ali* and the

13:31:48   15   Eleventh Circuit in *Jayyousi*, both gave some helpful

13:31:52   16   guideposts as to who should be compared to who.  The

13:31:55   17   Eleventh Circuit cautioned that "a sentencing court

13:31:57   18   should not draw comparisons to cases involving defendants

13:32:00   19   who are convicted of less-serious offenses or pleaded

13:32:02   20   guilty or had dissimilar criminal histories."  And in *Abu*

13:32:08   21   *Ali* the Fourth Circuit noted that "defendant's sentence

13:32:09   22   pursuant to a plea agreement are not necessarily

13:32:11   23   similarly situated to defendants sentenced after trial,

13:32:14   24   that is especially true where, as here, the defendant

13:32:17   25   refused to express remorse or accept responsibility for

| | | |
|---|---|---|
| 13:32:19 | 1 | his crimes." |
| 13:32:20 | 2 | And so with those guideposts in mind, I would |
| 13:32:24 | 3 | suggest there are actually two cases that present the |
| 13:32:26 | 4 | best comparison to the court for purposes of assessing |
| 13:32:29 | 5 | Mr. Stein. And those are the *Aldawsari* case out of the |
| 13:32:35 | 6 | Fifth Circuit and the *Mohamud* case out of the Ninth |
| 13:32:38 | 7 | Circuit, because really the best comparison would be |
| 13:32:41 | 8 | other defendants who are charged with a similar offense, |
| 13:32:44 | 9 | a weapon of mass destruction offense, who went to trial |
| 13:32:47 | 10 | and who showed no acceptance of responsibility and whose |
| 13:32:50 | 11 | guidelines were either a lengthy term of years or life. |
| 13:32:52 | 12 | And in the *Aldawsari* case there are many similar |
| 13:32:58 | 13 | facts to this case. The defendant was charged with |
| 13:33:00 | 14 | attempted use of a weapon of mass destruction where in |
| 13:33:02 | 15 | that case he had assembled precursor chemicals to build a |
| 13:33:05 | 16 | bomb, he had compiled a list of targets, and he was only |
| 13:33:09 | 17 | stopped when law enforcement happened to find out about |
| 13:33:11 | 18 | his plans and arrested him. He went to trial, and |
| 13:33:14 | 19 | throughout the trial, up until the final sentencing |
| 13:33:17 | 20 | hearing, he never expressed any remorse or contrition for |
| 13:33:19 | 21 | his crimes. |
| 13:33:20 | 22 | And in that case I would submit the defendant |
| 13:33:24 | 23 | actually did even less than what the defendant in this |
| 13:33:27 | 24 | case did to bring about the planned attack, because in |
| 13:33:30 | 25 | this case, as we've already gone over, the defendant |

13:33:33  1  actually tried to buy a finished bomb from someone that

13:33:36  2  he believed could provide it to him, among the other

13:33:39  3  many, many, months and weeks of planning that the

13:33:42  4  defendant did.

13:33:43  5        But at sentencing in *Aldawsari*, the Court imposed

13:33:47  6  a life sentence and the Fifth Circuit affirmed it.  And

13:33:50  7  we would submit that, based on that comparison, a case

13:33:52  8  that had many of those similar crucial guidepost factors

13:33:55  9  as Mr. Stein's case and a defendant who arguably even did

13:34:00  10  less to bring about that weapon of mass destruction

13:34:04  11  usage, we would submit that case presents an appropriate

13:34:07  12  comparison.

13:34:07  13        The second case I want to bring the Court's

13:34:10  14  attention to is the *Mohamud* case out of the Ninth

13:34:12  15  Circuit.  And that's the Christmas tree-lighting ceremony

13:34:14  16  attempted bombing that we've talked about at great length

13:34:17  17  in other hearings in this case.

13:34:19  18        THE COURT:  In Portland.

13:34:20  19        MS. BERKOWER:  Sorry?

13:34:21  20        THE COURT:  In Portland.

13:34:21  21        MS. BERKOWER:  Yes, Your Honor, in Portland,

13:34:22  22  Oregon.  In that case the defendant was charged with a

13:34:25  23  weapon of mass destruction offense, again an attempted

13:34:28  24  WMD offense.  He went to trial, he was convicted by a

13:34:31  25  jury, and his guidelines were life.  But in that case

13:34:36   1   there was some very significant differences.  Immediately

13:34:38   2   after his arrest, the defendant expressed remorse for

13:34:42   3   what he had done, and he continued to express remorse

13:34:45   4   throughout his time in the federal system.

13:34:47   5        He went to trial on an entrapment theory because

13:34:50   6   in that case, unlike in this case, there actually was

13:34:53   7   enough evidence to submit that question to the jury.

13:34:56   8   Here there certainly wasn't, as the Court found during

13:34:59   9   trial.  And after his conviction, he also presented

13:35:02   10  evidence from two psychologists that he was unlikely to

13:35:05   11  recidivate given his renunciation of violence, and his

13:35:09   12  very young age at the time of the offense that made him

13:35:12   13  more subjective to potential influences from outside

13:35:17   14  sources.

13:35:19   15        And even with that difference, that extreme

13:35:21   16  remorse, the judge in that case sentenced him to 30

13:35:25   17  years.  The Government asked for 40, and the judge

13:35:27   18  sentenced him to 30.  And we would submit that, based on

13:35:30   19  that, in a case that is so similar in so many ways, that

13:35:34   20  defendant wanted to also harm a large number of people,

13:35:38   21  kill a large number of people gathered to celebrate a

13:35:42   22  religious observance.  They're very similar crimes.  And

13:35:46   23  yet in that case, even after throwing himself on the

13:35:48   24  mercy of the court and renouncing what he had done, the

13:35:51   25  judge gave him 30 years.

13:35:52   1          And so based on those two comparisons, setting

13:35:55   2   aside all the cases that Mr. Pratt cited in his brief, or

13:35:59   3   the defendant pled guilty to an 11(c)(1)(C), or cases

13:36:02   4   that didn't involve a weapon of mass destruction, that

13:36:04   5   involved material support to terrorists or some other

13:36:06   6   crime that has a much-lesser anticipated punishment when

13:36:10   7   Congress even made it a crime, we would submit that those

13:36:13   8   two present an appropriate comparison and show that a

13:36:16   9   life sentence here is fully appropriate.

13:36:18   10          I would also just like to speak a moment to the

13:36:22   11   guidelines 'cause I know that the Court had some concerns

13:36:24   12   that were expressed at the last hearing about what the

13:36:27   13   terrorism enhancement does to the guidelines.  In some

13:36:32   14   cases the guideline -- the offense conduct is much less

13:36:37   15   serious than this, but the guideline -- the terrorism

13:36:40   16   enhancement will still apply.  So, for instance, in a

13:36:44   17   material support for terrorism case, which may be capped

13:36:47   18   at either 15 or 20 years maximum punishment, the

13:36:50   19   terrorism enhancement may well still apply, and it may

13:36:53   20   well still put that person at a guidelines of life

13:36:55   21   because it is such a severe enhancement.

13:36:58   22          But the conduct is just not the same as a weapon

13:37:02   23   of mass destruction offense.  And I would submit that

13:37:04   24   whatever concerns the Court may have about overstating

13:37:08   25   the offense conduct through the terrorism guideline,

| | | |
|---|---|---|
| 13:37:11 | 1 | that's simply not present here.  This kind of case, where |
| 13:37:14 | 2 | there was a mass hate crime murder planned, explosives |
| 13:37:18 | 3 | were manufactured and attempted to be purchased, that is |
| 13:37:22 | 4 | exactly the kind of case that the terrorism enhancement |
| 13:37:25 | 5 | appropriately brings the sentence, the recommended |
| 13:37:29 | 6 | guideline sentence, up to a life term. |
| 13:37:32 | 7 | It's fairly within the heartland of exactly what |
| 13:37:34 | 8 | the kind of punishment that Congress would want to impose |
| 13:37:40 | 9 | and did impose through the sentencing commission or did |
| 13:37:43 | 10 | recommend imposing through the sentencing commission for |
| 13:37:46 | 11 | this kind of crime.  And the Government would submit that |
| 13:37:48 | 12 | it would be unreasonable for the Court to discount the |
| 13:37:51 | 13 | differences that you would have in a case where the |
| 13:37:54 | 14 | guidelines are enhanced for a material support case |
| 13:37:57 | 15 | versus a weapon of mass destruction case, which is what |
| 13:38:00 | 16 | this is and what the jury convicted Mr. Stein of. |
| 13:38:02 | 17 | Now, I know that the Court asked that we -- the |
| 13:38:13 | 18 | way we proceed today is we speak to all of the different |
| 13:38:16 | 19 | issues that may come up, and so those were the main -- |
| 13:38:20 | 20 | those were the main reasons that the Government submits |
| 13:38:22 | 21 | that this defendant should receive a life sentence in |
| 13:38:24 | 22 | this case.  If the Court has any questions about that, I |
| 13:38:27 | 23 | can field those now or else I can move on to some of the |
| 13:38:30 | 24 | other points raised in Mr. Pratt's presentation. |
| 13:38:33 | 25 | THE COURT:  Well, I have a question.  Whether it's |

```
13:38:35    1   appropriate now or later I guess doesn't matter.  It's
13:38:38    2   something that I struggled with.  I wouldn't say I
13:38:41    3   struggled a great deal, but I thought about quite a bit
13:38:43    4   as I was fashioning preliminary thoughts for today's
13:38:47    5   hearing, without resolution.  And based on your position
13:38:53    6   here, I want to put that question to you.  And that is,
13:38:57    7   substantively speaking, for a 50-year-old defendant,
13:39:04    8   what's the real difference between a life sentence and a
13:39:06    9   25-year sentence, which is what I gave Mr. Allen?
13:39:11   10        MS. BERKOWER:  Well, Your Honor, I think there's a
13:39:13   11   few substantive -- there's a few differences.  And the
13:39:16   12   first is that I guess I don't know what the average life
13:39:19   13   span is for a person in Mr. Stein's condition.
13:39:22   14        THE COURT:  Well, I don't either, but we can
13:39:24   15   assume 70 to 80 is a normal life span for an individual.
13:39:29   16   I actually debated this, without resolution, in my mind
13:39:32   17   as well, whether being in prison enhances or
13:39:35   18   distinguishes that life span.  Prison's a hard life, but
13:39:39   19   unlike other situations, they get adequate nutrition and
13:39:43   20   medical care, so they're unknowns, I admit.
13:39:46   21        MS. BERKOWER:  I think part of the issue here that
13:39:48   22   we're trying to get our arms around as well, Your Honor,
13:39:52   23   is that the sentence in this case is important for more
13:39:55   24   than just the time that Mr. Stein will serve.  This was a
13:40:00   25   very serious crime, and to the extent that the purpose of
```

1-25-19   USA v. STEIN   No. 16-10141-02                43

13:40:05   1   sentencing is to fashion something that's appropriate for

13:40:07   2   the defendant but also that sends a deterrent message to

13:40:12   3   the community, that reflects the seriousness of that

13:40:15   4   offense in the community.  That's also important.  And I

13:40:19   5   would submit that while a 25-year sentence is certainly

13:40:22   6   nothing to scoff at, it is not of the same weight as a

13:40:26   7   longer sentence because I'm -- it just doesn't carry

13:40:31   8   that -- it just doesn't carry that same weight.

13:40:33   9       I would also submit that for someone like

13:40:36   10   Mr. Stein, who expressed this unchecked desire to carry

13:40:40   11   this out at all costs, I think he said "by all means

13:40:44   12   possible or necessary" in his interview with the FBI.

13:40:48   13   There is a very great chance that if he gets out, even as

13:40:51   14   an older man, he might try to do this again.  There's

13:40:54   15   nothing that shows that he's not going to change.

13:40:57   16       THE COURT:  That strains credulity, that a

13:40:59   17   75-year-old man would be organized -- I mean, it's a

13:41:03   18   theoretical possibility but is it strains credulity.

13:41:08   19       MS. BERKOWER:  Well, Your Honor, I would submit a

13:41:09   20   lot of what he did here is he's a charismatic person who

13:41:13   21   spoke very convincingly to other people to join him.

13:41:17   22   This is someone who said "a switch flipped and I went

13:41:19   23   into organization mode" in June.  And by September he and

13:41:23   24   his friends had homemade explosives.  I mean, there's

13:41:26   25   something to be said for, even if he might personally not

1-25-19   USA v. STEIN   No. 16-10141-02

44

| | | |
|---|---|---|
| 13:41:30 | 1 | be able to carry out the logistics of a plot the same at |
| 13:41:34 | 2 | an older age the same way he would at this point in time, |
| 13:41:38 | 3 | that he has -- he showed that skill, and he also showed |
| 13:41:41 | 4 | the desire to carry out great harm on this innocent |
| 13:41:45 | 5 | population. And I think that can't be understated and |
| 13:41:47 | 6 | it's recognized by courts pretty frequently in terrorism |
| 13:41:52 | 7 | cases. |
| 13:41:52 | 8 | THE COURT: Let me ask you a related question |
| 13:41:54 | 9 | then. And I alluded to this this morning in sentencing |
| 13:41:57 | 10 | Mr. Allen. I, in my thought process on this case, |
| 13:42:06 | 11 | arrived at a principled conclusion that not all weapon of |
| 13:42:13 | 12 | mass destruction cases are identical, that some -- that |
| 13:42:19 | 13 | given individual consideration, as you said -- some are |
| 13:42:22 | 14 | worse than others. I mean, they're all horrific, but |
| 13:42:25 | 15 | they're not just all the same. |
| 13:42:27 | 16 | Is that a principle with which you would agree or |
| 13:42:32 | 17 | disagree? |
| 13:42:32 | 18 | MS. BERKOWER: Yes, of course. I mean -- |
| 13:42:34 | 19 | THE COURT: But if I follow a guideline sentence, |
| 13:42:36 | 20 | they all end up at life. And it -- because of the way |
| 13:42:41 | 21 | the terrorism enhancement works with criminal history |
| 13:42:44 | 22 | category VI and the 12-level enhancement, any differences |
| 13:42:48 | 23 | that a court should take into account are overwhelmed by |
| 13:42:53 | 24 | the effect of the guideline enhancements to where they're |
| 13:42:57 | 25 | all the same. Now arguably, I suppose, there's a |

13:43:01  1  difference of a life sentence to a 59-year-old as opposed

13:43:04  2  to a 17-year-old, but that's not what we're talking

13:43:07  3  about.  We're talking about is it a life sentence.  And

13:43:10  4  if not all the offenses are the same, then what's the

13:43:12  5  court to do with a guideline that essentially requires me

13:43:16  6  to treat them all the same?

13:43:17  7       MS. BERKOWER:  I understand that, Your Honor.  And

13:43:19  8  I understand the Court is trying to parse between them in

13:43:21  9  a way that's meaningful.  And I guess I don't know that I

13:43:24  10  have an answer for you in terms of what's worse, you

13:43:28  11  know --

13:43:28  12       THE COURT:  But I have to answer that, and that's

13:43:30  13  why I'm asking for your assistance.

13:43:32  14       MS. BERKOWER:  What I would say is there are

13:43:34  15  several things that make this crime worthy of a life

13:43:37  16  sentence, regardless of whether other WMD cases may or

13:43:41  17  may not be justified in getting a life sentence.  And

13:43:43  18  that is something the Court identified at Mr. Allen's

13:43:46  19  hearing, which is the hate crime motive here, the fact

13:43:50  20  that this was a crime motivated by extreme hatred based

13:43:54  21  on race, religion, and national origin, and that that is

13:43:58  22  something that warrants a punishment at the highest

13:44:01  23  level, because that is so fundamentally contrary to

13:44:04  24  American values.

13:44:06  25       And so regardless of whether another defendant

| | | |
|---|---|---|
| 13:44:10 | 1 | who -- regardless of whether another defendant may or may |
| 13:44:14 | 2 | not, you know, be similarly situated with a similar |
| 13:44:17 | 3 | actual -- where they got to in the usage of the weapon or |
| 13:44:20 | 4 | whether they detonated it or not, that motivating factor |
| 13:44:25 | 5 | and how apparent it was in this case warrants a life |
| 13:44:27 | 6 | sentence here. |
| 13:44:27 | 7 | I would also say that, even without the terrorism |
| 13:44:31 | 8 | enhancement, this type of crime would warrant a life |
| 13:44:34 | 9 | sentence. The Government would probably be arguing for a |
| 13:44:37 | 10 | life sentence no matter what, even if there were no such |
| 13:44:40 | 11 | thing as the terrorism enhancement, because of the |
| 13:44:42 | 12 | horrific nature of it. And so while I understand there |
| 13:44:44 | 13 | has to be a comparison between like cases, we would |
| 13:44:48 | 14 | see -- we would say that judging this case on the conduct |
| 13:44:50 | 15 | alone warrants a life sentence, regardless of what it |
| 13:44:54 | 16 | might -- what might be appropriate in another sentence. |
| 13:44:56 | 17 | I would also note that not all WMD offenses |
| 13:45:01 | 18 | cross-reference to murder or attempted murder. Some |
| 13:45:03 | 19 | might be cross-referenced to a lower base offense level |
| 13:45:07 | 20 | that wouldn't ultimately bring the case up to a life |
| 13:45:11 | 21 | sentence. And I would say that I think that -- do those |
| 13:45:20 | 22 | considerations assist the Court at all? |
| 13:45:23 | 23 | THE COURT: Of course, a criminal history category |
| 13:45:24 | 24 | VI, by offense level 37 you're at 360 to life, which |
| 13:45:31 | 25 | isn't a life sentence, it's 360 to life. But at criminal |

13:45:38   1   history category VI, you get there pretty easily.

13:45:39   2        MS. BERKOWER:  That's true, Your Honor.

13:45:40   3        THE COURT:  So -- well, I'm just -- these are

13:45:44   4   conundrums, Ms. Berkower, that I thought about a great

13:45:50   5   deal in preparation for today, and I appreciate your

13:45:53   6   perspective on them.

13:45:55   7        MS. BERKOWER:  Thank you, Your Honor.

13:45:56   8        If -- there are a few other points that I expect

13:45:58   9   may come up in Mr. Pratt's presentation --

13:46:00  10        THE COURT:  All right.

13:46:00  11        MS. BERKOWER:  -- and since this is my opportunity

13:46:02  12   to address the Court, I would ask to talk about them now.

13:46:05  13        So with regard -- I know the Court has received a

13:46:19  14   number of sentencing letters in support of this

13:46:21  15   particular defendant.  And I would just note that the

13:46:25  16   Tenth Circuit, in *United States v. Morgan,* recognized

13:46:27  17   that letters that show a lack of familiarity with the

13:46:30  18   facts of the case, the nature of the offense, question

13:46:32  19   the defendant's guilt, or felt he had been sufficiently

13:46:35  20   punished by the prosecution and its collateral

13:46:38  21   consequences are not --

13:46:39  22        THE COURT:  I think most of the letters -- and

13:46:41  23   I've read all those letters -- primarily they were from

13:46:44  24   family members or I will call them lifelong friends, and

13:46:49  25   I think they went more to -- with reference to 3553(a)

13:46:54   1   factors -- more to the defendant's characteristics than

13:46:56   2   they did to the nature of the offense.

13:46:58   3        MS. BERKOWER:  Well, Your Honor, I would say that

13:47:00   4   to the extent some of them did seem to show a lack of

13:47:02   5   familiarity with what the charges actually were, I know

13:47:05   6   there were several references to this defendant had not

13:47:08   7   committed any act of violence or harm, and would never be

13:47:12   8   a murderer or threat to society, I think the Court should

13:47:16   9   take those --

13:47:16  10        THE COURT:  Well, Ms. Berkower, I've always had

13:47:19  11   the principle in sentencing that any defendant, no matter

13:47:21  12   how heinous their crime is, is entitled to have their

13:47:24  13   mother believe in them, and I assume siblings as well, so

13:47:30  14   I don't fault family members for their approach.

13:47:33  15        MS. BERKOWER:  Understood, Your Honor.

13:47:34  16        Your Honor, the defendant did, in his sentencing

13:47:38  17   papers, raise a claim of sentencing entrapment, which is

13:47:42  18   also called -- he also called at one point charge

13:47:45  19   manipulation or imperfect entrapment.  And if the Court

13:47:48  20   is interested in hearing about that, I can speak to that

13:47:50  21   now.

13:47:50  22        THE COURT:  I was not very persuaded at all by

13:47:54  23   that section of their brief, so I thought it was old

13:48:00  24   arguments in new clothes and I'd already rejected those

13:48:03  25   old arguments and wasn't impressed with the sartorial

13:48:08   1   changes that they were presented in.

13:48:09   2        MS. BERKOWER:  Your Honor, we would agree with

13:48:10   3   that assessment.

13:48:10   4        And also Mr. Stein raised in his sentencing papers

13:48:14   5   that this crime did not transcend national boundaries.

13:48:18   6   We would submit that it is -- the one district court that

13:48:20   7   held that is out of circuit, not precedential, not

13:48:24   8   binding.

13:48:24   9        THE COURT:  I didn't even think it was

13:48:25   10  particularly persuasive.  I thought that was a rather

13:48:28   11  outlier argument from that one court.

13:48:33   12       MS. BERKOWER:  Your Honor, the other thing that we

13:48:35   13  anticipate could come up in the defendant's presentation

13:48:37   14  is I know the defense may play a video portraying -- a

13:48:44   15  video portraying certain members of Mr. Stein's family.

13:48:47   16  I don't know if that --

13:48:48   17       MR. PRATT:  (Shaking head.)

13:48:49   18       MS. BERKOWER:  They are not doing that.  Okay.

13:48:50   19  Then I will not go into that.

13:48:52   20       The Court's brief indulgence, Your Honor.

13:48:55   21       THE COURT:  Certainly.

13:48:55   22       (Whereupon, a sotto voce discussion was had

13:48:58   23  between Ms. Berkower and Ms. Hahn.)

13:49:31   24       MS. BERKOWER:  And, Your Honor, Ms. Hahn just

13:49:33   25  pointed out one other instance in which application of

13:49:36   1   the terrorism enhancement actually does not bring the

13:49:40   2   guidelines for a particular case up to life.  That's

13:49:44   3   under 2K1.4A3.  Apparently there are certain

13:49:48   4   circumstances in which the enhancement could be applied

13:49:50   5   in a different way.  And so I know that while the

13:49:54   6   defense, especially Mr. Allen but Mr. Stein as well, also

13:49:58   7   have made a lot of -- drawn a lot -- or made a lot of

13:50:02   8   claims that it's impossible to distinguish between people

13:50:05   9   who are given the enhancement, we would submit that

13:50:08   10  that's just not the case.

13:50:09   11       Your Honor, in conclusion, we would respectfully

13:50:12   12  submit that a sentence of life imprisonment here is

13:50:15   13  appropriate, given the very specific facts of this case,

13:50:18   14  regardless of what any other WMD case might -- regardless

13:50:23   15  of the guidelines calculations in any other WMD case,

13:50:26   16  it's our contention that they appropriately address the

13:50:29   17  offense conduct here, given the hate crime motive, the

13:50:33   18  extreme horrific nature of this crime if it had been

13:50:36   19  carried out to fruition, Mr. Stein's complete lack of

13:50:40   20  contrition or remorse, and his determination to follow

13:50:43   21  through with this after Mr. Allen's arrest, his extreme

13:50:47   22  determination to do this even after being presented with

13:50:51   23  outs, having already purchased a bomb, being given an out

13:50:55   24  and still wanting to go forward, and then continuing with

13:50:59   25  his pursuit of that ideology in his FBI interview, we

| | | |
|---|---|---|
| 13:51:02 | 1 | would submit this is somebody who needs to spend the rest |
| 13:51:05 | 2 | of their life incarcerated, and we would ask the Court |
| 13:51:07 | 3 | for a life sentence. |
| 13:51:09 | 4 | THE COURT: Thank you, Ms. Berkower. |
| 13:51:10 | 5 | MS. BERKOWER: Thank you. |
| 13:51:11 | 6 | THE COURT: Defense? |
| 13:51:23 | 7 | MR. PRATT: Your Honor, Mr. Shultz will be |
| 13:51:24 | 8 | handling the first part of our argument. |
| 13:51:26 | 9 | THE COURT: I see that. |
| 13:51:28 | 10 | MR. SHULTZ: Thank you, Your Honor. Like |
| 13:51:36 | 11 | Ms. Berkower, Your Honor, I took note of the Court's |
| 13:51:39 | 12 | foreshadowing this morning and tried to adjust some of my |
| 13:51:42 | 13 | arguments. Excuse me for just a second. |
| 13:51:47 | 14 | I want to start kind of with our recommendation, |
| 13:51:51 | 15 | give the Court some background as to what our thinking |
| 13:51:53 | 16 | was. Our proposed sentence was 15 years, with a lengthy, |
| 13:51:57 | 17 | if not lifetime, period of supervision. |
| 13:52:00 | 18 | THE COURT: As I mentioned this morning, |
| 13:52:02 | 19 | Mr. Shultz, it seems to me unlikely -- and I say this |
| 13:52:06 | 20 | with no disrespect to our probation officers who have my |
| 13:52:10 | 21 | highest admiration but attempt -- let me put it this way. |
| 13:52:13 | 22 | I'm not sure how I would fashion a condition of |
| 13:52:15 | 23 | supervision that, with the benefit of hindsight, would |
| 13:52:18 | 24 | have caught and prevented this event. So how do I derive |
| 13:52:24 | 25 | comfort from a longer term of supervision? |

13:52:26   1           MR. SHULTZ:  Your Honor, I think supervision, in

13:52:29   2   and of itself, can be a deterrent factor.  Even after

13:52:32   3   somebody is released from prison, they are not free when

13:52:36   4   they're on supervision.  They are subject to search at

13:52:39   5   any time.

13:52:39   6           THE COURT:  And what would search have revealed

13:52:40   7   had they searched Mr. Stein?

13:52:42   8           MR. SHULTZ:  I think it would do two things:  one,

13:52:46   9   I mean, if there -- to the extent there was evidence,

13:52:48   10  physical evidence, that could have been found --

13:52:50   11          THE COURT:  Well, I'm not asking hypothetical.

13:52:51   12          MR. SHULTZ:  -- one, but more --

13:52:53   13          THE COURT:  I'm saying on the facts of this case,

13:52:54   14  what would a search have found?

13:52:56   15          MR. SHULTZ:  I'm trying to remember, Your Honor.

13:53:01   16  I mean, there were items of -- I believe there were,

13:53:04   17  like, notes and things that were found in his house.

13:53:06   18          THE COURT:  I think there'd be Fourth Amendment

13:53:07   19  issues with them searching Mr. Stein and then reading

13:53:11   20  through the pages of notes.

13:53:12   21          MR. SHULTZ:  Your Honor, that's a fair point.  I

13:53:14   22  think the deterrent value, though, of unannounced and

13:53:17   23  unchallenged -- not challengeable but unannounced

13:53:20   24  searches would have provided a -- would provide a

13:53:24   25  specific deterrent, not a general deterrent to, say,

13:53:27   1   community, "This is what happens when you commit these

13:53:29   2   crimes," but a specific deterrent to a person, Mr. Stein

13:53:32   3   in particular, who is under threat of being searched at

13:53:38   4   any time, a specific deterrent which I think in the

13:53:41   5   literature and the case law is much more effective and

13:53:44   6   recognized as much more effective than the idea of

13:53:47   7   general deterrence, which is generally not an actual

13:53:49   8   deterrent, Your Honor.

13:53:51   9        I also think that just the fact that he's going --

13:53:54   10   he would have to, in those cases, comply with maintaining

13:53:57   11   active employment, which was an issue here, there would

13:54:00   12   be drug screening and substance abuse screening, and

13:54:03   13   mental health treatment requirements, potentially.

13:54:05   14   Mr. Pratt is going to address some of those issues.  But

13:54:09   15   all of those kinds of conditions can be imposed in a way

13:54:12   16   that not only can prevent practically Mr. Stein from

13:54:15   17   having gone through this, but also theoretically in the

13:54:19   18   sense that they would deter him because he's going,

13:54:22   19   "Look, they could come in at any time, and I got to be

13:54:24   20   careful, I can't do this."

13:54:25   21        We don't have a situation here where Mr. Stein

13:54:28   22   was -- I mean, you know, Mr. Booker, for instance, the

13:54:31   23   FBI went and interviewed Mr. Booker fairly early on in

13:54:34   24   the process, determined that he was trying to get into

13:54:37   25   the army to launch an insider jihadi attack, and

13:54:40  1   basically said, "Hey, don't do that," and he persisted

13:54:43  2   anyway and that's been one of the arguments that we've

13:54:46  3   made.  Now, the persuasiveness of that --

13:54:47  4        THE COURT:  No, no, that counters one of the

13:54:49  5   arguments that you've made because you all have

13:54:50  6   complained that the FBI should not have sicced Dan Day

13:54:54  7   with a wire on him but should have talked them out of

13:54:56  8   that approach.  And, in fact, as you just noted, that

13:54:58  9   didn't work for Mr. Booker.

13:55:00  10       MR. SHULTZ:  But I think it would have worked for

13:55:01  11  Mr. Stein, and it was not tried.

13:55:04  12       THE COURT:  I think that's incredible.

13:55:07  13       MR. SHULTZ:  Okay.  Well, Your Honor, I would

13:55:09  14  suggest, Your Honor, that the threat of Government

13:55:12  15  unannounced search would be -- prevent insurmountable

13:55:17  16  practical obstacles but would also be deterrent in the

13:55:19  17  idea that if I'm doing something I'm not supposed to,

13:55:22  18  coupled with the mental health requirements, substance

13:55:24  19  abuse requirements, job requirements, and the fact that

13:55:26  20  every time he goes in to report, which is going to be a

13:55:29  21  burden, would be a burden to Mr. Stein, that would be a

13:55:33  22  reminder of "How did I get here?  What did I do?  What do

13:55:37  23  I need to rethink?" Your Honor.

13:55:38  24       We don't know where Mr. Stein will be on any given

13:55:42  25  day mentally or in his heart or what his thinking is, but

13:55:45    1   the fact that he's going to have to reflect on that,

13:55:48    2   after having serving -- after having served a lengthy

13:55:51    3   prison sentence, whatever sentence is imposed, we believe

13:55:56    4   that that period of supervision would provide a deterrent

13:55:59    5   factor, both specifically -- well, specifically to

13:56:02    6   Mr. Stein.

13:56:03    7           The other thing, Your Honor, and I want to echo

13:56:05    8   something Ms. Brannon said from this morning, is we get

13:56:08    9   in this business jaded, I think, to the idea of time.  We

13:56:11   10   get used to talking about lengthy sentences, guideline

13:56:15   11   calculations, drug quantities, that make 180 months sound

13:56:18   12   sort of like a routine kind of thing, and that is an

13:56:20   13   extraordinarily -- extraordinary length of time and lots

13:56:24   14   of things can happen in somebody's life.  And I think in

13:56:27   15   15 years from now there will be a number of changes that

13:56:30   16   Patrick will have to deal with.  There are things that he

13:56:32   17   will miss during that time.  You know, he'll -- we don't

13:56:35   18   know what his heart will be or heart -- how his heart

13:56:38   19   could change while he's in prison, if it -- to the extent

13:56:41   20   it hasn't already.  But we do know that he'll be of

13:56:44   21   retirement age.  He will have lived nearly half of his

13:56:47   22   expected remaining life in custody, or more if the Court

13:56:50   23   imposes a sentence comparable to Curtis Allen that

13:56:53   24   practically is like life.  He will likely have lost

13:56:56   25   members of his family, the farm, the destiny of his

13:56:59   1   family farm is independent than of what he does in prison

13:57:03   2   and what he gets to do, and he's going to have to adjust

13:57:06   3   to that new world.  And that's part of the role of

13:57:08   4   supervision and why we would say that a lengthy term of

13:57:11   5   supervision will help do that, as well as provide the

13:57:14   6   deterrent things.

13:57:14   7        Your Honor, you know, we proposed a 15-year

13:57:18   8   sentence based on some of the same data that Ms. Brannon

13:57:23   9   discussed this morning and that that -- the average from,

13:57:27   10   I believe, 2011 to 2017, or whenever they pulled their

13:57:30   11   data from, was 189 months.  But also we had studies up

13:57:35   12   till 2011 indicated that 90 percent of cases involving

13:57:39   13   the terrorism enhancement received sentences at 180

13:57:42   14   months or below.  That's partially why we did that.

13:57:46   15        Recognizing the Court's discussions this morning,

13:57:49   16   Your Honor, we understand, too, that the idea that

13:57:53   17   somebody has to be condemned to die in prison is not the

13:57:57   18   only solution.  We would agree with the Court's analysis

13:58:00   19   that the application of the terrorism enhancement in this

13:58:03   20   case does, in, I think, in the brief we said, take a

13:58:06   21   wrecking ball to the idea of guidelines and to the idea

13:58:08   22   of individualized determination, Your Honor.

13:58:12   23        Another point, Your Honor, I think -- I mean, it

13:58:33   24   was briefly discussed this morning, is the question of

13:58:39   25   practical reality, the reality of whether something like

| | | |
|---|---|---|
| 13:58:41 | 1 | this could have actually been pulled off.  And we |
| 13:58:43 | 2 | think -- |
| 13:58:44 | 3 | THE COURT:  Is that legally relevant? |
| 13:58:45 | 4 | MR. SHULTZ:  I think it should be.  I think it |
| 13:58:49 | 5 | should be legally relevant. |
| 13:58:49 | 6 | THE COURT:  Maybe it should be. |
| 13:58:51 | 7 | MR. SHULTZ:  I think it is, Your Honor, because |
| 13:58:54 | 8 | it's a circumstance of the offense, it's a nature and |
| 13:58:55 | 9 | circumstance of the offense.  The offense -- |
| 13:58:57 | 10 | THE COURT:  Well, the offense was conspiracy, and |
| 13:58:59 | 11 | so whether or not they could have pulled it off isn't |
| 13:59:02 | 12 | really an element of a conspiracy charge. |
| 13:59:04 | 13 | MR. SHULTZ:  Your Honor, I would agree, but it's a |
| 13:59:06 | 14 | nature and circumstances surrounding the offense.  I |
| 13:59:09 | 15 | don't think it just necessarily has to be just the |
| 13:59:11 | 16 | conviction, but the circumstances surrounding that. |
| 13:59:14 | 17 | THE COURT:  All right. |
| 13:59:14 | 18 | MR. SHULTZ:  And I think that practically that |
| 13:59:16 | 19 | you've got to factor that in.  I think the Court's |
| 13:59:18 | 20 | assessment that maybe it's not as -- it is as impactful |
| 13:59:23 | 21 | as I would read it, but the Court's acknowledgement of |
| 13:59:28 | 22 | that is something that should be taken into account, |
| 13:59:30 | 23 | particularly here, again, with also Court's |
| 13:59:34 | 24 | acknowledgement from this morning that Mr. Stein is |
| 13:59:36 | 25 | largely all hat and no cattle.  I'll discuss that in a |

| | | |
|---|---|---|
| 13:59:40 | 1 | moment. |
| 13:59:41 | 2 | I think that, Your Honor, I do want to also |
| 13:59:43 | 3 | discuss this -- the question of -- we've raised in our |
| 13:59:45 | 4 | brief of earlier FBI intervention, earlier FBI |
| 13:59:50 | 5 | alternatives, whether they should have arrested or done |
| 13:59:52 | 6 | something or how Mr. Stein should be held accountable for |
| 13:59:56 | 7 | something following the email we cited, you know, from |
| 14:00:00 | 8 | September 21st that up until that point the Government |
| 14:00:03 | 9 | considered this a maximum of 25-year kind of case, an |
| 14:00:06 | 10 | arson case, and a 371 conspiracy case, Your Honor. |
| 14:00:11 | 11 | And I think that you raised the question that the |
| 14:00:18 | 12 | FBI's not intervening, not giving him a proactive chance |
| 14:00:24 | 13 | to get out is not necessarily relevant to culpability, |
| 14:00:26 | 14 | and we're not raising it for that point. We raise it for |
| 14:00:29 | 15 | the point, though, Your Honor, that when the FBI goes |
| 14:00:31 | 16 | through this and they're intimately involved in the |
| 14:00:35 | 17 | creation of this crime, the process of this crime, the |
| 14:00:39 | 18 | activity surrounding this crime, they know it's -- what's |
| 14:00:42 | 19 | going on, and as we noted in our brief, they made a |
| 14:00:45 | 20 | decision, Your Honor. We're not criticizing that |
| 14:00:48 | 21 | decision in and of itself, but we think that that |
| 14:00:51 | 22 | decision to leave -- to not intervene earlier, to not |
| 14:00:54 | 23 | intervene June 15th, for instance, or July 19th, or |
| 14:00:56 | 24 | August 8th when Dan Day -- I think that's the |
| 14:00:59 | 25 | testimony -- said "Hey, we've got everything we need," |

14:01:01  1   you know, and their experts are telling them that means

14:01:04  2   they're hours away from having a bomb, that was an

14:01:06  3   incorrect assessment by Mr. Day, but when they choose not

14:01:09  4   to intervene, it's not because -- we're not saying that

14:01:14  5   that's a wrong choice by the FBI, but it is a choice of

14:01:17  6   an evidence -- it is evidence that their choice reflects

14:01:22  7   the idea that the Court recognized this morning that

14:01:25  8   these aren't terrorist masterminds and that there is some

14:01:28  9   safety element that undercuts their claims of danger

14:01:34  10  today.

14:01:34  11        They were safe to leave out for -- from at least

14:01:38  12  September 21st until some undetermined amount of time at

14:01:41  13  that time while they then made the bureaucratic

14:01:44  14  arrangements to introduce Brian.

14:01:46  15        THE COURT:  Well, but, Mr. Shultz, I think you're

14:01:49  16  ignoring the fact that, to the extent I adopt your

14:01:52  17  characterization of the FBI's motivation, which I don't

14:01:55  18  know that I do in full, but to the extent I adopt that,

14:01:58  19  that safety to which you allude was only because they had

14:02:02  20  the confidential informant planted at the heart of it,

14:02:06  21  who is giving them day-by-day, if not more frequent,

14:02:08  22  updates on what was going on, and that was the position

14:02:11  23  they would have jeopardized had they attempted to take

14:02:13  24  the same position that they attempted to undertake

14:02:17  25  unsuccessfully, I would note, with Mr. Booker.  So that

14:02:22  1  "safety," as you call it, is only because of their

14:02:25  2  involvement that you're not criticizing.  So it seems to

14:02:28  3  me that your argument is self-contradictory.

14:02:31  4      MR. SHULTZ:  No, Your Honor, I'm not criticizing

14:02:33  5  their involvement.  I'm just saying it represents a

14:02:35  6  real-time assessment that they made of the danger,

14:02:38  7  because as of September 21st, when an internal

14:02:40  8  communication was sent, saying, "Hey, this is an arson

14:02:43  9  and a 371 conspiracy that we consider an attempted arson,

14:02:47  10  that's a 25-year sentence," they're making these

14:02:49  11  assessments.

14:02:50  12      At that point, according to the Government's case,

14:02:52  13  the defendants had done everything they needed to do to

14:02:56  14  be convicted of conspiracy, Your Honor.  Everything that

14:02:59  15  Mr. Mattivi cited in his closing argument, all of the

14:03:02  16  actions that they took, all of the meetings that he

14:03:05  17  cited, occurred before that date.  And so this -- I mean,

14:03:08  18  I get that there's operational considerations of "Hey, we

14:03:10  19  might lose Dan Day as a credible source," but at that

14:03:14  20  point, Your Honor, according to Dan Day, everything was

14:03:17  21  done and they could have intervened at that point with a

14:03:19  22  full conspiracy kind of case, Your Honor, without any

14:03:23  23  loss of intelligence value or anything like that.

14:03:25  24      And, again, I'm not saying that's bad or whatever;

14:03:29  25  I'm just saying what it recognizes is that that they were

14:03:32  1  willing to say, "Okay, we have guys that we now know in

14:03:35  2  our minds have committed a conspiracy, an arson

14:03:39  3  conspiracy," the same objective that they've had the

14:03:43  4  whole time.  "It is okay for us to leave them without

14:03:46  5  real-time surveillance."  Dan Day was their only source

14:03:50  6  of information, and that was not a 24-hour kind of thing,

14:03:52  7  and this is somebody who'd supposedly told the FBI that

14:03:56  8  Mr. Stein was ready to go off half-cocked at any kind of

14:03:59  9  minute, and they made that determination.

14:04:01  10       I'm not -- again, I'm not criticizing.  What I'm

14:04:04  11  saying is that that's an assessment in real time of what

14:04:07  12  the FBI really thought of the danger of these people.

14:04:10  13  And so this -- it belies now this idea that they just

14:04:13  14  cannot be left out on the street, because they were left

14:04:15  15  out on the street.

14:04:16  16       THE COURT:  I think the Government's argument is

14:04:19  17  more retributive than it is prohibitive as to the length

14:04:24  18  of sentence they're requesting.  And retribution is an

14:04:27  19  appropriate factor for a court to consider at sentencing,

14:04:29  20  but I think it's not -- it's not to prevent future crimes

14:04:36  21  primarily as much as it is retribution for the crime they

14:04:39  22  committed.

14:04:40  23       MR. SHULTZ:  Yeah, and to the extent that it is

14:04:45  24  retributive, I'm not sure what I said in response, I

14:04:47  25  understood -- maybe I misunderstood Ms. Berkower to be

14:04:49    1   saying that part of Mr. Stein -- part of the reason he

14:04:52    2   needs to be in prison for life is because he is so

14:04:53    3   dangerous in the future.

14:04:55    4        THE COURT:  She did make that comment.

14:04:56    5        MR. SHULTZ:  Even suggesting, at 75, he might get

14:04:58    6   out and try to do it again, Your Honor.  And what I'm

14:05:01    7   saying is that as it's happening all this information the

14:05:04    8   FBI knew, and they made a decision.  And I'm not saying

14:05:06    9   it was wrong.  Right?  I'm saying it represents what they

14:05:10   10   thought in real time of the danger, and it's different

14:05:13   11   than what is being suggested, Your Honor.

14:05:17   12        Your Honor, I want to talk a little bit about some

14:05:21   13   of these comparative sentencing issues.  And I guess

14:05:26   14   before I begin that I, without rehashing it -- and I have

14:05:30   15   not done the data pulls that the federal defender's

14:05:33   16   office has -- I would request that we -- I would adopt

14:05:37   17   the arguments they made regarding the data that they

14:05:40   18   pulled from the sentencing commission and ask that those

14:05:43   19   exhibits also be admitted on behalf of defendant Stein.

14:05:45   20        THE COURT:  And I think you're entitled to do

14:05:47   21   that, and I'll allow you to incorporate those positions

14:05:52   22   into Mr. Stein's case as well.

14:05:54   23        I will note again, as we discussed this morning,

14:05:56   24   that because many of them involve guilty pleas as opposed

14:06:01   25   to trials, they're not completely comparable, but we had

14:06:05  1  all that discussion this morning.  We need not repeat it

14:06:08  2  now.

14:06:08  3       MR. SHULTZ:  Right, Your Honor, and I don't want

14:06:09  4  to necessarily rehash all of those points with you, and I

14:06:12  5  understand that the value on of the -- the value that the

14:06:14  6  Court -- or the evaluation the Court made of those.

14:06:16  7       I would say, well, a couple things.  As it relates

14:06:20  8  to Mr. Stein relative to Mr. Allen, I believe the Court

14:06:24  9  addressed this in an appropriate way in its ruling on our

14:06:30  10 objection for Mr. Stein to get a leader/organizer role.

14:06:34  11 The Court sustained that objection and, I think,

14:06:36  12 correctly said that although he played a pivotal role in

14:06:39  13 the conspiracy, being an intermediary, initiating

14:06:42  14 meetings, providing some of the materials, he was the

14:06:45  15 most verbose.  I still think one of the most apt

14:06:49  16 characteristics was the Court at some hearing described

14:06:51  17 Mr. Stein as "extraordinarily loquacious," Your Honor,

14:06:54  18 and I think that is accurate.

14:06:56  19      But I think correctly the Court notes that the

14:06:58  20 only thing that weighs in favor of elevating him from

14:07:04  21 Mr. Allen and/or Mr. Wright, in terms of the

14:07:07  22 leader/organizer, is that he took some sort of role in

14:07:10  23 recruitment of accomplices.  And Ms. Berkower cited that

14:07:13  24 again.  But the Court properly notes in its order that

14:07:16  25 that was a role in which Stein proved to be largely

14:07:19  1   ineffectual.  You then further said that he was not

14:07:22  2   solely responsible for devising the plan.  He did not

14:07:24  3   provide any more wherewithal when compared to his

14:07:27  4   codefendants, neither did he exercise greater

14:07:30  5   decision-making authority.

14:07:30  6        This was a conspiracy that for -- by and large in

14:07:34  7   different ways each defendant played different roles, and

14:07:37  8   I would suggest, Your Honor, that Mr. Stein is not so

14:07:40  9   different from Mr. Allen.  He may be in one way, but not

14:07:43  10  in the other.  For instance, Mr. Stein didn't test,

14:07:46  11  didn't make, didn't pursue the knowledge of how to create

14:07:49  12  explosives himself.  He certainly was probably the most

14:07:52  13  verbally proactive in these meetings and perhaps

14:07:57  14  expressed the most direct and vile language, but each of

14:08:02  15  those things, Your Honor, did not set either one of them

14:08:04  16  apart in such a way that he deserves a life sentence

14:08:07  17  relative to Mr. Allen.

14:08:09  18        As regards to the comparative sentencing cases, I

14:08:17  19  would echo again, Your Honor, Ms. Brannon from earlier

14:08:22  20  today where she suggested that there is no perfect case.

14:08:26  21  It's an obvious point that there's ways you can look at

14:08:28  22  the data that can support one side or the other.  There's

14:08:31  23  not a perfect analogous case in a situation.

14:08:34  24        I would also, though, echo the Court's comment

14:08:37  25  from earlier that the *Loewen* case did have remarkable

14:08:41   1   factual similarities to this case, both in terms of the

14:08:44   2   likely outcome had the plan in that case succeeded.  In

14:08:50   3   fact, the Government in a brief in that case, described

14:08:52   4   it much -- almost identical language that Mr. Mattivi

14:08:54   5   used this morning to describe the impact if this bomb had

14:08:58   6   gone off, that hundreds of innocent civilians would have

14:09:01   7   been killed had Mr. Loewen's plot succeeded.  We cited

14:09:04   8   that in our brief, Your Honor.

14:09:05   9        I would say that it is distinct in some ways in

14:09:11   10  that the attempt verse conspiracy.  And we suggested this

14:09:16   11  in our brief, but, Your Honor, there is a difference in

14:09:19   12  my mind between talking about and conspiring and planning

14:09:24   13  to enact a crime of mass violence and pushing the button

14:09:28   14  to do it.

14:09:28   15       THE COURT:  Your arguments at this late date,

14:09:31   16  Mr. Shultz, that all they were doing was talking about it

14:09:37   17  are -- events have dramatically overtaken that.  I know

14:09:40   18  that from the beginning defense argued that this was just

14:09:43   19  a First Amendment case, they were talking about things,

14:09:44   20  but we're well past that point.

14:09:46   21       MR. SHULTZ:  And I didn't mean to imply that I was

14:09:47   22  just saying just talking about it in terms of a First

14:09:51   23  Amendment sense, Your Honor.  I would say, Your Honor,

14:09:53   24  conspiring with the reality on the ground situation of

14:09:55   25  where they were in terms of when Mr. Stein was arrested,

14:09:59  1  he was a week away from having a bomb from Brian, based

14:10:04  2  on the conversations there, and from that point he was at

14:10:08  3  least three or four weeks away from any kind of

14:10:11  4  operational plan actually happening, based on this idea

14:10:14  5  of the election and what was going to happen after the

14:10:17  6  election, I think is also a unique factor in this case.

14:10:20  7      My argument, Your Honor, was intended not to say

14:10:23  8  talk, they were just talking, it's sort of a game.  My

14:10:26  9  argument, Your Honor, was that to the extent that

14:10:29  10  somebody is still talking about it's a week until I have

14:10:33  11  a bomb and a month until I potentially -- a plan could go

14:10:36  12  through is different and should be evaluated differently

14:10:39  13  than somebody who drives what they think is an armed and

14:10:44  14  activated bomb to the scene of the crime, ready to push

14:10:47  15  the button or in some of the other cases where they have

14:10:50  16  somebody pushing the button to explode a bomb that they

14:10:53  17  think will kill innocent civilians.

14:10:54  18      THE COURT:  Well, given that the charge is

14:10:56  19  conspiracy, how is that legally different?

14:10:57  20      MR. SHULTZ:  I think, Your Honor, in terms of

14:11:01  21  the -- the legal difference, I think the difference is

14:11:04  22  that the nature of the conduct indicates an intent and a

14:11:09  23  mind that has crossed thresholds that are not necessarily

14:11:14  24  crossed in conspiracy cases.

14:11:15  25      THE COURT:  You think there were thresholds yet to

14:11:17  1  be crossed in this case?

14:11:18  2       MR. SHULTZ:  You what?

14:11:19  3       THE COURT:  You think there were thresholds yet to

14:11:22  4  be crossed in this case at the time the defendants were

14:11:23  5  arrested?

14:11:23  6       MR. SHULTZ:  Your Honor, I think that there is --

14:11:26  7  and I don't know, there's no case I can cite to this,

14:11:29  8  Your Honor, but I would say that I think that there is a

14:11:34  9  difference between conspiring to do a bombing at some

14:11:37  10 point in the future and driving a bomb to a place and

14:11:42  11 pushing a button.

14:11:43  12      I think there is a contemplation of that that any

14:11:47  13 person would have to go through that once they get

14:11:50  14 through that, that's a different -- it's a different and

14:11:53  15 more dangerous situation.  That may be naive of me.  It

14:11:58  16 may be that, you know, I mean, I don't know, but I think

14:12:01  17 in this case in particular, Your Honor, when there are

14:12:04  18 questions of all hat and no cattle-type questions, Your

14:12:07  19 Honor, that there's contemplation that has to happen

14:12:12  20 before you actually take the step of, in reality, killing

14:12:16  21 somebody.

14:12:16  22      THE COURT:  Well, I have to tell you, Mr. Shultz,

14:12:18  23 obviously, as you know, I heard all the evidence in this

14:12:20  24 case --

14:12:20  25      MR. SHULTZ:  Uh-huh.

14:12:20  1          THE COURT:  -- and they clearly were not as far

14:12:22  2   along in their plot as Mr. Loewen may have been, but I

14:12:27  3   cannot find or conclude that there were thresholds they

14:12:31  4   had not yet crossed.  They maybe didn't have the button

14:12:33  5   in front of them to push, to stick with your analogy, but

14:12:36  6   mentally they were -- they were, with resolution,

14:12:43  7   committed to that path.  That is my conclusion from the

14:12:46  8   evidence that I heard.

14:12:46  9          MR. SHULTZ:  Okay, Your Honor.

14:12:49  10          I want to address the distinction also, Your

14:12:52  11   Honor, between plea and trial cases, and would argue

14:12:57  12   generally, Your Honor, that there is a danger in -- I

14:13:03  13   don't know if danger's the right word.  I think that the

14:13:06  14   distinction between trial and plea cases, I understand

14:13:08  15   that there might be a legal posture and a legal

14:13:10  16   difference, should be one that we exercise or talk about

14:13:14  17   with extreme caution when it comes to sentencing, at the

14:13:17  18   risk of providing attacks on trial, Your Honor.  The

14:13:23  19   defendants and any defendant has the right to put the

14:13:25  20   Government to its constitutionally burden --

14:13:28  21   constitutional burden of proof.

14:13:29  22          THE COURT:  Well, they do, but they don't have the

14:13:32  23   right to do that without consequences.

14:13:33  24          MR. SHULTZ:  Well, but I think, Your Honor, the

14:13:35  25   purposes of sentencing are to fashion an appropriate

14:13:38  1   sentence for the conduct for which they either are

14:13:40  2   convicted or plead -- or pled to and not with regard to

14:13:45  3   how they necessarily get there.

14:13:47  4        THE COURT:  Well, to the extent that you're

14:13:48  5   arguing that it's inappropriate to consider a different

14:13:51  6   sentence for someone who pled as opposed to someone who

14:13:53  7   went to trial, you would agree with me that settled law

14:13:57  8   is against that premise?

14:13:58  9        MR. SHULTZ:  I would agree with that, Your Honor.

14:13:59  10       THE COURT:  All right.

14:13:59  11       MR. SHULTZ:  I would agree, and I understand that

14:14:01  12  there's the idea of acceptance of responsibility.

14:14:03  13       I would say also in this case, though, it's a

14:14:07  14  little bit a different situation because in this case

14:14:09  15  Mr. Stein is in a better position relative to sentencing

14:14:12  16  than he was before trial, because, if you recall, there

14:14:15  17  were two 924(c) charges that he put the Government to

14:14:18  18  their proof and the Government wasn't able to even get

14:14:21  19  that -- those charges to the jury, Your Honor.  And that

14:14:25  20  would have been at the time 30 years of mandatory

14:14:28  21  sentencing that is now no longer there.

14:14:31  22       I think now with the recent ruling, I can't think

14:14:34  23  of the citation off the top of my head, I think it would

14:14:36  24  now be a ten-year addition.  But, Your Honor, he -- when

14:14:42  25  he put the Government to its proof, that he's in a better

14:14:46   1   sentencing position relative to all of the crimes and

14:14:49   2   conduct he was accused of than he was before trial.

14:14:52   3        While generally I think that the law is against us

14:14:54   4   on the idea that a plea is different than a trial in

14:14:57   5   terms of sentencing, I think in this case there is

14:14:59   6   something to factor in and that we should be cautious as

14:15:03   7   we walk forward in that distinction.

14:15:05   8        Your Honor, I want to echo or adopt Ms. Brannon's

14:15:13   9   arguments as well.  Her reflections on the length of

14:15:18  10   time, what can happen, I think I may have mentioned this

14:15:20  11   already, that we get jaded to the idea of long sentences.

14:15:24  12   Did I say that?

14:15:26  13        THE COURT:  You did.

14:15:27  14        MR. SHULTZ:  My notes have become quite different

14:15:29  15   and my outline is different based on some of the

14:15:32  16   arguments made this morning, and so I'm piecing it

14:15:34  17   together as I go.

14:15:34  18        THE COURT:  I understand.

14:15:35  19        MR. SHULTZ:  I would also argue, Your Honor, that

14:15:37  20   Ms. Brannon is correct that the Government's worst-case

14:15:40  21   scenario, in terms of what would happen, isn't

14:15:44  22   necessarily the only basis by which we determine the --

14:15:48  23   that.  But I understand the Court's kind of -- we've kind

14:15:51  24   of discussed that already, but I thought that argument

14:15:53  25   was appropriate in this case.

14:15:54   1          Regarding specific cases, Your Honor, Ms. Berkower
14:16:11   2   cited the *Aldawsari* case, Your Honor.  I would again
14:16:15   3   argue that that was a case that was a different posture
14:16:17   4   because it indicated that Mr. Aldawsari acquired all the
14:16:20   5   chemicals he needed to make a bomb.  There's no question
14:16:23   6   of any, you know -- well, he had acquired all of it, he
14:16:29   7   was further along in the process.  And to the extent that
14:16:30   8   we've discussed that distinction, I would argue, Your
14:16:32   9   Honor, that's a distinction also that would apply here.
14:16:36   10         I would also point the court back to the cases
14:16:38   11   that we cited in our brief, for instance, the *Abdul-Latif*
14:16:43   12   and *Mujahidh* cases where the defendants were sentenced to
14:16:45   13   18 and 17 years respectively.  They wanted to -- in
14:16:50   14   language that's similar to here -- they wanted to time
14:16:53   15   their attack on a military recruiting station to maximize
14:16:57   16   casualities.  They never disavowed their intentions at
14:17:01   17   the time of sentencing.  They did plead, but they pled to
14:17:06   18   conspiracies to kill military recruits and to use weapon
14:17:11   19   of mass destruction.  The maximum sentence was life.
14:17:13   20   Each of those defendants was given 18 and 17 years
14:17:16   21   respectively.
14:17:18   22         *Rezwan Ferdaus*, Your Honor, also pled, I believe,
14:17:23   23   to -- no, I'm sorry, he pled to two counts involving 15-
14:17:26   24   and 20-year maximum sentences but did not reach the
14:17:30   25   maximum in the 20-year case, was given 17 years.  His

14:17:33  1  conduct was not similar in terms of a one-time plan but

14:17:37  2  similar in terms of a desire to kill American citizens in

14:17:42  3  that he was providing improvised device switches to what

14:17:48  4  he thought were members of a foreign terrorist

14:17:50  5  organization.  He would get reports from those people

14:17:53  6  that these switches have been used to kill certain

14:17:55  7  amounts of soldiers.  He would gleefully respond and

14:17:58  8  provide the next order.  It indicated a mentality that

14:18:02  9  had crossed -- that had taken action and gone even

14:18:06  10  further.

14:18:06  11      In that case also the FBI undercovers proactively

14:18:12  12  told him, and I think there's a little bit of a

14:18:14  13  distinction here that, you know, Ms. Berkower talks about

14:18:18  14  Brian said, "Hey, you sure you want to do this?"  In that

14:18:21  15  case the FBI undercovers proactively said, "Hey, you can

14:18:24  16  back out.  You should back out.  There's no shame in

14:18:26  17  backing out.  It's okay to back out," 25 separate times,

14:18:30  18  and he still pursued those things and was given a 17-year

14:18:34  19  sentence, Your Honor, on a case that obviously involved

14:18:37  20  different charges and different maximum sentences, but on

14:18:39  21  a conviction or on a sentence that did not reach the

14:18:42  22  maximum even with 20 years.

14:18:44  23      The *James Cromitie* case, Your Honor, he was

14:18:47  24  convicted at trial in a weapon of mass destruction

14:18:49  25  event -- offense to bomb three targets.  He had placed

| | | |
|---|---|---|
| 14:18:53 | 1 | what he thought were bombs, multiple of them, and he got |
| 14:18:55 | 2 | a 25-year mandatory minimum sentence in that case, but |
| 14:19:00 | 3 | did not get life. |
| 14:19:01 | 4 | And then, Your Honor, the remarkable factual |
| 14:19:05 | 5 | similar case of Loewen, I think, we've sort of discussed |
| 14:19:09 | 6 | that in that case he was driving a bomb to kill hundreds |
| 14:19:12 | 7 | of innocent civilian travelers, based on not hatred, |
| 14:19:16 | 8 | based on race or ideology necessarily, but based on a |
| 14:19:18 | 9 | hatred of America and a devotion to al-Qaeda.  And, Your |
| 14:19:23 | 10 | Honor, I think that that case, he got a 20-year sentence |
| 14:19:26 | 11 | based on a life recommendation. |
| 14:19:28 | 12 | I understand there were some discussions or |
| 14:19:31 | 13 | factors in terms of sources and methods.  That's not |
| 14:19:36 | 14 | necessarily clear from the documents that we can see, |
| 14:19:39 | 15 | Your Honor, and I don't know -- I think, again, that's |
| 14:19:41 | 16 | something we should exercise caution in, the distinction |
| 14:19:45 | 17 | between sentences based on how the Government |
| 14:19:48 | 18 | investigates them is something we should exercise |
| 14:19:50 | 19 | cautiously. |
| 14:19:51 | 20 | THE COURT:  The other difference is he pled. |
| 14:19:53 | 21 | MR. SHULTZ:  What? |
| 14:19:54 | 22 | THE COURT:  The critical difference is he pled. |
| 14:19:55 | 23 | MR. SHULTZ:  You're right, Your Honor, he did |
| 14:19:57 | 24 | plead.  And I think that is different. |
| 14:20:01 | 25 | I would echo my contention that the Court has |

```
14:20:06   1   addressed already that I think that driving that there
14:20:09   2   indicates a mindset that is different as well.  I know
14:20:12   3   the Court disagrees with that, but we'd argue that's a
14:20:15   4   distinction.
14:20:16   5        In sum, Your Honor, is this:  the bottom line is,
14:20:32   6   Your Honor, we think there are cases that can support --
14:20:35   7   the vast majority of cases, as noted in the data provided
14:20:38   8   by the federal defender and by the study we cited,
14:20:42   9   indicate that the vast majority of cases receive
14:20:45   10  sentences of 180 months or less in terrorism
14:20:49   11  enhancement-type cases.  I think that also matches
14:20:51   12  anecdotally with what I found in terms of the cases we
14:20:55   13  cited in that few of them are actually given life
14:20:58   14  sentences, and a life sentence is not appropriate in this
14:21:00   15  case, and that the cases most similar to the conduct of
14:21:05   16  defendants in this case warrant a sentence other than
14:21:08   17  death in prison, that a term of years, with a lengthy
14:21:12   18  term of supervised release, is a sufficient but not
14:21:14   19  greater-than-necessary sentence based on the factors
14:21:18   20  we've discussed.
14:21:19   21       THE COURT:  Thank you, Mr. Shultz.
14:21:20   22       MR. SHULTZ:  Thank you.
14:21:21   23       THE COURT:  Mr. Pratt.
14:21:30   24       MR. PRATT:  Thank you, Your Honor.
14:21:31   25       Your Honor, the first thing I'd like to address is
```

1-25-19   USA v. STEIN   No. 16-10141-02

75

```
14:21:37   1   the "all hat, no cattle" comment.  I first brought this

14:21:40   2   up in my closing argument, and to correct Ms. Berkower,

14:21:45   3   it is not "all hat, no cattle, but you can buy cattle";

14:21:51   4   it's all hat --

14:21:51   5        THE COURT:  Great line.  Didn't you think that was

14:21:53   6   a great line?

14:21:54   7        MR. PRATT:  It is a great line.  And as I said in

14:21:57   8   closing, "all hat, no cattle, but the Government was

14:22:00   9   willing to supply the cattle."

14:22:03   10       THE COURT:  I'll give you credit.  Also a good

14:22:06   11  line.

14:22:06   12       Now, I would remind you, because you all have

14:22:08   13  carried that line back to me quite a bit, but I think

14:22:10   14  you've lost the context in which I said it this morning,

14:22:13   15  which was drawing a distinction between Mr. Allen and

14:22:18   16  Mr. Stein because Mr. Allen's counsel had argued that he

14:22:21   17  was far less culpable than Mr. Stein, for whatever

14:22:24   18  reasons, and I was reviewing the fact that Mr. Stein

14:22:27   19  would make broad statements that perhaps he didn't follow

14:22:31   20  through on, whereas Mr. Allen was making substantive

14:22:34   21  contributions to the conspiracy.

14:22:36   22       MR. PRATT:  And we would agree with that, that

14:22:38   23  Mr. Allen was making much more contributions --

14:22:42   24       THE COURT:  I didn't say "much more."  I was

14:22:45   25  merely pairing the defendant's -- that is his counsel's
```

14:22:49   1   allegations that he was not nearly as substantially

14:22:52   2   involved as Mr. Stein.

14:22:55   3        MR. PRATT:  Your Honor, I was going to mention the

14:22:57   4   family letters, but those have already been talked about.

14:23:00   5        THE COURT:  And I have read those.

14:23:01   6        MR. PRATT:  And, Your Honor, based on this

14:23:05   7   morning, I have gone through my remarks and edited them

14:23:11   8   substantially, knowing how the Court feels about deceased

14:23:15   9   equine.

14:23:16   10       THE COURT:  That's why I like you, Mr. Pratt.

14:23:18   11       MR. PRATT:  Thank you, Your Honor.  But, Your

14:23:21   12   Honor, I do want to say that I sort of am taking a

14:23:27   13   different tact in my argument.  We did a detailed

14:23:31   14   sentencing memo, and the presentencing report contains, I

14:23:38   15   think, sufficient information that I did not want to

14:23:43   16   repeat that and go over it.  So I did take sort of a

14:23:48   17   little different tact in going through this, and it deals

14:23:53   18   more sort of on a mental health level sort of issues.

14:23:59   19       And when I first got this case, I wanted to know

14:24:05   20   why.  Something -- when I get a case and I'm dealing with

14:24:10   21   something I've never dealt with before, something I

14:24:13   22   always ask, and in this case it was why a person would

14:24:18   23   want to commit the crimes that Patrick Stein was

14:24:21   24   convicted of.  Not the simple reason we all heard on the

14:24:27   25   recordings, his fear and hatred of Muslims.  I wanted to

14:24:33  1   know why or how a person could demonize another group of

14:24:40  2   people so much to want to commit those crimes.

14:24:45  3        So I started reading about hate.  I read articles,

14:24:49  4   I've read books, I read papers.  I cited to one of those

14:24:52  5   books in the sentencing memos.  I wanted to know why

14:24:57  6   human beings hate.  And what it really boils down to is

14:25:02  7   that we are emotional beings.  At the most basic level,

14:25:07  8   we hate because we feel.  We feel insecure.  We feel

14:25:11  9   anger.  We feel afraid.

14:25:14  10        And I'm not offering this as an excuse for

14:25:18  11   anything.  I'm sort of offering it as perhaps an

14:25:22  12   explanation.  Now, one of the articles I read was called

14:25:26  13   *A Duplex Theory of Hate:  Development and application to*

14:25:30  14   *Terrorism, Massacres, and Genocide.*  And it approached

14:25:36  15   hate as having three components:  negation of intimacy,

14:25:40  16   passion, and commitment.

14:25:42  17        Now, passion is easy to understand as the

14:25:46  18   expression of extreme fear or anger in response to a

14:25:51  19   perceived threat.  And just listening to a few minutes of

14:25:54  20   the audios in this case, we can agree that Patrick Stein

14:25:57  21   had passion.

14:25:59  22        Commitment is designed as cognitions of contempt

14:26:03  23   that are laced with the devaluation of targeted

14:26:07  24   individuals; in other words, dehumanization.  And, again,

14:26:12  25   I think we can agree that that was evident in this case.

14:26:15    1          Now, the negation of intimacy is a little bit
14:26:19    2     harder to understand because it requires a distancing
14:26:22    3     from the object of hate.  It's more of a normalization of
14:26:28    4     the hate.  And this is often referred to as the learned
14:26:32    5     part of hate, most often through propaganda, be it from
14:26:36    6     parents, teachers, friends, organizations, media, social
14:26:41    7     media, political campaigns and, yes, even through
14:26:45    8     political leaders.
14:26:45    9          And I have found no evidence from all the times
14:26:49   10     I've spoken with Patrick Stein's family that Patrick
14:26:53   11     learned this through his parents, his families, or his
14:26:56   12     teachers.  But what negation of intimacy does is it
14:27:02   13     repeats negative images until they are no longer
14:27:06   14     characteristics of the few but they are the stereotypes
14:27:10   15     of the whole, until normalization occurs.  And I think
14:27:16   16     that this is what happened partially with Patrick.  For
14:27:21   17     years Patrick immersed himself in right-wing news and
14:27:24   18     ideology:  Sean Hannity, Michael Savage, Alex Jones.
14:27:30   19          THE COURT:  Millions of people listen to them.
14:27:32   20          MR. PRATT:  I understand that, Your Honor.  And
14:27:34   21     certainly many others, conservative right-wing things.
14:27:41   22     But if Muslims or Islam was addressed, it's always in a
14:27:46   23     negative manner:  Islam is a religion of hate; Islam
14:27:51   24     wants to take over the United States as part of its
14:27:55   25     world-wide caliphate; Islam's true aim is to bring Sharia

| | | |
|---|---|---|
| 14:28:00 | 1 | law to the United States.  It's repeated over and over |
| 14:28:03 | 2 | again.  Night after night Patrick exposed himself to |
| 14:28:08 | 3 | this.  But it wasn't just news and radio; it was |
| 14:28:13 | 4 | right-wing Internet pages and blogs.  And, again, I'm not |
| 14:28:17 | 5 | offering this as an excuse for anything. |
| 14:28:21 | 6 | THE COURT:  Mr. Pratt, I'm -- I guess I'm going to |
| 14:28:25 | 7 | ask you to kind of get to the point on this.  I'm paying |
| 14:28:28 | 8 | attention to you, but I will note for the record that the |
| 14:28:30 | 9 | majority of the people sitting at the tables behind you |
| 14:28:32 | 10 | are now working on their iPhones. |
| 14:28:35 | 11 | MR. PRATT:  And I understand that, Your Honor. |
| 14:28:36 | 12 | THE COURT:  And that's fine if they want to do |
| 14:28:37 | 13 | that.  I think it's a little disrespectful.  I'm not |
| 14:28:40 | 14 | doing that. |
| 14:28:40 | 15 | MR. PRATT:  I'm not concerned. |
| 14:28:41 | 16 | THE COURT:  The point is, I think you're kind |
| 14:28:43 | 17 | of -- |
| 14:28:43 | 18 | MR. PRATT:  Your Honor, I'm not concerned. |
| 14:28:44 | 19 | THE COURT:  -- sermonizing to a point that we're |
| 14:28:46 | 20 | losing our focus here. |
| 14:28:47 | 21 | MR. PRATT:  I'm not concerned about the people |
| 14:28:48 | 22 | behind me, Your Honor. |
| 14:28:49 | 23 | THE COURT:  Well, I'm merely pointing that out as |
| 14:28:51 | 24 | an example that maybe we're kind of losing our focus |
| 14:28:53 | 25 | here. |

| | | |
|---|---|---|
| 14:28:53 | 1 | MR. PRATT:  Okay. |
| 14:28:56 | 2 | He also watched the YouTube videos that were |
| 14:28:58 | 3 | discussed in court:  ISIS burning people alive, ISIS |
| 14:29:03 | 4 | lowering cages filled with people to drown them.  But |
| 14:29:09 | 5 | these were not the only sources of negative information |
| 14:29:11 | 6 | about Muslims that Patrick Stein received. |
| 14:29:15 | 7 | The people he hung around with, the militia people |
| 14:29:18 | 8 | who got on Zello every night and talked about the world |
| 14:29:22 | 9 | events, the Muslims.  Jason Crick believed that the |
| 14:29:24 | 10 | Muslim refugees in Dodge City, in Garden City, needed to |
| 14:29:29 | 11 | be under surveillances because they were up to something |
| 14:29:31 | 12 | illegal.  There was the campaign rhetoric of Donald |
| 14:29:35 | 13 | Trump.  And this is something we talked about in our |
| 14:29:37 | 14 | memo, the entire atmosphere of 2016:  The Muslims |
| 14:29:43 | 15 | cheering after 9-11, Islam hates us and we can't allow |
| 14:29:46 | 16 | people coming into the country who have this hatred, the |
| 14:29:50 | 17 | Muslim bans, the stories of jack -- |
| 14:29:53 | 18 | THE COURT:  The Muslim ban happened after all of |
| 14:29:55 | 19 | these events. |
| 14:29:56 | 20 | MR. PRATT:  The discussions of the Muslim bans |
| 14:29:59 | 21 | were during -- were before these events and during these |
| 14:30:04 | 22 | events.  They were part of the campaign.  The Muslim ban |
| 14:30:08 | 23 | itself occurred after he was elected and took office. |
| 14:30:13 | 24 | THE COURT:  I want to give you leeway, Mr. Pratt, |
| 14:30:17 | 25 | but, I mean, this kind of conversation is endemic in the |

| | | |
|---|---|---|
| 14:30:20 | 1 | history of our country.  And it's not just coming from |
| 14:30:24 | 2 | the right.  The left has incredible attacks on |
| 14:30:29 | 3 | conservative Christians.  You can listen to that on MSNBC |
| 14:30:35 | 4 | or other issues or outlets that they have.  But none of |
| 14:30:41 | 5 | that explains or justifies anything remotely like what |
| 14:30:44 | 6 | we're dealing with here, so I'm not sure what we're |
| 14:30:47 | 7 | talking about. |
| 14:30:47 | 8 | MR. PRATT:  It doesn't justify it, Your Honor. |
| 14:30:49 | 9 | But in 2017, the Southern Poverty Law Center was part of |
| 14:30:55 | 10 | the brief -- |
| 14:30:56 | 11 | THE COURT:  You know, do not quote the Southern |
| 14:30:59 | 12 | Poverty Law Center to me because they've lost all |
| 14:31:00 | 13 | credibility in becoming a huge organ of the very thing |
| 14:31:04 | 14 | you're talking about from the left.  Anyone that they |
| 14:31:05 | 15 | have the modest disagreement with from the right, with |
| 14:31:08 | 16 | Christians or otherwise, they label as hate mongers, and |
| 14:31:13 | 17 | they were a motivator of one of the people who attacked |
| 14:31:16 | 18 | those ballplayers, so do not quote the Southern Poverty |
| 14:31:19 | 19 | Law Center. |
| 14:31:20 | 20 | MR. PRATT:  I am not going to quote the Southern |
| 14:31:24 | 21 | Poverty Law Center. |
| 14:31:24 | 22 | THE COURT:  Thank you. |
| 14:31:24 | 23 | MR. PRATT:  What I was going to quote is a brief |
| 14:31:27 | 24 | that they were involved in, which states that "the |
| 14:31:30 | 25 | Government's denigration of Muslims foments the social |

14:31:34   1   divisiveness and violence that the establishment clause

14:31:38   2   was meant to forestall."

14:31:40   3       Again, this all goes to normalization.  A former

14:31:44   4   Assistant Assistant Attorney General for civil rights

14:31:48   5   explained that policy singling out protected groups can

14:31:52   6   normalize hate and legitimatize hate-motivated violence

14:31:57   7   directed at Muslims or people perceived to be Muslims.

14:32:00   8   That's the point, Your Honor.  The point is not that --

14:32:04   9       THE COURT:  But, Mr. Pratt, millions of people

14:32:06   10  listen to this stuff, whether it comes from the left or

14:32:08   11  the right.

14:32:09   12      MR. PRATT:  But it's --

14:32:10   13      THE COURT:  But it hasn't normalized it to the

14:32:12   14  point that any appreciable number at all of individuals

14:32:17   15  try to engage in the action that these defendants did.

14:32:20   16      MR. PRATT:  But then you put in Dan Day, who goes

14:32:24   17  in there and normalizes it even more for them, with the

14:32:29   18  people from Garden City, by telling them that these

14:32:33   19  people -- that one day the Mary Street apartments are

14:32:38   20  filled with white residents, the next day the white

14:32:40   21  residents are gone, the next day, they're filled with

14:32:44   22  Muslims.  That he went into the African store, and the

14:32:49   23  men in there were wearing $3,000 suits, and they had

14:32:52   24  automatic weapons, and that at night they're carrying out

14:32:56   25  bags that he believes to be either cash or drugs, and

14:33:00   1   that they're trafficking in human babies and they're

14:33:03   2   doing all these other things.  He's normalizing this for

14:33:08   3   Patrick and the other defendants.  He's going in there

14:33:11   4   and telling them that there needs to be a plan after The

14:33:15   5   Pulse nightclub shooting because he believes, Dan Day

14:33:18   6   believes, that they can -- that they can do this in their

14:33:21   7   own backyard.

14:33:24   8       THE COURT:  We discussed all this at the proffered

14:33:27   9   entrapment instruction, which I rejected.

14:33:29   10      MR. PRATT:  And I understand that, Your Honor.

14:33:30   11  But Dan Day is an integral part of the nature and

14:33:34   12  circumstances of this offense.  And all Patrick Stein is

14:33:38   13  doing is asking the Court to view this case with the lens

14:33:43   14  of the totality of the circumstances, and that includes

14:33:46   15  Dan Day.  Dan Day was an agent provocateur and yes-man to

14:33:53   16  Patrick Stein.  He testified -- Dan Day testified he

14:33:56   17  agreed with 99.9 percent of everything Patrick Stein

14:34:01   18  said.  He never disagreed with him.  He testified, Dan

14:34:08   19  Day did, that it was on them to back out.  He wasn't

14:34:11   20  supposed to try and get them to back out or do anything

14:34:14   21  of the sort.  It was on them.

14:34:17   22      THE COURT:  And wasn't it?  Wasn't it on them to

14:34:21   23  back out?

14:34:21   24      MR. PRATT:  His instructions from the FBI were --

14:34:24   25      THE COURT:  I don't care about his instructions.

| | | |
|---|---|---|
| 14:34:25 | 1 | Wasn't it on the defendants to decide whether they were |
| 14:34:28 | 2 | going forward or backing out? |
| 14:34:29 | 3 | MR. PRATT:  Your Honor, when they have somebody |
| 14:34:31 | 4 | who's paid by the Government come in and say, "This is |
| 14:34:34 | 5 | what's going on in Garden City, at a place I live just a |
| 14:34:38 | 6 | couple blocks from, that you live an hour from, that I |
| 14:34:42 | 7 | drive by every day, this is what's going on, we need to |
| 14:34:45 | 8 | worry about this," there was no evidence that Mr. Stein |
| 14:34:50 | 9 | was in Garden City except for February of 2016 when he |
| 14:34:57 | 10 | was on one -- I think it may have been twice in February |
| 14:35:01 | 11 | of 2016.  There's no evidence presented that he was ever |
| 14:35:04 | 12 | in Garden City after that.  All the information they got |
| 14:35:08 | 13 | was from Dan Day. |
| 14:35:11 | 14 | THE COURT:  Mr. Pratt, they made their choices. |
| 14:35:14 | 15 | MR. PRATT:  And I understand that, Your Honor. |
| 14:35:16 | 16 | And Patrick Stein takes full responsibility for what he |
| 14:35:21 | 17 | said and what he did.  But his choices weren't always |
| 14:35:25 | 18 | made on true information.  They were made on information |
| 14:35:31 | 19 | that was coming from the outside.  A lot of times that |
| 14:35:36 | 20 | information was coming strictly from Dan Day.  That's |
| 14:35:38 | 21 | what we're telling the Court. |
| 14:35:43 | 22 | Patrick takes responsibility for what he said and |
| 14:35:46 | 23 | did during this case.  He said those hateful things on |
| 14:35:49 | 24 | the tapes.  He sent those vile text messages to Brian. |
| 14:35:53 | 25 | He delivered the 300 pounds of fertilizer to Brian in |

14:35:59  1   October 14th.  He is simply asking that his actions be

14:36:02  2   viewed in the light of the totality of the circumstances.

14:36:06  3   And that is why they asked for the entrapment defense

14:36:11  4   during trial.  And that is why we presented an imperfect

14:36:16  5   entrapment defense in our sentencing memo.

14:36:23  6        Now, I would like to move on a little bit and talk

14:36:26  7   about substance abuse.  The Government's position, as set

14:36:29  8   out in a sentencing memo, is that Patrick's "history of

14:36:34  9   substance use and mental health issues, most of which the

14:36:39  10  defendant indicated to USPO were resolved prior to the

14:36:42  11  start of the instant offenses, are not of a severity that

14:36:46  12  counsels leniency."

14:36:49  13       Having spent over 20 years representing people

14:36:53  14  with mental health and drug issues, I find the

14:36:56  15  Government's position either highly naive or

14:37:00  16  intentionally obtuse.  Drinking a 12-pack of beer in one

14:37:05  17  sitting is not a sign of simple use.

14:37:07  18       THE COURT:  And voluntary intoxication is not a

14:37:09  19  legal defense.

14:37:10  20       MR. PRATT:  And I'm not saying it is a legal

14:37:11  21  defense, Your Honor.  I'm saying it's mitigation.

14:37:15  22       Five inpatient treatments beginning in 1986 and

14:37:20  23  continuing until 2016 is not a sign of simple use.

14:37:24  24  Needing to be medically detoxed from both methamphetamine

14:37:27  25  and alcohol is not a sign of simple use.  Needing to

14:37:32  1   drink a bottle to a -- half a bottle to a bottle of

14:37:36  2   Everclear grain alcohol a day is not a sign of simple

14:37:42  3   use.  Still meeting the criteria for a level one

14:37:45  4   outpatient treatment as late as December 6, 2016, is not

14:37:49  5   a sign of simple use.  These are all signs of long-term

14:37:54  6   addiction, of someone who has been fighting addiction for

14:37:58  7   their entire life.

14:37:59  8        Your Honor, you have been on the bench for over

14:38:02  9   ten years, and in that time I know that I alone have

14:38:08  10  argued to this court at least a dozen times the effects

14:38:12  11  of addiction to both meth and alcohol, and that stopping

14:38:17  12  their use does not simply resolve the problem.

14:38:20  13       As this court is aware, the research shows that it

14:38:24  14  takes as little as six months and as long as 18 months

14:38:29  15  from the last use of methamphetamine for the brain to

14:38:31  16  rewire itself.  Even assuming best case, Patrick's brain

14:38:36  17  would have been under the effects of meth well until

14:38:39  18  December 2016, two months after he was arrested.

14:38:43  19       I'm sure this court has heard just as much, if not

14:38:47  20  more, about mental health as it has about substance

14:38:49  21  abuse.  Given the current climate of the mental health

14:38:53  22  epidemic in this country, it is one thing to argue that a

14:38:56  23  person's mental health condition is not sufficient for

14:38:59  24  the Court to grant leniency, a position we disagree with.

14:39:03  25  It is something totally different to take a cavalier

14:39:06   1   attitude that because someone is not currently under

14:39:09   2   professional care, their mental health issues have

14:39:12   3   resolved themselves.

14:39:13   4       The report on mental health in America puts the

14:39:17   5   number of adults who have mental health issues and are

14:39:20   6   not receiving treatment at 56.4 percent nationally and

14:39:26   7   56.1 percent in Kansas.  Under the Government's

14:39:31   8   reasoning, their issues must be resolved or they would be

14:39:35   9   receiving treatment.

14:39:36   10      Your Honor, for reasons previously stated, at this

14:39:41   11  time we are not going to be putting on any additional

14:39:43   12  evidence or argument regarding Patrick's history or

14:39:46   13  characteristics, but would rely on the information

14:39:49   14  already provided to the Court through our sentencing

14:39:51   15  memorandum and the presentencing report, and as well as

14:39:54   16  the Government's Exhibit 354 and 355 that were submitted

14:40:00   17  last night.  We believe that these documents provide

14:40:03   18  sufficient information for the Court to grant a variance

14:40:06   19  from the guideline, if not alone, then under the totality

14:40:11   20  of the circumstances.

14:40:13   21      The Government has asked this court to impose a

14:40:16   22  life sentence, life without the possibility of parole.

14:40:21   23  They're asking for a life sentence for a case that from

14:40:24   24  the very beginning was under FBI control.  Before there

14:40:28   25  was even a hint of a plan, the FBI had, in the words of

14:40:35  1  Patrick Stein, "infiltrated the militia and knew

14:40:37  2  everything that was going on."  They are asking for a

14:40:39  3  life sentence for a case that, even after Curtis Allen

14:40:42  4  and Gavin Wright tested HMTD, did not rise to the level

14:40:47  5  of immediate disruption; a life sentence on a case that,

14:40:50  6  after Dan Day told the Government the defendants had

14:40:52  7  everything they needed to build a bomb, still did not

14:40:55  8  rise to the level of immediate disruption; a life

14:41:00  9  sentence on a case that on September 20th, 2016, was only

14:41:05  10  worthy of a maximum 20 years in prison under 18 U.S.C.

14:41:09  11  844(i) because the meeting with the UCE had yet to take

14:41:16  12  place; a life sentence on a case that requires the

14:41:20  13  parsing of words.  At what point does it stop being an

14:41:25  14  844(i) explosive and become a 2332a weapon of mass

14:41:32  15  destruction?

14:41:33  16       In its brief, the Government cites *United States*

14:41:36  17  *v. Nichols* for the justification for a life sentence in

14:41:39  18  this case.  "For punishment purposes, there should be no

14:41:43  19  distinction between a conspiracy to use a weapon of mass

14:41:48  20  destruction and the use of such a weapon."  Such a rule

14:41:53  21  not only misreads the statute but takes away any

14:41:56  22  discretion this court may have in sentencing.

14:42:00  23       No, Congress did not create different punishments

14:42:03  24  in 2332a.  It created a range of punishments:  "Any term

14:42:11  25  of years or for life."  This allows the Court to weigh

14:42:17  1  the circumstances of the offense with the circumstances

14:42:20  2  of the offender and reach a sentence that is appropriate

14:42:24  3  for each case.

14:42:26  4      The conspiracy that Terry Nichols was part of to

14:42:31  5  blow up the Murrah Federal Building in Oklahoma City.

14:42:35  6  The conspiracy that Terry Nichols was part of injured

14:42:39  7  more than 680 people.  The conspiracy that Terry Nichols

14:42:42  8  was part of killed 168 people.  The conspiracy Patrick

14:42:50  9  Stein was a part of was under the surveillance of the FBI

14:42:53  10  before its inception to the moment he was arrested.

14:43:00  11      In their brief the Government highlighted the

14:43:02  12  following sentence:  "The legislators' special treatment

14:43:07  13  strongly suggest we should not distinguish between using

14:43:10  14  an explosive weapon of mass destruction or conspiring to

14:43:14  15  do so in determining the proper punishment in this case."

14:43:19  16      But the next few lines are just as instructive.

14:43:23  17  "Furthermore, the felony-murder statute does not require

14:43:28  18  actual commission of the predicate offense.  Rather, the

14:43:32  19  statute provides that inchoate offenses, such as an

14:43:35  20  attempt to commit the crime, are also sufficient.  This

14:43:40  21  lends further support for concluding that conspiring to

14:43:43  22  use an explosive weapon of mass destruction, also a form

14:43:48  23  of inchoate offense, may suffice as a predicate offense

14:43:52  24  to felony-murder.

14:43:54  25      "We understand that there are degrees of inchoate

14:43:57  1   offenses, and conspiracy requires much less than intent.

14:44:02  2   '[U]nder attempt law, it must be shown that the defendant

14:44:04  3   has taken . . . a 'substantial step' towards commission

14:44:07  4   of the crime . . .   Conspiracy law, however, attacks

14:44:11  5   inchoate crime at a far more incipient stage -- the crime

14:44:16  6   of conspiracy is complete at the time of the

14:44:19  7   agreement . . .'  However, given the allegations of overt

14:44:22  8   acts stated in the indictment, we are persuaded

14:44:25  9   Mr. Nichols' actions were more akin to attempt and should

14:44:29  10  not be treated any differently at sentencing."

14:44:31  11      So while the Government wants this court to look

14:44:34  12  at *Nichols* and see conspiracy case equals life sentence,

14:44:38  13  this is simply clouding the issue.

14:44:40  14      Another important distinction is the law of

14:44:43  15  conspiracy.  According to the Tenth Circuit and the

14:44:47  16  Government, with the exception of Gavin Wright, the

14:44:50  17  conspiracy was complete on June 14th, 2016, in Brody

14:44:55  18  Benson's field.  For certain, it included Mr. Wright on

14:44:59  19  July 19th, 2016, during the meeting at the Burch

14:45:04  20  residence, and on August 14th, 2016, when a target was

14:45:10  21  chosen.  But the federal Government doesn't do ordinary.

14:45:13  22  The federal government does sexy.  The federal government

14:45:16  23  doesn't want to arrest them when they're only talking

14:45:20  24  about bombing.  The Government wants to arrest them for

14:45:23  25  the actual attempt, when they're actually trying to push

14:45:26  1   the button.  But Curtis Allen's arrest on October 11th,

14:45:30  2   2016, put a crimp in their plans and they were stuck with

14:45:35  3   a conspiracy that they eventually oversaw from the

14:45:40  4   beginning.

14:45:41  5       Your Honor, I have not spent time going through

14:45:44  6   the 3553(a) factors point by point, as I believe that our

14:45:49  7   sentencing memo has done a sufficient job of that.  I'm

14:45:52  8   also confident that this Court knows those factors better

14:45:55  9   than I do, and so I did not want to get bogged down in

14:45:58  10  the minutia.

14:45:59  11      But, in closing, I would like to say that I have

14:46:02  12  spent many, many hours talking with Patrick Stein in

14:46:06  13  person and over the phone, and I know that he takes

14:46:09  14  ownership of the things that he said and the things that

14:46:13  15  he did that led to his conviction.  He is the only

14:46:17  16  defendant that gave a post-arrest interview, and while he

14:46:20  17  did not come out and admit their plans, there can be no

14:46:24  18  question from what he did say as to what those plans

14:46:30  19  were.

14:46:30  20      Patrick's only contention has, from the beginning,

14:46:33  21  been that the FBI, through their paid informant Dan Day,

14:46:38  22  helped to move along the defendants down the path that

14:46:41  23  led to their convictions.  That was the reason he

14:46:45  24  requested an entrapment instruction during trial.

14:46:49  25      Patrick Stein and the other defendants did not

14:46:52   1   commit these crimes in a vacuum, devoid of outside

14:46:56   2   influences, and that needs to be taken into consideration

14:46:59   3   by this court when imposing sentence that is sufficient

14:47:03   4   but not greater than necessary.

14:47:06   5          Thank you.

14:47:07   6          THE COURT:  Thank you, Mr. Pratt.

14:47:11   7          MR. MATTIVI:  Judge, we need to have something in

14:47:18   8   the record because I anticipate that there's going to be

14:47:20   9   an appeal from the defendants.

14:47:22  10          THE COURT:  I think that's a safe bet.

14:47:24  11          MR. MATTIVI:  Right.  So Mr. Pratt has raised the

14:47:26  12   issue of an email that I sent, and he's called it charge

14:47:29  13   manipulation.  And I know the Court discounted it earlier

14:47:32  14   and Ms. Berkower offered to address it and the Court said

14:47:34  15   that there was no need because it wasn't going to enter

14:47:36  16   into your decision-making.

14:47:37  17          THE COURT:  I think Ms. Berkower and I were

14:47:39  18   talking about something else.  I don't recall exactly

14:47:41  19   what it was.

14:47:41  20          MR. PRATT:  No, that email is attached as an

14:47:43  21   exhibit.

14:47:43  22          THE COURT:  No, I read the email.  But I think

14:47:45  23   Ms. Berkower and my conversation -- I don't recall now

14:47:47  24   what it was, but I don't think we were talking about

14:47:49  25   that.

1-25-19   USA v. STEIN   No. 16-10141-02                    93

```
14:47:50   1          MR. MATTIVI:  From our perspective, you were, so
14:47:52   2   maybe we misunderstood.  But my only point is we need to
14:47:55   3   have something in the record because we need to be able
14:47:57   4   to refer to it in the event that there is an appeal, and
14:47:59   5   it pertains to that email.  And Mr. Pratt has
14:48:03   6   characterized it as having to do with the interaction of
14:48:07   7   the undercover.
14:48:07   8          In reality what that email had to do with is the
14:48:11   9   email came after Mr. Day reported to the agents that
14:48:16  10   Wright and Allen had successfully manufactured HMTD.
14:48:19  11   That's what prompted the email, not what the defense has
14:48:22  12   represented.  And so all I needed is for that to be in
14:48:26  13   the record.  I will sit down and be quiet.
14:48:27  14          THE COURT:  Is there a piece of evidence that you
14:48:29  15   think needs to be in the record or merely your
14:48:33  16   explanatory statement?
14:48:33  17          MR. MATTIVI:  I think the timeline is there.  I
14:48:35  18   think if we go back in depth and look at the timeline of
14:48:37  19   the trial that will be clear but I wanted something in
14:48:40  20   the record at this hearing we could point to in the event
14:48:41  21   there's an appeal.
14:48:41  22          THE COURT:  All right.  Well, you've made your
14:48:41  23   explanatory statement.
14:48:45  24          Mr. Pratt?
14:48:45  25          MR. PRATT:  I would like to put in the record that
```

| 14:48:47 | 1 | my understanding from the Government, Mr. Day indicated |
| 14:48:51 | 2 | that the HMTD had been manufactured on the -- the |
| 14:48:59 | 3 | confirmation of that had been on September 13th, 2016, at |
| 14:49:07 | 4 | a meeting in Sublette.  And the email says, "with the |
| 14:49:14 | 5 | events planned in the next several days."  So clearly it |
| 14:49:19 | 6 | is not talking about an event that occurred seven days |
| 14:49:23 | 7 | earlier.  I'm just -- |
| 14:49:26 | 8 | THE COURT:  These are all appellate arguments. |
| 14:49:28 | 9 | MR. PRATT:  I understand that, Your Honor, but I |
| 14:49:30 | 10 | wanted to get that in the record as well. |
| 14:49:32 | 11 | THE COURT:  Very well.  Are we all satisfied with |
| 14:49:34 | 12 | the status of the record? |
| 14:49:35 | 13 | MR. MATTIVI:  We are, Your Honor.  Thank you. |
| 14:49:37 | 14 | MR. PRATT:  Yes, Your Honor. |
| 14:49:38 | 15 | THE COURT:  Mr. Stein, at sentencing hearings such |
| 14:49:42 | 16 | as this, I always give the defendant both an opportunity |
| 14:49:45 | 17 | to make any statement to me you might wish to make in my |
| 14:49:50 | 18 | consideration of sentencing, as well as the opportunity |
| 14:49:51 | 19 | to have the last word; in other words, to be the last |
| 14:49:54 | 20 | thing before I formulate the tentative sentence.  You are |
| 14:49:57 | 21 | not required to say anything at this hearing, but if |
| 14:50:00 | 22 | there's anything you'd like to say, I'll be happy to hear |
| 14:50:03 | 23 | from you at this time. |
| 14:50:05 | 24 | THE DEFENDANT:  I would, Your Honor. |
| 14:50:06 | 25 | THE COURT:  All right.  Very well.  Mr. Shultz, |

1-25-19   USA v. STEIN   No. 16-10141-02          95

14:50:12   1   can you make sure the microphone's -- thank you.

14:50:15   2          THE DEFENDANT:   Thank you, Your Honor, for

14:50:17   3   allowing me to say a few words.

14:50:20   4          To my family and friends, I sincerely apologize

14:50:25   5   for the literal hell that this has put you all through,

14:50:29   6   everything from the harassment from the press, the

14:50:31   7   embarrassment to my name, our name, the Stein name, the

14:50:37   8   constant questioning from the neighbors, the rumors and

14:50:40   9   the lies that go around that you have to defend and

14:50:43   10  correct, the financial burdens, travel burdens, missing

14:50:48   11  work, having to take over the responsibilities of the

14:50:53   12  farm that were mine, and many more, I'm sure, that I'm

14:50:58   13  not even listing, but most of all, the heartbreak of not

14:51:02   14  being able to see, hug, kiss, love or share and make

14:51:06   15  memories like we used to do all the time.   I know this

14:51:13   16  has been extremely hard on all of you.   I take full

14:51:17   17  responsibility for everything I said and everything I

14:51:21   18  did.   Nobody forced me to do any of it.

14:51:28   19         Mom, Dad, Doug, Alicia, Rhonda, Kendra, Nichole,

14:51:49   20  Tyler, Brandon, Kenny, Susie, Carla, and Linda, from the

14:51:56   21  bottom of my heart and the deepest part of my soul, I'm

14:52:03   22  so sorry that you've been affected by what I did.   Thank

14:52:13   23  you for standing with me and supporting me through this,

14:52:19   24  what has and continues to be the hardest time in my life.

14:52:25   25  Without your support, I couldn't even imagine what I

14:52:29   1   would have done.  I love you all more than you will ever

14:52:32   2   know.

14:52:35   3        Your Honor, thank you for refereeing and directing

14:52:40   4   for the last two years a process that's been back and

14:52:44   5   forth, up and down, inside and out, and, for me, a

14:52:48   6   personal hell on earth, without giving up or losing your

14:52:55   7   mind yourself.

14:52:56   8        I ask you to please grant me as much leniency as

14:53:01   9   you possibly can when handing down my sentence so I can

14:53:05   10  get back to my family, meet the grandkids that I haven't

14:53:07   11  met yet, and get back to farming so my dad and Kenny can

14:53:13   12  retire, without having to sacrifice our farms.  I've

14:53:18   13  learned valuable lessons through the last 28 months, and

14:53:22   14  don't plan on revisiting anything that has put me here

14:53:25   15  today.  Thank you.

14:53:28   16       THE COURT:  Thank you, Mr. Stein.

14:53:34   17       Well, as I indicated this morning, I set these

14:53:37   18  sentences to be scheduled separately because I think each

14:53:40   19  sentencing is a separate issue and needs separate

14:53:43   20  consideration and determination by the Court, and I

14:53:48   21  intend to and have and will give separate consideration

14:53:50   22  to each.

14:53:51   23       That being said, there are some factors that in my

14:53:55   24  consideration that I've done in contemplation and

14:53:59   25  preparation for today that I've thought about that apply

14:54:02   1   to all three cases, all three defendants, and then, of

14:54:07   2   course, some that apply individually to each defendant.

14:54:10   3   I noted this morning in Mr. Allen's sentencing some of

14:54:13   4   those factors that I thought apply to all three, and I

14:54:17   5   think because I'm having separate hearings I should

14:54:19   6   review those first, and I intend to do so.

14:54:21   7         First, as I noted and as has been discussed here

14:54:24   8   with counsel and me this morning, because they heard my

14:54:27   9   comments this morning, although Mr. Stein, of course, did

14:54:30   10  not, I have had tremendous respect for the guidelines.

14:54:36   11  The law requires me to consider it but it does not

14:54:38   12  require me to follow the guidelines.  In some ways I

14:54:41   13  noted that since I've been on the bench I have perhaps

14:54:45   14  deviated or departed from the guidelines more than I

14:54:47   15  thought I would coming over here from my prior job, but

14:54:50   16  I've always had a lot of respect for them, in part

14:54:53   17  because they promote uniformity in sentencing nationwide

14:54:55   18  so that similar defendants, as is, of course,

14:54:58   19  hypothetical, aspirational, who are facing similar crimes

14:55:01   20  do not receive wildly different sentences, whether in

14:55:05   21  courtrooms on different coasts or on different floors of

14:55:08   22  a courthouse.

14:55:09   23        But I found the guidelines unsatisfactory in this

14:55:15   24  case because, as Ms. Berkower and I discussed, she having

14:55:18   25  heard my comments this morning, I feel like -- I guess

14:55:22  1  not in all cases.  Ms. Hahn directed her and, through

14:55:28  2  her, me, to situations where that would not apply.  But

14:55:31  3  in many cases that are like this, the effect of the

14:55:33  4  guidelines, with both a criminal history category

14:55:35  5  enhancement and the offense level enhancement, would tend

14:55:38  6  to throw almost all cases into the life sentence

14:55:42  7  category.

14:55:42  8       And I find that dissatisfactory both because, as I

14:55:46  9  discussed with Ms. Berkower, not all terrorism offenses

14:55:50  10  are the same.  Some are more serious than others, which

14:55:53  11  she agreed to.  And not all defendants have equal

14:55:58  12  culpability.  But to follow the guideline would be to

14:56:00  13  throw all of these types of cases into a life sentence.

14:56:04  14  And I found that and find that unsatisfactory and

14:56:08  15  inadequate for the particularized determination that I'm

14:56:11  16  required by law to give in sentencing, and I find it

14:56:14  17  incompatible with the requirements that I've considered

14:56:18  18  under 18 U.S.C. 3553(a) in determining what an

14:56:21  19  appropriate sentence is in this case.

14:56:22  20       And so for that particularized consideration and

14:56:27  21  for comparative purposes among defendants, I determined

14:56:31  22  that I needed to fashion a sentence separate from the

14:56:34  23  guidelines.  I noted, as we discussed at our earlier

14:56:40  24  objections hearing, that the terrorism enhancement

14:56:43  25  statute provides, in the event that it's not applied, the

14:56:48   1   12-level enhancement and the criminal history category

14:56:51   2   guideline enhancement, then the Court should consider an

14:56:54   3   upward variance or departure from the recommended

14:56:57   4   guideline sentence to account for its nonapplication.

14:56:59   5        And so it's my -- as I noted this morning, it's my

14:57:04   6   determination that the sentence or the range of sentence

14:57:08   7   that I've considered in looking at these cases, I

14:57:12   8   believe, would be substantially unchanged even had I

14:57:14   9   sustained the objection to the terrorism enhancement.  I

14:57:18   10  did not, of course, for reasons I've explained elsewhere,

14:57:21   11  but I nevertheless find that trying everybody under the

14:57:29   12  life category is inadequate and unsatisfactory.

14:57:31   13       Significant factors that I think apply to all

14:57:33   14  three defendants in this case, which I will again review,

14:57:37   15  they were convicted by the jury of conspiring to plan and

14:57:42   16  carry out an extremely significant terroristic attack, an

14:57:47   17  attack that, had it been successful, and we can quibble

14:57:50   18  with whether or not it could have been successful,

14:57:52   19  whether frankly the defendants, left to their own

14:57:55   20  devices, could have actually carried this off.  That is,

14:57:58   21  of course, unknowable, although I will concede that there

14:58:00   22  is room for some doubt that they could have actually

14:58:02   23  achieved this, but certainly they intended to, they

14:58:05   24  wanted to, they planned to, and they thought they could

14:58:07   25  carry it out.

14:58:07   1         Had they done so, it would have resulted in mass

14:58:10   2    casualities, incredible disruption, and there's been some

14:58:14   3    reference or comparison of this case today to the

14:58:18   4    Oklahoma City bombing.  And one case that I find -- one

14:58:20   5    factor that I find makes this worse than OKC is that in

14:58:26   6    this case the planned and intended attack was motivated

14:58:30   7    by a particularly heightened animus towards race,

14:58:33   8    religion, and national origin, the very types of things

14:58:37   9    that this republic safeguards and protects against.  So I

14:58:43   10   find that obviously a very disturbing and significant

14:58:48   11   enhancement to it.

14:58:49   12        Again, because the conviction is of conspiracy,

14:58:52   13   it's of no small note that the defendants engaged in

14:58:58   14   detailed planning, an organization to advance towards

14:59:03   15   this purpose, and they did so having -- there are, of

14:59:06   16   course, hours of recorded conversations that obviously

14:59:08   17   they did not know were being recorded, and they bear no

14:59:12   18   evidence that any of the defendants really had second

14:59:14   19   thoughts, had hesitation, had thoughts of withdrawal, had

14:59:19   20   remorse for their plans.  So that factors into my

14:59:25   21   considerations with respect to the conspiracy involved

14:59:27   22   here.

14:59:27   23        I noted this morning that, and I just noted, that

14:59:30   24   there is some skepticism as to whether they could have

14:59:33   25   carried it off, but that's not legally relevant under the

**JOHANNA L. WILKINSON, CSR, CRR, RMR**
U.S. District Court, 401 N. Market, Wichita, KS 67202
(316) 315-4334

14:59:38   1   established law and with respect to the law of

14:59:40   2   conspiracy.  There are arguments made in defense brief

14:59:42   3   that no one was actually injured physically in their

14:59:46   4   events.  That's factually true, but, again, not

14:59:48   5   particularly legally relevant -- not particularly legally

14:59:52   6   relevant under conspiracy application.  And as we heard

14:59:54   7   this morning, the intended victims have quite appreciable

14:59:59   8   emotional consequences from discovering that strangers to

15:00:04   9   them, who knew nothing of them, planned to blow them up.

15:00:11   10          Finally, as I've discussed, I don't find the FBI's

15:00:16   11   actions in this case to either be wrong or even to

15:00:20   12   diminish the guilt or culpability of the defendants in

15:00:24   13   that they chose not to try to dissuade the defendants as

15:00:27   14   they did unsuccessfully in the Fort Riley case, I believe

15:00:32   15   it was, but they instead chose to monitor and report what

15:00:37   16   was going on.

15:00:37   17          I found that not to be entrapment at the trial.  I

15:00:40   18   find it not to be imperfect entrapment here.  I find the

15:00:45   19   FBI's approach to monitor and not alienate the only

15:00:49   20   source of information into what the defendants' planning

15:00:55   21   to not be condemnatory nor to be exculpatory towards the

15:01:00   22   guilt of the defendants in this case.

15:01:04   23          I find this was not just a case of talk.  I've

15:01:08   24   already discussed that in my conversations with counsel

15:01:10   25   this morning, not just an exercise of First Amendment's

15:01:15  1  right, but it was actually detailed planning to carry out

15:01:17  2  a horrific offense.

15:01:18  3       With respect to Mr. Stein, his counsel has argued

15:01:24  4  for him, both in the briefs and here this morning, that

15:01:31  5  two things, I guess, that they -- pardon me -- that they

15:01:36  6  asked me to consider in mitigation of his sentence:  one,

15:01:41  7  that he was raised in an alcoholic home and himself had

15:01:44  8  alcohol and substance abuse problems.  They noted he had

15:01:49  9  family business and personal failures.  And secondly,

15:01:52  10 that the theoretical attack was several weeks off and was

15:01:55  11 very unsophisticated.  As to the second point first,

15:01:58  12 because the conviction was for conspiracy, because they

15:02:01  13 were clearly conspiring to carry out this attack, I find

15:02:03  14 that argument to be of no legal moment.

15:02:07  15      As to the first with respect to the home and

15:02:09  16 background, it's a sad comment, I guess, to make, but I

15:02:16  17 would say that the majority, the overwhelming majority,

15:02:20  18 of defendants in my courtroom come from some or similar

15:02:28  19 backgrounds.  And so to the extent that defendants are

15:02:30  20 entitled to allowance for that, it would almost be built

15:02:34  21 into the system because so many of them have it.

15:02:36  22      I further find, as I think most courts have found,

15:02:40  23 that, particularly with respect to, I guess, this case,

15:02:44  24 that that's not grounds that explain or excuse the

15:02:49  25 horrific nature of the conspiracy involved here.  And I

15:02:53   1   did not find it to be a motivation or a factor to lessen

15:02:58   2   their guilt.

15:02:58   3        There's considerable discussion about the events

15:03:05   4   and the atmosphere of 2016 and how divisive they were

15:03:13   5   with respect to issues that touched on what the

15:03:14   6   defendants were concerned about.  And, again, I noted

15:03:19   7   this earlier this morning, to claim that the 2016

15:03:22   8   election cycle was unusually divisive is primarily to

15:03:26   9   show one's ignorance of American history.  A price, I

15:03:28   10  guess, of our democracy, of our republic, is that we

15:03:33   11  have -- and I think Ms. Berkower touched on this -- we

15:03:36   12  have extremely divisive elections because our system is

15:03:39   13  to resolve those disputes through election, not through

15:03:42   14  acts of violence.

15:03:45   15       I think a detailed study of American history would

15:03:48   16  show that although perhaps the issues in this last

15:03:51   17  election cycle were unique, the divisive nature of it was

15:03:54   18  not.  I compared this morning it to the 1968 presidential

15:03:59   19  election cycle, which really generated more civil and

15:04:03   20  civic unrest and divisiveness in our society than I think

15:04:06   21  the 2016 cycle did.  And I don't think that those

15:04:13   22  discussions are at all relevant to excusing or even

15:04:16   23  explaining what these defendants planned to do.  There

15:04:20   24  were issues that were discussed but they do not begin to

15:04:27   25  connect a dot from those discussions to these plans.

| | | |
|---|---|---|
| 15:04:30 | 1 | I do note that Mr. Stein, other than the |
| 15:04:34 | 2 | enhancement to criminal history category VI by the |
| 15:04:36 | 3 | terrorism enhancement -- or terrorism, yeah, the |
| 15:04:38 | 4 | terrorism enhancement -- has no significant criminal |
| 15:04:41 | 5 | history.  He had several arrests, even one for an |
| 15:04:45 | 6 | attempted burglary, which was expunged, but I find his |
| 15:04:48 | 7 | criminal history not particularly a negative |
| 15:04:50 | 8 | consideration to these issues.  But what I do find, not |
| 15:04:54 | 9 | just about these defendants but about Mr. Stein in |
| 15:04:56 | 10 | particular, was that he was extraordinarily enthusiastic |
| 15:05:03 | 11 | about this event. |
| 15:05:05 | 12 | I think I would say he was much more enthusiastic |
| 15:05:10 | 13 | than his codefendants.  They were all fully in, but he |
| 15:05:16 | 14 | was the one most enthusiastic.  Mr. Shultz, I think, |
| 15:05:21 | 15 | noted my "extremely loquacious" comment.  But it's not |
| 15:05:24 | 16 | just that he was talkative.  Some people talk a lot. |
| 15:05:28 | 17 | Mr. Stein's talk was filled with virulent hatred and |
| 15:05:33 | 18 | animus towards Muslims and towards immigrants, and he had |
| 15:05:38 | 19 | talked about that more than others. |
| 15:05:39 | 20 | When the objections were filed to the U.S. |
| 15:05:44 | 21 | sentencing guideline calculation in this case, my initial |
| 15:05:49 | 22 | read of those was different once I get into them.  For |
| 15:05:52 | 23 | instance, when I saw that there was an objection to the |
| 15:05:54 | 24 | terrorism enhancement, I initially sort of scoffed at |
| 15:05:57 | 25 | that.  I determined, as my written order of a few weeks |

15:06:00  1  ago showed, ultimately that that was a substantive

15:06:04  2  objection, although I, in the end, overturned that

15:06:07  3  objection.  There was much more behind that objection

15:06:10  4  than I thought on first reading.

15:06:12  5      On the other hand, when I first read the objection

15:06:16  6  to Mr. Stein not being a leader/organizer, I scoffed at

15:06:21  7  that objection.  But as I got into what the guidelines

15:06:25  8  actually require for a leader/organizer -- and that's an

15:06:28  9  enhancement that has a great deal of published history to

15:06:31  10  it -- I determined that applying those standards that are

15:06:34  11  well-established did not allow me to find Mr. Stein's

15:06:42  12  guideline enhanced by being a leader/organizer.

15:06:44  13      To say his guideline was enhanced, of course, is

15:06:46  14  somewhat of a misnomer because his numbers were well

15:06:49  15  above the top end of the offense level anyway, so at the

15:06:52  16  end of the day, whether I would have sustained or

15:06:54  17  overturned that finding, his ultimate guideline level

15:07:00  18  would have been unchanged.  But I found based on those

15:07:02  19  standards, that he did not meet the standards of

15:07:05  20  leader/organizer.  But to leave that discussion there is

15:07:09  21  to misrepresent the role that Mr. Stein played in this

15:07:12  22  conspiracy.

15:07:13  23      Clearly, he was the chief cheerleader for the

15:07:17  24  hatred and the animus expressed towards the Muslim

15:07:20  25  immigrants.  Clearly he was the chief sort of rallier of

15:07:26   1   emotions.  If he'd have not technically filled the role

15:07:29   2   of leader/organizer, he was the one that expressed the

15:07:33   3   most passion, the most vigor towards these reprehensible

15:07:40   4   acts that were planned.  He continued that through the

15:07:45   5   events of the final hours.  After Mr. Allen had been

15:07:52   6   arrested, after Mr. Wright, out of fear, had withdrawn,

15:07:56   7   Mr. Stein was still full steam ahead.  And that's

15:07:59   8   because, in all events, he was the one who was, again,

15:08:03   9   not a leader/organizer, but was really emotionally

15:08:07   10  driving the atmosphere and the attitude of hate which fed

15:08:12   11  this unholy plan that these defendants were carrying out.

15:08:16   12       Frankly, that continued, even after his arrest.

15:08:21   13  He was starkly unrepentant in his interview with the FBI

15:08:25   14  agents, as set forth in one of the sentencing

15:08:29   15  memorandums, completely justifying in his positions,

15:08:34   16  continuing to be passionate and justifying that what he

15:08:38   17  was doing was appropriate.  And, frankly, that continues,

15:08:44   18  I think, to this very day.

15:08:47   19       Mr. Allen this morning made a simple but, I

15:08:51   20  thought, powerful statement that he was so ashamed of

15:08:54   21  what he had done that he really was unable to even talk

15:08:57   22  about it and asked his counsel to read his statement.

15:09:00   23  And I found in that some, admittedly belated, sense of

15:09:07   24  remorse, but that was something that I took into account

15:09:12   25  in announcing the sentence that I did for Mr. Allen.

15:09:15  1        Mr. Stein loves his family and is deeply grieved
15:09:19  2   by the fact that he has put them through what he has put
15:09:22  3   them through, that they've suffered the consequences for
15:09:25  4   his actions.  But even today I hear no remorse from him
15:09:30  5   of what his actual plans were, and it's my opinion that
15:09:34  6   he has none.
15:09:37  7        As indicated, I don't intend to follow the
15:09:41  8   guideline sentence for Mr. Stein, but in consideration of
15:09:42  9   all these factors and in consideration of the 3553(a)
15:09:45  10  factors that apply here, it's my opinion that an
15:09:51  11  appropriate sentence for Patrick Stein on this case is a
15:09:55  12  sentence of 30 years, or 360 months, incarceration.
15:09:59  13       Now, I asked myself, is that really a different
15:10:05  14  sentence than life for a 50-year-old man?  And it
15:10:10  15  probably isn't.  But I committed myself to a course of
15:10:13  16  conduct in this case that would allow me to give a
15:10:17  17  sentence that reflected the differences between the
15:10:20  18  defendants, which I thought was not only appropriate but
15:10:24  19  frankly was required by the law, by the sentencing law, a
15:10:30  20  course that would not be fulfilled, requirements, that
15:10:33  21  is, that would not be fulfilled if I simply gave
15:10:36  22  everybody a life sentence.
15:10:37  23       And so in order to fashion a sentence that
15:10:40  24  reflected both their varying roles in the conspiracy, and
15:10:43  25  as I've noted Mr. Stein, although I found, was not a

1-25-19 USA v. STEIN No. 16-10141-02          108

15:10:46  1  leader/organizer, was the emotional motivator and that

15:10:51  2  reflects their current status.  I found in Mr. Allen,

15:10:54  3  again, a little bit of belated remorse.  I find none in

15:11:00  4  Mr. Stein.  So this course that I've committed myself to

15:11:03  5  allows me to differentiate a sentence between the

15:11:05  6  defendants, which I think is appropriate.  I don't know

15:11:08  7  that there's a difference between a sentence of 30 years

15:11:10  8  or of life for Mr. Stein, but having set my course on

15:11:12  9  that conduct, I think that's an appropriate way to

15:11:16  10  proceed.

15:11:16  11     So having obviously sat through the trial and

15:11:21  12  having heard all of the evidence with respect to

15:11:24  13  Mr. Stein, having obviously read the matters submitted at

15:11:27  14  length for today's sentence, although not giving

15:11:31  15  Mr. Stein the life sentence the guidelines recommend for

15:11:33  16  Count 1, it's my intent and I propose as a tentative

15:11:37  17  sentence a term of 360 months on Count 1.  Count 2 has a

15:11:43  18  statutory maximum of ten years, or 120 months, which I

15:11:46  19  will impose to run concurrent to the sentence to Count 1.

15:11:49  20     Following that, if there is a following, I will

15:11:53  21  place Mr. Stein on supervised release for ten years on

15:11:56  22  Count 1 and a maximum for three years on Count 2, to run

15:12:00  23  concurrently.

15:12:00  24     I do think this sentence, although quite lengthy,

15:12:07  25  is sufficient and not greater than necessary to reflect

15:12:10  1  the seriousness of the extraordinarily serious issues

15:12:13  2  that this case involved.  I think it will promote respect

15:12:17  3  for the law, not only among these defendants but among

15:12:21  4  others, and provide just punishment for the offenses of

15:12:23  5  which a jury convicted them.  I hope, and that's all that

15:12:29  6  I can ever do, that the sentence will afford adequate

15:12:32  7  deterrence to criminal conduct, either obviously by these

15:12:35  8  defendants or others in effecting that.

15:12:38  9       While he's on supervision, I intend to impose the

15:12:41  10 mandatory and special conditions of supervision set forth

15:12:43  11 in Part D of the presentence report.  Additionally, based

15:12:47  12 on his personal characteristics and history, and the

15:12:50  13 instant offense, I'm imposing a condition regarding

15:12:53  14 substance abuse and mental health treatment, both of

15:12:56  15 which, as Mr. Pratt noted in his allocution to me, I

15:13:00  16 think are merited based on his condition.  I do not and I

15:13:03  17 did not find them to be grounds for a more lenient

15:13:07  18 sentence than the one I proposed, but I do think they are

15:13:09  19 conditions that require a condition for treatment.

15:13:13  20      I'm restricting his participation in

15:13:16  21 anti-government activities.  I've spelled out in my

15:13:19  22 earlier order in this case the appropriate language that

15:13:21  23 I think comports with your First Amendment rights in that

15:13:24  24 regard.  And obviously, given the nature of this offense,

15:13:28  25 I believe the search and seizure condition of the

15:13:30  1  defendant and his property are appropriate.

15:13:32  2      Mr. Stein has no finances with which to pay a

15:13:36  3  fine. I'm not imposing one. But he is, by law, required

15:13:39  4  to pay a hundred-dollar special assessment for each of

15:13:41  5  the two counts of conviction, for a total of $200. He's

15:13:45  6  also obviously not a candidate for voluntary surrender.

15:13:47  7  I'll remand him to the custody of the marshals at the

15:13:49  8  conclusion of this hearing pending designation by the

15:13:52  9  Bureau of Prisons of an appropriate facility.

15:13:54  10      That is the tentative sentence of the court. Are

15:13:57  11  there objections to this sentence?

15:13:59  12      MS. BERKOWER: Your Honor, for the record, the

15:14:02  13  Government would ask to preserve its objection to the

15:14:05  14  reasonableness of the sentence.

15:14:06  15      THE COURT: That objection's preserved.

15:14:07  16      MS. BERKOWER: Thank you.

15:14:08  17      MR. PRATT: Your Honor, we would as well, both to

15:14:10  18  the procedural and to the substantive length of the

15:14:12  19  sentence.

15:14:13  20      THE COURT: All right. Defendant's objection as

15:14:15  21  both to the procedural and substantive nature of this

15:14:17  22  sentence is also preserved.

15:14:18  23      Do you have a recommendation, Mr. Pratt, as to a

15:14:21  24  place of confinement?

15:14:22  25      MR. PRATT: No, Your Honor. We -- I mean, we

15:14:25   1   would ask for a medical facility, given Mr. Stein has got

15:14:29   2   some health problems that the marshals have been dealing

15:14:31   3   with, but other than that --

15:14:32   4       THE COURT:  I'm aware of those and I will

15:14:33   5   recommend that the bureau place him in a medical

15:14:37   6   facility.

15:14:37   7       MR. PRATT:  We don't have a specific

15:14:39   8   recommendation.  Perhaps Springfield.

15:14:40   9       THE COURT:  I'll recommend they place him in a

15:14:43   10  medical facility to deal with his situations.

15:14:45   11      MR. PRATT:  Thank you.

15:14:46   12      THE COURT:  Mr. Stein, would you stand for the

15:14:47   13  sentence of the court.

15:14:48   14      (The defendant complies.)

15:14:49   15      THE COURT:  The Court determines that the

15:14:51   16  presentence investigation report, as previously corrected

15:14:53   17  or modified by this court, and the previously stated

15:14:56   18  findings are accurate and I'm ordering them incorporated

15:14:58   19  into the following sentence:  Pursuant to the Sentencing

15:15:01   20  Reform Act of 1984, it is the judgment of this court that

15:15:03   21  the defendant Patrick Eugene Stein is hereby sentenced to

15:15:06   22  the custody of the Bureau of Prisons for a term of 360

15:15:09   23  months on Count 1 of the indictment, 120 months on

15:15:14   24  Count 2 of the indictment, with those counts to be served

15:15:17   25  concurrently.  This term of imprisonment is to be

15:15:20  1   followed by a term of ten years of supervised release on

15:15:22  2   Count 1 and three years of supervised release on Count 2,

15:15:26  3   with those counts also to run concurrent to each other.

15:15:29  4        Within 72 hours of your release from the custody

15:15:31  5   of the Bureau of Prisons, the defendant is to report to

15:15:34  6   the probation office in the district in which he is

15:15:35  7   released, and while on supervision, he's to comply with

15:15:38  8   the mandatory and standard conditions of supervision

15:15:41  9   adopted by this court, as well as the special conditions

15:15:44  10  of supervision set forth in Part D of the presentence

15:15:46  11  report.

15:15:46  12       Defendant's ordered to pay the United States a

15:15:49  13  special assessment of $200 to the Crime Victims Fund

15:15:52  14  pursuant to 18 United States Code § 3013.  That

15:15:55  15  assessment's due immediately and may be satisfied while

15:15:58  16  in Bureau of Prisons custody.  No fine is imposed.

15:16:01  17       I'm required to advise both parties of their

15:16:04  18  respective rights to appeal this sentence and conviction.

15:16:06  19  Any appeal taken is subject to 18 United States Code §

15:16:10  20  3742.  I'd advise the defendant that it's your right to

15:16:13  21  appeal this conviction and sentence but only if you file

15:16:16  22  a timely notice of appeal within 14 days of the entry of

15:16:19  23  judgment in this case.  If you do not file such a notice

15:16:22  24  of appeal, you may lose your right to appeal.  If you

15:16:25  25  request, the clerk of the court will prepare and file a

15:16:27   1   notice of appeal in your behalf.  And if you cannot pay

15:16:29   2   costs of appeal, you can apply for leave to appeal in

15:16:31   3   forma pauperis.

15:16:31   4        That is the judgment and sentence of the court.

15:16:34   5   The defendant's remanded to the custody of the United

15:16:37   6   States Marshals pending designation of an appropriate

15:16:39   7   facility by the Bureau of Prisons.  I will request the

15:16:41   8   bureau consider placing him in a medical facility

15:16:44   9   appropriate to deal with his situations, as reflected in

15:16:48   10  his file.

15:16:48   11       Is there anything else that need to come before

15:16:50   12  the court regarding this defendant?

15:16:51   13       MR. MATTIVI:  Nothing known to the Government.

15:16:53   14  Thank you.

15:16:53   15       MR. PRATT:  No, Your Honor.  Thank you.

15:16:54   16       THE COURT:  We're going to take a recess until

15:16:56   17  3:40, at which point we'll continue -- or take up the

15:17:00   18  sentencing of Mr. Wright.  I would advise, I guess

15:17:03   19  primarily court security officers, that it doesn't look

15:17:05   20  we'll be out of here by 5:00, but we'll be here until

15:17:08   21  we're done.

15:17:09   22       Court's in recess until that time.

15:17:10   23       CLERK DAVENPORT:  All rise.

15:17:11   24       (Whereupon, the proceedings were concluded at 3:17

15:17:17   25  P.M.)

C E R T I F I C A T E

I, Johanna L. Wilkinson, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my hand on this the 12th day of February, 2019.


s/ Johanna L. Wilkinson
Johanna L. Wilkinson, CSR, CRR, RMR
United States Court Reporter